UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.                              )<br>)<br>SERGIO ELPIDIO ALCANTARA-, )<br>SALDANA                         )<br>"a/k/a Jose Delgado"            )<br>"a/k/a Erving Nieves"           )<br>"a/k/a "Ruben"                  )<br>"a/k/a "Sergio"                 )<br>)<br>CESAR ZAPATA                     )<br>"a/k/a Nani"                    )<br>"a/k/a Zupra"                   )<br>"a/k/a "Viejo"                  )<br>"a/k/a "Commandante"            )<br>)<br>HERIBERTO CARRASCO              )<br>"a/k/a Joselito"                )<br>"a/k/a Flaco," and              )<br>)<br>GEORGE SAMUELS                   )<br>     Defendants.                 ) | CRIMINAL NO. 05-10235-GAO |

**UNITED STATES' APPLICATION**
**FOR A POST-INDICTMENT RESTRAINING ORDER**

The United States, by and through its attorney, Michael Sullivan, United States Attorney for the District of Massachusett makes an application to this Court, pursuant to 21 U.S. §853(e)(1)(A), for an additional post-indictment restraining ord in the above-captioned case. On September 8, 2005, this Cou issued two restraining orders against real properties in this cas which are attached as exhibits. The current restraining order sought to preserve the availability of certain additional proper

1

that is subject to forfeiture in the above-styled criminal actio

The additional property to be restrained is:

> The contents (approximately $450,000) of The Bank of Western Massachusetts, Bank Account Number 0100116421, in the name of Pine Street Auto Sales. (the "Pine Street Account")

As grounds therefore, the government states as follows:

1. Pursuant to 21 U.S.C. §853(e)(1)(A), this Court authorized to enter restraining orders or injunctions, require t execution of satisfactory performance bond, or take any oth action to preserve the availability of property subject forfeiture.

2. On September 1, 2005, Sergio E. Saldana, Cesar Zapa Heriberto Carrasco and Geoge Samuels (the "Defendants") we indicted by a federal grand jury sitting within this district in Two-Count Indictment, charging Conspiracy to Distribute Cocaine, violation of 21 U.S.C. §§846 and 841(a)(1), Possession With t Intent to Distribute five Kilograms or More of Cocaine; violation of 21 U.S.C. §841(a)(1), and Aiding and Abetting, violation of 18 U.S.C. §2. The Indictment contained a forfeitu allegation, providing that the Defendants, upon conviction, sha forfeit to to United States, pursuant to 21 U.S.C. §853: ( all property constituting or derived from any proceeds the sa Defendants obtained directly or indirectly as a result of t charged offenses; and (2) any and all property used intended to be used in any manner or part to commit and

2

facilitate the commission of the offenses. The forfeitu[re] allegation noted that such property included, but was not limit[ed] to:

> (a) <u>31 Braywood Circle, Springfield, Massachusetts</u>, more fully described as a certain parcel of land with buildings thereon, being land in Springfield, Hampden County, Massachusetts in that part of Springfield known as Indian Orchard, being situated on Braywood Circle and being known and designated as Lot 6 (six) as shown on Section D on a plan of Homelands, so-called, which plan is recorded in the Hampden County Registry of Deeds in Book of Plans 9, Page 68 & 69, being the same premises conveyed in a deed from Marie Saldana to Marie Saldana and Sergio E. Saldana and recorded in the Hampden County Registry of deeds on August 10, 2005 at Book 15258, Page 571 (the "Braywood Circle Property");

> (b) <u>61 Appaloosa Lane, West Springfield, Massachusetts</u>, more fully described as a certain parcel of land with buildings thereon, being land known as Lot 4 (four) as shown on a plan entitled "Morgan Hills Estates" revised on December 29, 1999 prepared by D.L. Bean, Inc. and recorded in the Hampden County Registry of Deeds, Book of Plans 316, Page 67, being the same premises conveyed in deed from Vladimir Lapik to George Samuels and Kyanna M. Samuels and recorded in the Hampden County Registry of deeds on April 8, 2005 at Book 14932, Page 576 (the "Appaloosa Lane Property");

3. The Court has entered restraining orders and lis pende[ns] against both the Braywood Circle Property and the Appaloosa La[ne] Property.

4. Yesterday, September 12, 2005, the United States learn[ed] of the Pine Street account. Simultaneously with this motion, t[he] United States is filing a bill of particulars, specifically nami[ng] the Pine Street Account as subject to forfeiture pursuant to t[he]

already-existing forfeiture allegation of the Indictment additional property subject to forfeiture under 21 U.S.C. §853, (1) property constituting or derived from any proceeds the sa Defendants obtained directly or indirectly as a result of t: charged offenses; and/or (2) property used or intended to be us in any manner or part to commit and to facilitate the commission the offenses.

5. The transfer, movement, conveyance or dissipation the monies in the Pine Point Account by the Defendants or any th: party could render the monies in the Pine Point Account unavailab for forfeiture. Given the ease with which the monies can be ma unavailable for forfeiture, the need to preserve the availabil: of the subject property through the entry of the order request herein outweighs the hardship on any party against whom the ord is to be entered.

6. Any third party claims to the monies in the Pine Poi Account may be properly brought and resolved in ancilla proceedings conducted by this Court following the execution of Preliminary Order of Forfeiture and service of notice to a interested parties in accordance with the provisions of feder forfeiture law.

**BACKGROUND**

**Legal analysis**.

7.  In determining whether to issue a restraining order "[t]he return of the indictment by the federal grand jury . . . represents a determination of probable cause sufficient to issue restraining order under 21 U.S.C. §853(e)(1)(A) . . . ." United States v. Sellers, 848 F.Supp. 73, 75 (E.D.La. 1994); *accord*, In Billman, 915 F.2d 916, 919 (4th Cir. 1990)("[T]he government m 'seize property based on a finding of probable cause to belie that the property will ultimately be proven forfeitable.' T probable cause found by the grand jury satisfies the government burden of proving the allegations of the indictment." Unit States v. Property in Waterboro, 64 F.3d 752, 756 (1st Cir. 1995 see also, United States v. Thier, 801 F.2d 1463, 1468-69 (5th Ci 1986)(same); United States v. Bouler, 799 F. Supp. 581, 5 (W.D.N.C. 1992).  As noted in the legislative history of t Comprehensive Crime Control Act of 1984,

> For the purposes of issuing a restraining order, the probable cause established in the indictment or information is to be determinative of any issue regarding the merits of the government's case on which the forfeiture is to be based.

S.Rep. No. 225, 98th Cong., 2d Sess. 203 (1984), *reprinted in* 19 U.S. Code Cong. & Admin. News 3182, 3386.

8.  In the present case, the federal grand jury's Septembe 1, 2005 Indictment establishes probable cause that the charge crimes were committed. The Indictment, which contains a forfeitu allegation and the subsequent bill of particulars, whic

5

specifically identifies the Pine Point Account as property subje
to forfeiture, establishes sufficient probable cause for t
issuance of restraining orders. The United States seeks
preserve the status quo to prevent the transfer, movemen
conveyance or dissipation of the monies, making them unavailab
for forfeiture.

9. **Discussion.** In the next few paragraphs the Governme
will discuss and summarize additional facts that demonstrate th
Pine Point Auto Sales was used to facilitate the charged dr
trafficking violations by the Defendants, and that, in light of t
close and continuing involvement of Pine Point Auto Sales and i
operators in the charged criminal activity and the small amoun
legitimate business it conducted, that there is probable cause
believe that the monies in the Pine Point Account are proceeds
and/or were used to facilitate drug trafficking.

10. Pine Point Auto Sales is a used car dealership located
1608 State Street, Springfield, MA. Beginning in approximate
March 2005, law enforcement agents from the DEA in Springfield,
and the Massachusetts State Police began an investigation into
cocaine trafficking activities of Jose Delgado, a/k/a Serg
Elpidio Alcantara-Saldana. The investigation has revealed th
Delgado receives large amounts of cocaine from New York and
Southern United States. Delgado and his partner, Cesar Zapa
a/k/a Nani, a/k/a Commandante own and operate an automobi

business in Springfield, MA called "Pine Point Auto Sales." T[he] record owner of Pine Point Auto Sales is a person named "Geor[ge] Wihbey," but, based on the investigation, Wihbey appears to be [a] straw owner. The investigation has obtained rent receipts for Pi[ne] Point Auto from April 2004 through December 2004, showing th[at] Zapata and Delgodo pay rent to Excellence Auto (a dealersh[ip] adjacent to Pine Point) for the premises. These receipts sh[ow] payments ranging from $2500 to $2900 per month. All but one [of] these payment were made in cash. Zapata and Delgado also buy t[he] majority of the cars on the Pine Point business at differe[nt] auctions under the license of Excellence Auto.

11.   During the investigation, agents observed that ca[rs] frequently made very brief stops (lasting from approximately 2 [to] 5 minutes) at Pine Point Auto, and then left the premises. Th[is] behavior is consistent with Pine Point Auto Sales being used [to] conduct drug trafficking. In addition, an analysis of the licen[se] plate of some of the cars making brief stops at Pine Point Au[to] revealed that several had prior drug histories. In addition, t[he] investigation has recently learned that the FBI conducted [a] controlled purchase of cocaine at Pine Point Auto Sales, purchasi[ng] one ounce on May 29, 2001.

12.   Pine Point Auto Sales is an auto sales business and [is] described as small white brick building on the north side of Sta[te] Street, surrounded by a parking lot containing (15) to (2[0]

vehicles. This business is located between Casey Glass on its we side and Excellence Auto on its east side. There is a large si in front of the building which is visible from State Street

13.  As discussed in more detail below, Pine Point Auto Sal is an auto sales business run by Jose Delgado and Cesar Zapata a used to facilitate their cocaine trafficking busines Specifically, Pine Point Auto Sales is used, in part, to obta vehicles to use for the transportation of narcotics and dr proceeds cocaine.

14.  As further described below, a cooperating individu (CI1) told investigators that Delgado uses the vehicles at "Pi Point" to transport the cocaine and drug proceeds that Delga distributes. CI1 has personally been to Pine Point, has seen the vehicles, and has seen the hidden compartments in these vehicle During the course of wire interceptions, agents have observ Delgado and Zapata at Pine Point on multiple occasions. At time based on wire intercepts and surveillance, Zapata has travelec the Auto shop for a short period of time after business hour Surveillance also observed that very little legitimate car sa business is conducted at Pine Point. In addition, during t investigation, when the target subjects have spotted l enforcement surveillance, the target subjects have stopped usi the cars they were operating and have obtained new cars. F example, on August 22, 2005, Carrasco spotted police surveillan

in New York while driving a maroon Dodge Caravan and subsequent changed to a different maroon Dodge Caravan with a two-tone strip which had previously been seen at the Pine Point Auto Sales.

15.  Specifically, the investigation has revealed th vehicles from Pine Point Auto Sales are used to transport cocai and drug proceeds. Delgado and his associates, including Zapata a Heriberto Carrasco a/k/a "Joselito" distribute to individuals Springfield, including George Samuels, and to other individuals Eastern Massachusetts, including Boston.
During the course of the investigation, Zapata was observed dai on the lot of Pine Point Auto Sales by agents.

16.  On May 17, 2005, SA Barron spoke with Special Age Drouin of the Boston Office of the DEA and SA Drouin advised Barron that on May 17, 2005 members of his group had debrief a cooperating individual (hereinafter referred to as CI regarding a cocaine source of supply in the Springfield, area. CI1 was debriefed after he/she was arrested by agen from Boston DEA in possession of approximately 250 pounds marijuana. CI1 stated that he/she had purchased cocaine fr two individuals in the Springfield area who owned a c dealership called Pine Point Auto Sales. Starting in abo January 2004, CI1 further stated that he/she purchased sever kilograms of cocaine from one of these individuals, "Sergio", a daily basis and CI1 would then bring the cocaine to the Bost

area and distribute it through another individual. CI1 stat
that when "Sergio" delivered the cocaine, "Sergio" would ofe
be driving different vehicles, each one of which had a deal
tag. CI1 further stated that Jose Delgado a/k/a "Sergio" a
"Zupra" have a warehouse in the Springfield area which is us
to house incoming shipments of cocaine and marijuana whi
he/she believes come in through tractor trailers. CI1 th
added that he/she believes "Sergio" and "Zupra" are supplied
"Mexicans" because he/she was told so by "Sergio". CI1 was al
told by "Sergio" that he receives shipments of marijuana
tractor trailer and keeps them in a garage in the Springfie
area.

    17. In 2005, CI1 was arrested and charged in U.S. Distri
Court in Boston with conspiracy to distribute five kilograms
more of cocaine. The information that CI1 has provic
regarding Delgado a/k/a "Sergio," Zapata, and Carrasco a/k
"Joselito" has been consistent throughout and has be
corroborated by evidence independent of CI1's information.

    18. CI1 told investigators that beginning around 2002
2003, and continuing for more than one year, CI1 began to obta
large amounts of cocaine from a drug trafficker in Springfiel
MA known as "Sergio." CI1 obtained between 10 and 15 kilogra
of cocaine from "Sergio," approximately 5 to 6 days a week. C
positively identified a photograph of Jose Delgado as "Sergi

10

out of a 6-person photo array. According to CI1, "Sergi
personally delivered this cocaine himself along with "Sergio'
associate "Joselito." CI1 positively identified a photograph
Carrasco out of a 6-person photo array as "Joselito.". C
described to law enforcement agents that "Sergio" and "Joselit
would drive in separate cars in tandem with the cocaine in on
one vehicle and communicate by cell phone or walkie talkie
avoid the police. On an almost daily basis, CI1 personal
either received cocaine from "Sergio" and "Joselito" or provid
drug proceeds to them. CI1 redistributed this cocaine to a f
individuals in Eastern Massachusetts whom CI1 identified
investigators. CI1 told investigators that sometime in 2004 C
1 collected a drug debt for "Sergio" from a drug trafficker
Boston who received 10 to 20 kilograms of cocaine a week.

19. On more than one occasion, CI1 was present w
"Sergio" and "Sergio's" source of supply for cocaine whom C
described as an older Mexican male who resided in Arizona a
who "Sergio" referred to as godfather. CI1 told investigato
that "Sergio" received the cocaine from Mexican individuals wl
transported the cocaine to "Sergio" in tractor trailers hidd
in produce. On one occasion, CI1 saw Sergio's with betwe
approximately $900,000 and $1,000,000 in U.S. currency that wa
in one of these tractor trailers that "Sergio" was having se
to his source of supply for cocaine. CI1 also told agents tha

11

"Sergio" at times utilized an alternative source of supply
New York whom CI1 believed to be a Dominican woman. CI1 stat
that "Sergio" often traveled to New York.

20. CI1 also identified for law enforcement agents t
vehicles that "Sergio" and "Joselito" used to transport cocai
and drug proceeds. According to CI1, each of these vehicles h
hidden compartments known as traps, hides, or *"clavos"*
transport drugs and money. In particular, "Sergio" a
"Joselito" used a dark colored Chevrolet mini-van that had t
traps: one behind the CD player to hide a gun and money, a
another in rear under the carpet which could 30 to 35 kilogra
of cocaine. CI1 personally observed these traps, and the dru
and money in these traps. CI1 furthermore told agents that C
knew that "Sergio" had several semi-automatic weapons. CI1 to
investigators that "Sergio" had access to multiple vehicl
which bore MA dealer plates because "Sergio" ran an auto sal
shop in Springfield, MA called "Pine Point." CI1 further to
investigators that one of the individuals that worked at P
POINT was a 55-60 year old Dominican male. CI1 positive
identified a photograph of Zapata as this individual, but C
had no information about Zapata being involved in dru
trafficking. According to CI1, as part of the Point Point Aut
business, "Sergio" purchased numerous low-end pick up truck

that he sold to the Mexican source of supply which were t[ ]n used to transport drug narcotics and drug proceeds.

21. On May 24, 2005, SA Barron spoke with Special Age[nt] Mark Tully of the Boston Office of the DEA and SA Tully inform[ed] SA Barron that on April 12, 2005 members of the DEA Bost[on] Office were conducting a court authorized Title III electron[ic] surveillance on individuals in the Boston area. During th[e] electronic intercept, agents overheard a telephone call in wh[ich] it appeared that a target of their investigation, Manu[el] Florentino, was going to deliver three kilograms of cocaine [to] another individual. Agents of the Boston office then observ[ed] a meet between Florentino and another individual. Subsequent [to] the meet, agents followed the Ford Explorer, believed to [be] driven by Florentino, and surveillance was later detected by t[he] driver of the vehicle. Soon after, the driver of the vehic[le] abandoned the vehicle and fled on foot. The driver was nev[er] apprehended. A subsequent search of the abandoned vehicle l[ed] to the seizure of one kilogram of cocaine and $19,900.00 Unit[ed] States Currency. A registration check of the vehicle show[ed] that it was registered to Eleuterio Santana, 1608 State Stree[t,] Springfield, MA. 1608 State Street, Springfield, MA is th[e] address of Pine Point Auto Sales, which is known to be owned a[nd] operated by Zapata and Delgado.

22. On June 2, 2005, the DEA Springfield Resident Office initiated an electronic surveillance of Zapata's cellular telephone. On July 1, 2005, the DEA Springfield Resident Office began intercepting communications over several of Delgado's cellular telephones. Over the course of these electronic intercepts, through intercepted calls and physical surveillance, Zapata, Delgado and other co-conspirators were believed to be transporting large quantities of cocaine and currency between Springfield, MA and New York City. During a large portion of surveillances conducted on these individuals when they were believed to be conducting illicit activities, these individuals would utilize several different vehicles which were commonly observed on the Pine Point Auto Sales car lot. When utilizing these vehicles, the co-conspirators would attach a MA Dealer license plate (MA 7406) onto the vehicle. This license plate is registered to Pine Point Auto Sales. Several of the surveillances would begin or end at the Pine Point Auto Sales lot.

23. On July 12, 2005, agents observed Zapata meet with "Carlitos" and another black male in what is believed to have been a delivery of drugs or money. After this meeting, at approximately 8:55pm, SA Barron observed Zapata exit his residence along with "Carlitos" and enter his vehicle. SA Barron observed "Carlitos" carrying both a white and the black bag as he entered Zapata's vehicle. Agents then surveilled Zapata and observed him driving

directly to the rear of Pine Point Auto Sales, 1608 State Str[eet], Springfield, MA. SA Barron observed Zapata pull around the b[ack] and observed him exit the vehicle and walk out of sight in the r[ear] of the building at approximately 9:04 pm. At approximately 9[:07] pm, SA Barron observed Zapata return to the vehicle and exit [th]e parking lot. It should be noted that the dealership was closed [at] this time.

24. On July 23, 2005, pursuant to several calls intercept[ed] over the Zapata cellular telephone, Agents observed Manuel a[nd] Victor Florentino on the Pine Point Auto Sales Lot. Agents at th[e] time knew Manuel Florentino to have a Federal Arrest Warrant out [of] Boston, MA for Conspiracy to Distribute 5000 grams or more cocaine. Upon leaving the Pine Point Lot, Florentino's vehicle w[as] stopped and both individuals were placed under arrest: Manu[el] Florentino on the warrant mentioned above and Victor Florenti[no] for having a invalid driver's license. Through analysis [of] numerous calls between the two brothers, Zapata and Raul Portorre[al] (an un-indicted co-conspirator of Zapata) I believe that t[he] Florentinos were at Pine Point Auto Sales to conduct narcoti[cs] business with Zapata and Delgado.

25. On August 26, 2005, SA Barron received Federal Arre[st] Warrants for Zapata, Delgado, Samuels and Carrasco. SA Shankweil[er] applied for and received Federal Search Warrants for the residenc[es] of Zapata, Delgado, Samuels and Pine Point Auto Sales. Up[on]

15

execution of these warrants, Agents seized, among other thin[gs], approximately 26 kilograms of cocaine, approximately $100,000 [in] cash, (3) handguns, (3) vehicles and a $13,000.00 Rolex Watch.

26.  During the search of Zapata's residence, SA Barron sei[zed] a briefcase which contained a large amount of documentat[ion] pertaining to Pine Point Auto Sales.  This documentation inclu[ded] numerous vehicle titles, purchase and repair receipts, automob[ile] auction lists and other documentation which indicated that Zapa[ta] was running the day to day business of the dealership. [The] investigation has discovered receipts for ten cars being bought [by] the dealership, dating back to March 15, 2005.  The most expensi[ve] vehicle purchased was $7815 and the least expensive was $450. [The] average of the ten vehicles was $3534.50.

**Conclusion**     Wherefore, for the foregoing reasons, t[he] Government requests this Court to enter a protective ord[er] immediately restraining, prohibiting, and enjoining the Defendant Sergio E. Saldana, Cesar Zapata, Heriberto Carrasco and Geo[rge] Samuels and their agents, servants, employees, attorneys, fami[ly] members and those persons in active concert or participation wi[th] him, and those persons, financial institutions, or entities w[ho] have any interest or control over the subject property fr[om] attempting or completing any action that would affect t[he] availability, marketability or value of said property, includi[ng] but not limited to selling, assigning, pledging, distributing[,]

encumbering, wasting, secreting or otherwise disposing of, r
removing from the jurisdiction of this Court, all or any part f
their interest, direct or indirect, in the subject property.

The Government further requests that any financ
institutions holding any accounts subject to this Order
prohibited from taking offsets against such accounts, and that tł
continue to credit any deposits, interest, dividends, or otł
credits to such accounts in the normal course of business, and sı
deposits, interest, dividends, and other credits shall be subje
to this Order. In addition, upon receiving notice of this Orde
that each financial institution be required to promptly inform t
Government as to the account balances at the time of notice, a
thereafter supplement such information by reporting to t
Government any changes to the accounts, and by responding prompt
to requests by the Government for information on the account
current status.

The Government further requests that the US Marshal or hı
designee be directed to promptly serve a copy of this Restrainiı
Order upon Sergio E. Saldana, Cesar Zapata, Heriberto Carrasco aı
Geoge Samuels, their counsel and the Bank of Western Massachusett
and make a return thereon reflecting the date and time of service

The Government further requests that this Restraining Orde
remain in full force and effect until further order of this Court

```
                                   Respectfully submitted,
                                   MICHAEL J. SULLIVAN
                                   United States Attorney


                              By:  /s/ [signature]
                                   Jennifer H. Zacks
                                   Assistant U.S. Attorney
                                   U. S. Attorney's Office
                                   United States Courthous
                                   1 Courthouse Way, Sui
9200
                                   Boston, MA  02210
     Date: 13 September, 2005      (617) 748-3100
```

18