UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
vs.                               )          NO. 05-10235-GAO
                                  )
SERGIO ELPIDIO ALCANTRA-SALDANA, et al )
GEORGE SAMUELS                    )
          (Defendant)             )


## DEFENDANT'S PRELIMINARY MEMORANDUM OF LAW


## THE INVESTIGATION


In the fall of 2004, DEA Agents in New York began conducting parallel investigations aimed at two major groups of Dominican nationals believed to be importing large quantities of cocaine into the United States.  The interdiction of these shipments and the laundering of funds generated by their sales were designated priority investigations.  These investigations, dubbed "Big Fish" and "Store Front", were aimed at producing prosecutable federal cases in the Southern District of New York. Through the use of confidential informants, electronic surveillance, and a host of other investigative techniques, DEA Agents in New York were able to establish the conspirators' importation routes, organizational roles, money laundering sites, as well as locations used to warehouse and distribute the cocaine.

Beginning in January 2005, DEA Agents in New York recovered two cellular telephones during the arrest of one Salvador Beltre. Beltre was a distributor for an organization headed by Dagoberto Cordero-Sanchez, one the primary targets of the "Big Fish" investigation. A review of one of Beltre's seized  telephones internal directory revealed telephone number (413) 218-5517. An administrative subpoena sent to the service provider revealed the subscriber as one Jose Gil. This number was changed on February 21, 2005 to (413) 883-7649. In early March, DEA Agents in New York advised their Massachusetts counterparts that this number appeared in the toll

records of two other subjects of the New York investigation.

Agents in the Springfield office of DEA connected this number to an address at 93 Florence Street in Springfield and to the person of Cesar Zapata. In mid-February 2005, Massachusetts State Police with the Drug Task Force arrested Hector Delacruz and Luis Ventura, in possession of several kilos of cocaine. After their arrest, Delacruz and Ventura began to cooperate with state authorities leading to the arrest of Carlos Sanchez. Agents were able to confirm through toll records contact between Zapata's telephone and telephones seized from Sanchez and Delacruz. Agents learned Zapata had changed this service days after the Sanchez arrest.

During the Spring of 2005, Agents conducted surveillances of Zapata and others aided by reviews of the toll records of cellular telephones linked to the parties. These surveillances, supplemented by informant information, lead to a decision to target Zapata for electronic surveillance. On May 31, 2005, Charles Dolan, an Assistant District Attorney in Hampden County, made application for a wiretap order for Zapata's cellular telephone. The authorization from Hampden County District Attorney William M Bennett authorized Assistant District Attorney Dolan to make an application under Massachusetts General Laws Ch. 272 section 99 for an order permitting the interception of "wire communications."

The initial application executed by Assistant District Attorney Dolan was captioned as a request for a warrant permitting the interception of "oral communications." All of the warrants which issued after the initial warrant for Zapata's cellular telephone purported to authorize the interception of both "oral and wire communications."

Monitoring of Zapata's telephone lead Agents to believe he was a multi-kilo cocaine dealer with sources of supply in New York as well as outside the country. Zapata's telephone was monitored throughout June 2005. During this period Agents conducted surveillances of Zapata and Saldana in New York. Agents theorized their purpose in traveling to New York was to arrange for a substantial shipment of cocaine.

On July 1, 2005, Assistant District Attorney Dolan sought and received two additional state court orders for two cellular telephones believed to be utilized by Saldana. Interceptions over Zapata's and Saldana's cell phones revealed contact with several Dominican nationals, Rene Lora, Jesus Medrano, and Jose Montolio. Agents believed these individuals to be major

sources of supply and subjects of the New York investigation.

In early July, Agents intercepted communications leading them to believe Zapta and Saldana were in New York  seeking to secure a multi-kilo delivery of cocaine.  Agents believed they observed such a delivery on July 12, when Saldana's brother traveled from New York to Springfield carrying two large bags. Over the course of the Summer, additional state wiretap orders were obtained for several new telephones linked to Saldana. On August 17, 2005, a wiretap order was secured for Samuels' telephone.  The electronic surveillance ended August 27, 2005, shortly after the Defendant's arrest in this case.

Agents knew  the principal targets of the investigation were aware of the physical surveillance of their activities. Arrest and search warrants were sought for Saldana, Zapata, Carrasco, and Samuels on August 26, 2005. The decision to apply for search and arrest warrants on August 26th  was based upon the Agents stated belief that a delivery of cocaine by Saldana to Samuels was imminent. Search warrants issued for five locations:  Zapata's residence at 93 Florence Street; Saldana's residence at 31 Braywood Circle; Saldana's business  Pine Point Auto Sales at 1608 State Street; 41Brooks Street Saldana's former residence; and 61 Appoloosa Lane West Springfield, Samuels' residence.

At the conclusion of the Zapata/Delgado/Carrasco/Samuels wiretap portion of their investigation, DEA Agents prepared a single Affidavit in support of this series of five separate search and arrest warrants directed against Zapata, Delgado, Carrasco, and Samuels. [App. A, Item 3, Doc #87-121].[1] Although separate search  warrants issued for each address , all the warrants carried an identical description of the property to be seized. Additionally, the affidavit supporting the arrest warrant was identical to the first 41  paragraphs of the search warrant affidavit.   The  warrants were executed throughout the day and early evening on August 27, 2005.

---

[1] All bracketed references in the brief to the record Appendix "A" will be to Item # and Document #.

# ARGUMENT

## SCOPE OF THE SEARCH AND THE
## PARTICULARITY REQUIREMENT
### (61 Appoloosa Lane, West Springfield, Massachusetts)

A search warrant must particularly describe the items to be seized. The purpose of this requirement is to render general searches impossible and prevent the seizure of one thing under a warrant describing another.

The degree of specificity required when describing the object to be seized may necessarily vary according to the circumstances and types of items required. The particularity requirement of the Fourth Amendment "prevents a general exploration of rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443 (1971). This makes general searches impossible and prevents the seizure of one thing under a warrant describing another. As to what is being taken, nothing is left to the discretion of the officer executing the warrant. It insures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause.

The single affidavit utilized here to support probable cause to issue the warrants to search the series of businesses and residences failed to establish that particular items of evidence described in the warrant and linked to specific criminal activity would likely be located at 61 Appoloosa Lane. This warrant was impermissibly broad in that generic classes of items the warrant described as seizable were not supported by a factual basis to establish them as fruits of specific criminal activity which were probably located at each site. In lieu of a specific description which was easily ascertainable, the officers applying for the warrant opted to include an identical generic laundry list permitting the seizure of numerous items for which neither probable cause existed, nor any demonstrated probability existed that such items would be found at the Appoloosa Lane location.

In any event, the officer executing the warrant exceeded even the broad grant provided by the warrant and seized a number of items which were clearly not described in the warrant. Virtually all of the parties' financial records were seized without regard to whether they were

described in the warrant. These included items which were easily identifiable such as tax returns, real estate and business records, and financial documents clearly not contemplated by the description in the search warrant. (See Defendant's Affidavit pg.3).

As part of the probable cause doctrine what is required is that evidence of the crime can be found at the <u>described</u> locus at the <u>time</u> of the search. <u>United States v. Arguirre</u>, 839 F.2d 854 (1st Cir. 1987)(emphasis supplied). Although discussed in the context of an anticipatory search warrant, the First Circuit held that magistrates who are asked to issue warrants should draft them <u>narrowly</u> enough to insure that opportunities for exercising unfettered discretion are eliminated, and that the conditions set for governing the agent's service of them should be explicit, clear, and narrowly drawn so as to avoid misunderstanding or manipulation. <u>United States v. Ricciardelli</u>, 998 F.2d 8, 12 (1st Cir. 1993).

In addition to general probable cause requirements, search warrants require two additional conclusions necessary to their issuance supported by substantial evidence. First, there must be evidence that the items sought are in fact seizable by virtue of being connected to criminal activity, and next, that the items will be found in the place to be searched. <u>United States v. Diaz</u>, 841 F.1d 1, 3 (1st Cir. 1988). Where an affidavit does not provide any nexus between particular items and criminal behavior, seizure of those items is improper.

The affidavit for Appoloosa Lane  failed to provide any information that would permit the issuance of a search warrant authorizing the seizure of firearms. Nothing contained within the four corners of the affidavit demonstrated probable cause to believe that firearms would be found at this locus. Additionally, nothing in the application suggested if firearms were found, their possession would be evidence of a federal crime. The plain view doctrine permits the seizure of items located in plain view if "(1) the seizing officer has a prior justification for being in a position to see the item in plain view; and (2) the evidentiary value of the item is immediately apparent." <u>United States v. Owens</u>, 167 F.3d 739, 746 (1st Cir.1999). Evidentiary value is "immediately apparent" only if there are "enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime." <u>United States v. Hamie</u>, 165 F.3d 80, 83 (1st Cir.1999).  In this, case an unloaded firearm seized from the interior of the residence could not support such an inference. Indeed, a fair, common sense reading of the affidavit compels the opposite inference.

While it is not unusual in cases such as this to employ a single affidavit to support requests for multiple warrants, it remains the obligation of the issuing Magistrate to tailor the searches to the particular showing made out as to individual persons and locations. This was not the case here. Instead, identical items subject to seizure were included in every warrant which issued without regard for the factual basis set forth in the affidavit relating those items to particular individuals, crimes or places.

## PROBABLE CAUSE

Probable cause is the product of probabilities, not absolutes.  The principal issue in any probable cause analysis is whether the Magistrate had a substantial basis from which to conclude that the articles or activity described [was] probably present or occurring at the place to be searched.

The Fourth Amendment to the Federal Constitution requires a Magistrate to determine that probable cause exists before issuing a search warrant. The requisite probable cause for the search of the dwelling must be contained within the four corners of the affidavit. Probable cause sufficient to support the issuance of a search warrant is "something more than mere suspicion, but something less than evidence sufficient to warrant a conviction." The issuing magistrate and reviewing court may rely only upon information expressly recited within the affidavit and inferences which may reasonably drawn therefrom.

For evidence to avert suppression, the warrant application must demonstrate probable cause to believe that a particular person has committed a crime–"the commission element"–and that enumerated evidence relevant to the probable criminality likely is located at the place to be searched–"the nexus element". United States v. Fuccillo, 808 F.2d 173, 175 (1st Cir. 1987) (cert. denied). The issuing Magistrate ordinarily considers only the facts set forth in supporting affidavits accompanying the warrant application. See, e.g., Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 565, 91 S.Ct. 1031, 1035, 28 L.Ed.2d 306 (1971). Under the "probable cause" standard, the "totality of the circumstances" disclosed in the supporting affidavits must demonstrate "a *fair probability* that contraband or evidence of a crime will be

found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 232, 76 L.Ed.2d 527 (1983).

Among others, the factors that may contribute to a "probable cause" determination include whether an Affidavit supports the probable "'veracity' or 'basis of knowledge' of persons supplying hearsay information," *and* whether informant statements are self-authenticating.

Reviewing courts, including both the district court and the court of appeals, must accord "considerable deference" to the probable cause determination made by the issuing Magistrate. The duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. The reviewing court must examine "the Affidavit in a practical, common sense fashion, and accord considerable deference to reasonable inferences the [issuing magistrate] may have drawn from the attested facts. Moreover, given the strong preference for warrants under our Fourth Amendment jurisprudence, normally a reviewing court will defer to an issuing Magistrate's probable cause determination in a doubtful or marginal case. United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); United States v. Craig, 861 F.2d 818, 823 (5th Cir. 1988).

In each case the basic question for the magistrate is whether he has a substantial basis for concluding that any of the articles described in the warrant are probably in the place to be searched. This principle requires that facts which support probable cause must be "closely related to the time of the issue of the warrant [so] as to justify a finding of probable cause at that time." Timeliness must be "determined by the circumstances of each case."

In order to establish probable cause, an affidavit must "contain enough information for the issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they may reasonably be expected to be located in the place to be searched."

It is, moreover, imperative that the warrant establish not only this kind of tri-cornered nexus between the criminal act, the evidence to be seized and the place to be searched, but also that the nexus incorporate a temporal dimension. The important privacy interests protected by the Fourth Amendment make it incumbent upon the magistrate to craft the warrant with explicit, clear, and narrowly drawn conditions governing its execution to ensure that the anticipated nexus will actually exist if and when the warrant is executed. The "commission" and "nexus" elements

in the "probable cause" analysis each include a temporal component. The issuing magistrate must not only consider the accuracy and reliability of the historical facts related in the affidavits, but must determine, *inter alia*, whether the facts reasonably inferable from the affidavits demonstrate a "fair probability" that evidence material to the "commission" of the probable crime will be disclosed at the searched premises at the time the search warrant would issue, rather than at some remote or future time. United States v. Riccardelli, 998 F.2d 8, 12 9 (1st Cir. 1993).

There are several aspects of the information in Agent Shankweiler's affidavit which affect the existence of probable cause. The first of these concerns the temporal aspect of the informant's information. The information S/A Shankweiler used to link the Samuels residence at 61 Appoloosa Lane to the drug conspiracy began with informant information from an individual identified as CW-2. This individual's identity is known to the Defendant. This informant's evidence consisted of the following: CW-2 stated "George Samuels has been a kilogram quantity distributor of cocaine in Springfield for at least three years. Samuels used to own Schillacci's Fashions with "Fats," and that Samuels and "Fats" have been partners in the cocaine business." [App. A, Item 3, Doc #97].

Unlike this informant's knowledge about Zapata and Saldana , i.e., first hand conversations, and personal observations, CW-2's information about Samuels is silent as to its source or time. Clearly, the informant's basis of knowledge was not established, nor was the information self-authenticating. Additionally, the affidavit does not corroborate any material aspect of this informant's information. In short, this informant possessed no current information linking the items sought under the warrant to Samuels or his residence.

In an effort to establish the existence of an ongoing drug conspiracy, the affiant chronicled Saldana's and Zapata's unsuccessful efforts to engineer a shipment of cocaine through Montolio and Lora beginning in June 2005. A common sense reading of the affidavit establishes the two met or spoke with Lora and Montolio several times in June in an unsuccessful effort to arrange a delivery. On June 29, 2005 Saldana called Zapata from New York asking him to contact his friend (Lora). Later calls intercepted over Zapata's telephone demonstrated he was unable to reach Lora and did not travel to New York as expected. [App. A, Item 3, Doc # 96-98].

On July 7, 2005, Agents monitored Saldana and Zapata traveling to New York to meet

an individual identified only as Juan.  This meeting took place at 1224 Nelson Avenue in the Bronx. Although Agents believed this trip was undertaken to pay for a narcotics shipment [App. A, Item 3, Doc #100], a close review of paragraph 33 demonstrates the individual identified as Juan appears to be a customer of Saldana. In a series of conversations with Juan on July 4 and 5, immediately preceding this trip, it is apparent that Juan has money for Saldana from past narcotic sales. [App. A, Item 3, Doc #103-104].

During this same time period (July 2-6 ) Agents monitored a conversation in which Samuels arranged  to meet Saldana. Although physical surveillance revealed motor vehicles belonging to Samuels at Saldana's residence, [App. A, Item 3, Doc #102] and Saldana's vehicle at Samuels' residence, [App. A, Item 3, Doc #104] no actual meetings were observed. Additionally, no evidence is set forth in the affidavit to suggest any delivery of drugs or money during this time period; either to Samuels, or at his residence.

Agents observed what they believed was a drug delivery on July 12, 2005, five days after Zapata and Saldana traveled to Nelson Avenue on July 7.

Agents monitored a call between Saldana's brother, Carlitos, and Zapata. Agents observed Carlitos and an unknown male arrive from New York at Zapata's residence at 93 Florence Street (via Gerardo's Transportation) carrying two bags. After entering the residence for five minutes, Zapata left with Carlitos still carrying both bags and drove directly to Pine Point Auto Sales. Zapata was observed at the rear of the business and left after a very short time. Both men then drove to Saldana's residence. Carlitos was observed to be carrying only one bag when entering Saldana's residence. [App. A, Item 3, Doc #108].

No telephone calls to, or meetings with Samuels at 61 Appoloosa Lane, occurred in proximity to these observations.

The affiant sought to establish that Saldana would be returning from New York on the evening of August 26 in order to make an expected delivery of cocaine. [App. A, Item 3, Doc #120]. The affiant drew this inference from an intercepted telephone call earlier on the 26th in which Saldana informed Samuels he would "see him" later. The search warrant application was granted at 5:30 p.m. on the 26th. The Agents were aware from monitoring Saldana's telephone calls throughout the evening of the 26th that Saldana remained in New York  until the 27th. The evidence is equally clear that Saldana never made the anticipated 8:00 p.m. delivery described to

the issuing Magistrate. The intercepted calls that occurred over the monitored telephones after the search warrant was granted provided the Agents with a factual basis to believe just the opposite was true. [See Defendant's Affidavit at pg.    ]

This information was critical to a continued finding of probable cause as to the residence at 61 Apoloosa Lane and as such should have been made known to the issuing Magistrate. See United States v. Vigeant, 176 F.3rd. 565 (1st Cir. 1999 ). This is especially true where Saldana's *modus operandi*, as described by the informants, and as observed by the Agents, differed materially from the information provided to the Magistrate to establish probable cause as to 61 Appoloosa Lane.

The Agents' efforts to link the items identified as seizeable in the search warrant for 61 Appoloosa Lane was based solely on the summary in paragraph 47 of the affidavit. [App.A, Item 3, Doc #114] Distilled to its essential elements, the claimed link to the premises is predicated upon an August 18 interception and physical surveillance of Saldana; an August 23 intercept of Samuels and Saldana, and an August 25 intercept and surveillance of Saldana. No facts set forth in this paragraph legitimately established the probability that drugs or any other item described as seizeable was likely to be located at Samuels' residence at the time of the search. The observations made, even when coupled with the intercepts, do not support the nexus element of the probable cause requirement.

In the present case, undertaking a common sense analysis of the facts presented to the Magistrate, the warrant application did not establish probable cause to believe the described evidence of the crimes under investigation would be found at 61 Appoloosa Lane.


## STALENESS


Whether averments in an affidavit are sufficiently timely to establish probable cause depends upon the particular circumstances of each case. United States v. Bucuvalas, 970 F. 2d 937 (1st Cir. 1992).Four criteria must be considered. First, on must consider the basis of the maturity of the informant's input in relation to the nature of the suspected criminal activity (discrete crime or regenerating conspiracy), second, the habits of the suspected criminal

(nomadic or entrenched) must be considered, next the character of the items to be seized must be analyzed (perishable or of enduring utility), finally, the nature of the premises to be searched (mere criminal forum or secure operational base must be scrutinized). United States v. Moscatiello, 771 F. 2d 589 (1st Cir. 1985).   In this regard even though the Affidavit demonstrates ongoing criminal activity by a group of individuals; utilizing the criteria set forth above the historical information provided in 2003 by Jose Merced, March 2004 by Jose Garcia and CW-2 reporting a series of undated incidents occurring beforehand do not, without more, save the Affidavit from a claim of staleness.

## THE WIRETAP WARRANTS

A.    All electronic  Communications Intercepted over cellular  telephones (413) 313-3144 , (413) 204-8402, (347) 621-7413, (917) 684-5975, (646) 427-9433 and (413) 519-9044 Must Be Suppressed Because the Primary Orders Failed to Describe Particularly The Communications To Be Intercepted.

_____

_____1.    Since none of the  wiretap orders authorized the interception of particular electronic communications, the conversations recorded between July 1 and August 27 were intercepted in violation of the separate particularity provisions of Title III and the Fourth Amendment. A central provision of Title III provided:
**Each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify:**
**(b) the nature...of the communication facilities as to which...authority to intercept is granted;**
**(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates. 18 U.S.C. §2518 (4)(b) and (c). (emphasis supplied)**
Any communications seized in violation of these "particularity" provisions of Title III must be suppressed under Title III's own exclusionary rules.  United States v. Giordano, 416 U. S. 505, 524 (1974).  18 U.S.C. §§ 2515, 2518 (10)(a).

Suppression is also required under the judicially fashioned exclusionary rule for violations of the Fourth Amendment's particularity provisions.  Berger v. New York, 388 U. S. 41, 56-59 (1967); Katz v. United States, 389 U. S. 347, 356 (1967); Marron v. United States, 275 U. S. 192, 196 (1927).

Accordingly, because the six  wiretap warrants which are the subject of this motion failed to describe particularly both the kind and content of the particular cellular telephone communications subject to interception, all conversations were intercepted without regard to the Order's particularity provisions, in violation of Title III, 18 U.S. C. §2518 (4) (c), 10(a) (i) and 10 (a) (iii), United States v. Ward, 808 F. Supp. 803, 805-808 (S.D. Ga. 1992); and of the 4th and 14th Amendments, Berger v. New York, 388 U. S. 41, 59 (1967), which "prevent the seizure of one thing under a warrant describing another." Stanford v. Texas, 379 U. S. 426, 437 (1965), quoting Marron v. United States, 275 U. S. 192, 196 (1927); cf. United States v. Klein, 565 F. 2d 183, 186 (1st Cir. 1977). Evidence derived from the execution of these warrants must be suppressed.

On May 31, 2005, Assistant District Attorney Charles Dolan made application for an order seeking to intercept oral communications over cellular telephone number (413) 883-7649 before Judge Sweeney of the Hampden County Superior Court. This application was captioned an application to intercept "oral communications."  The body of the application referred to both oral and wire communications occurring over the described cellular telephone number. [App. A, Item 17, Doc #337-347].

The parties against whom the interceptions were sought were Cesar Zapata, Jose Delgado, Pedro Nazario, Luis Silva, and Orlando Soto. [App. A, Item 17, Doc #339]. There were five extensions of this order. The order was renewed on June 15, July 1, July 16, and 31, and August 16, 2005.   The targets of this order did not change throughout the warrants execution.

 The application referred to the "designated offenses" as "the distribution of illegal drugs in violation of Mass. Gen Laws Ch. 94C sections 32, 32A, 32B, 32C, 32D, 32E, and 40. [App. A, Item 17, Doc #338]. These offenses were thereafter referred to in the application as the "specified narcotics offenses." The description of oral and wire communications subject to interception were related in the application to the "specified narcotics offenses." [App. A, Item 17, Doc #340]

The  District Attorney's authorization designating A.D.A. Dolan to make the application

for the wiretap referred to an application to intercept "wire communications." [App. A, Item 20, Doc #389]. The warrant, which issued on June 1, 2005, authorized the interception of both oral and wire communications. [App. A, Item 19, Doc #350]. The order contained no express provision for service of the warrant. [App. A. Item 19, Doc #353]. The order described the "oral and wire communications" subject to seizure as "oral and wire communications occurring over target telephone 1. These interceptions are essential to continued identification of persons and places being utilized in furtherance of this conspiracy." [App. A, Item 19, Doc #352].

All of the original orders, renewal orders, applications, authorizations, and affidavits which followed the original June 1 order for Zapata's cellphone contained the same captions, designated offenses, description of communications to be intercepted, notice requirements, statements of prior interceptions, and necessity showings. (A separate chronology of these orders, together with the series of search warrants is attached to this memorandum as appendix "AA")[2]

Cellular telephone subscribers are assigned a combination of an MIN and an ESN to access cellular service. The MIN/ESN combination number also is used by the carrier for billing its cellular phone subscribers. The MIN/ESN access combination is programmed on "Erasable Programmable Read Only Memory" (EPROM) located on a computer chip which is part of the circuitry of the telephone. United States v. Pervaz, 118 F3rd. 1 (1st. Cir. 1997).

Cellular telephone or cellular radio, are components of a telecommunications system in which a portable or mobile radio transmitter and receiver, or "telephone," is linked via microwave radio frequencies to base transmitter and receiver stations that connect the user to a conventional telephone network. The geographic region served by a cellular system is subdivided into areas called cells. Each cell has a central base station and two sets of assigned transmission frequencies; one set is used by the base station, and the other by mobile telephones. To prevent radio interference, each cell uses frequencies different from those used by its surrounding cells, but cells sufficiently distant from each other can use the same frequencies. When a mobile telephone leaves one cell and enters another, the telephone call is transferred from one base station and set of transmission frequencies to the next using a computerized switching system

---

[2] A CD containing the documents itemized in the Table of Contents in Appendix "AA" will be provided under separate cover.

Digital cellular telephone service is a method of encoding information using a binary code of 0s and 1s. Most newer wireless phones and networks use digital technology. In digital, the analog voice signal is converted into binary code and transmitted as a series of on and off transmissions. There are three digital wireless technologies, CDMA, TDMA and GSM.

Digital signals are a mathematical or numerical representation of sound, with each sonic nuance captured as a binary number. Extensive error checking schemes ensure that a wireless digital link stays intact, even when transmitted through the air.

Each digital cellular telephone has a circuit board containing several computer chips. These chips translate analog to digital and digital back to analog with assistance from the cellular telephones microprocessor.

In 1968, Congress preempted the field of interception of wire and oral communications by enacting Title III of the Omnibus Crime Control and Safe Streets Act, Pub.L. 90-351, 82 Stat. 212 (1968) (codified at 18 U.S.C. § 2510 et seq.). In 1986, Congress enacted the "Electronic Communications Privacy Act of 1986," Pub.L. 99-508, 100 Stat. 1848 (1986) ("ECPA"). The ECPA amended Title III to protect cellular communications from interception without prior judicial approval.

As enacted in 1968, Title III did not apply to the monitoring of radio transmissions. In the Electronic Communications Privacy Act of 1986, 100 Stat. 1848, however, Congress enlarged the coverage of Title III to prohibit the interception of "electronic" as well as oral and wire communications. By reason of that amendment, as well as a 1994 amendment which applied to cordless telephone communications, 108 Stat. 4279, Title III now applies to the interception of conversations over both cellular and cordless phones. Bartnicki v. Vopper, 532 U.S. 514, 121 S.Ct. 1753 (2001).

A special rule accompanied the ECPA to afford those states with wiretap statutes an opportunity to conform to the federal amendments. Pub. L. 99-508, §111(b). The rule states that if a state-authorized interception would be valid without regard to the amendments, it would be deemed valid notwithstanding the amendments, if applied within two years of October 21, 1986, and if conducted pursuant to 18 U.S.C. §2516(2). United States v. Carranza, 921 F.2d. 1557 (11th Cir. 1991).

-14-

Public Law 99-508, § 111(b) provides in full:

**Any interception pursuant to section 2516(2) of Title 18 of the United States Code which would be valid and lawful without regard to the amendments made by this title [enacting sections 2521 and 3117 of this title, amending this section and sections 2232, 2511 to 2513, 2516(1)(a), (1)(c), (1)(g) to ( 1), (2), (3), and 2517 to 2520 of this title, and enacting provisions set out as notes under this section] shall be valid and lawful notwithstanding such amendments if such interception occurs during the period beginning on the date such amendments take effect and ending on the earlier of-**

> **(1) the day before the date of the taking effect of State law conforming the applicable State statute with chapter 119 of Title 18, United States Code, as so amended; or**

> **(2) the date two years after the date of the enactment of this Act [Oct. 21, 1986].**

18 U.S.C. §2510 historical note (West Supp.1990).

The Commonwealth of Massachusetts has never amended its wiretap statute to permit the interception of "electronic communications." The Massachusetts wiretap statute [M.G.L. Ch. 272 section 99] describes two classes of communications that may be intercepted with a warrant issued pursuant to section 99.  Section 99 B(1) and (2) defines those communications as follows:

B. Definitions. As used in this section--

> 1.    **The term "wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception.**

> 2.    **The term "oral communication" means speech, except such speech as is transmitted over the public air waves by radio or other similar device.**

Under the Federal Wiretap Statute, Title III sets forth three classes of communications subject to interception and defines them pursuant to section 2510 (1),(2), (12),(12)(A), and (18) as follows:

> (1)    **"wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the**

aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce;

(2)    **"oral communication"** means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication;

(12)    **"electronic communication"** means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photo-electronic or photo-optical system that affects interstate or foreign commerce, but does not include--

(A) any wire or oral communication;. . . (emphasis supplied)

18)    **"aural transfer"** means a transfer containing the human voice at any point between and including the point of origin and the point of reception;

The definition of wire communication in section 2510 (1) must be read in conjunction with the definition given to the term "aural transfer" in 2510 (18).  When read together the term "wire communication" requires the transfer of a human voice by wire or cable through facilities used in or affecting interstate commerce.

The Defendant's digital cellular telephone calls to co-defendants' digital cellular telephones did not involve the transfer of the human voice through any interstate facility by wire or cable. As may readily be demonstrated, the interstate facilities involved in these transfers transmitted a binary code by radio wave which was processed into human speech by the parties' cellular telephones.

The communications intercepted here were not "oral or wire communications" as those terms are defined under state or federal law.  The communications intercepted here were "electronic communications" as that term is defined in 2510 sections (12) and (12)(A).

As will be discussed in greater detail in the following section, The Commonwealth of Massachusetts wiretap statute does not permit the interception of digital cellular telephone communications.

2.    Suppression is required pursuant to Title 18 U.S.C. §2516 (2)  where the State
Court Orders, Authorizations, and Approvals were not made in Conformity with
M.G.L. Ch.272 sec 99.

Section 2515 of Title 18 prohibits the receipt into evidence of intercepted
communications or their fruits in any trial, hearing, or other proceeding in or before any court,
grand jury, . . . or other authority of the United States, a State, or a political subdivision thereof if
the disclosure of that information would be in violation of this chapter. Section 2515 applies
across the board in both federal and state proceedings. S.Rep. 1097, supra, quoted in 2 U.S. Code
Cong. & Adm. News at p. 2185 (1968).

Any aggrieved person, as defined by 18 U.S.C. §2510(11), may move to suppress the
contents or fruits of an intercepted communication in a federal or state trial, hearing, or other
proceeding on the grounds that "the communication was unlawfully intercepted", that the
authorizing order was insufficient, or that the interception failed to conform with that order. 18
U.S.C. §2518(10)(a).

"The words 'unlawfully intercepted' are themselves not limited to constitutional
violations," but include a failure to satisfy requirements of Title III as well. United States v.
Giordano, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341, 360 (1974) (suppressing
wiretap-derived evidence for failure to have the U.S. Attorney General or specially designated
Assistant Attorney General authorize application to judge for order approving interceptions).


Title 18 U.S.C. § 2516(2) provides in relevant part:


**The principal prosecuting attorney of any State , or the principal prosecuting
attorney of any political subdivision thereof, if such attorney is authorized by a
statute of that State to make application to a State Court judge of competent
jurisdiction for an order authorizing or approving the interception of wire, oral, or
electronic communications, may apply to such judge, and such judge may grant in
conformity with section 2518 of this chapter and with the applicable State statute. . .**


Whether the proceedings are federal or state, interpretation of a state wiretap statute can
never be controlling where it might impose requirements less stringent than the controlling
standard of Title III. If a state should set forth procedures more exacting than those of the federal

statute, however, the validity of the interceptions and the orders of authorization by which they were made would have to comply with that test as well.  See, e.g., United States v. Manfredi, 488 F.2d. 588 (2nd Cir.1973). Thus, Title III provides the minimum standard against which the interceptions in question must be judged.

Manfredi and its progeny obligate a federal court "to apply in a federal proceeding all provisions of a state wiretap statute containing more stringent requirements than those prescribed by Title III ." In determining whether to admit a wiretap obtained by a state officer acting under a state court order issued pursuant to a state statute, Manfredi requires  application of  only those more stringent state statutory requirements or standards that are designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character. Manfredi, supra.

 In United States v. Miller, 69 F.3rd. 419 (10th Cir. 1995), the Tenth Circuit held "under the federal wiretap statute, 18 U.S.C. § 2516(2), we must defer to state law " 'on the question of the validity of [a] wiretap order obtained in state court under state law.' " See also United States v. Tavarez, 40 F.3d 1136, 1137 (10th Cir.1994) (quoting United States v. McNulty, 729 F.2d 1243, 1266 (10th Cir. 1983).

Other circuits to also consider this issue have concluded that section 2516(2) prohibits introduction of electronic surveillance evidence in federal court where state standards are violated. See United States v. Bascaro, 742 F.2d 1335, 1346-47 (11th Cir. 1984), cert. denied, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); United States v. McNulty, 729 F.2d 1243, 1264-65 (10th Cir. 1983) (en banc); United States v. Nelligan, 573 F.2d 251, 254 (5th Cir. 1978); United States v. Marion, 535 F.2d 697, 702 (2nd Cir.1976). See also United States v. Butz, 982 F2d. 1378 (9th Cir. 1993)  In United States v. Charles, 210 F.3rd. 10 (1st Cir. 2000), the First Circuit held "we recognize that several courts have concluded that §2516(2) may require the application of state law where the state wiretap statute contains standards that are more protective of privacy than the corresponding provisions of the federal wiretap statute." The Court in Charles took note of a contrary holding in United States v. Sutherland, 929 F.2d. 765 (1st Cir. 1991) but noted Sutherland involved no claim Title III was violated and did not concern an interpretation of section 2516(2).  Charles impliedly adopted the rule of law  established in Marion supra  but found it inapplicable to the facts of that case.

In the same vein the 11th Circuit in United States v. Carrazana, 921 F.2d. 1557 (1991), analyzing a similar claim a state wiretap was inadmissable under section 2516, followed the same general rule in reviewing whether the state court order complied with state requirements.

Samuels alleges that the authorizations, applications, and orders all failed to conform to the State wiretap statute. The sections of the State statute with which the various orders and applications failed to comply were all either more protective of privacy than Title III or were statutory requirements that directly and substantially implemented the legislative intention to limit the use of intercept procedures. These requirements include the lack of a notice requirement, an insufficient showing of necessity, and the lack of statutory authorization to conduct or authorize the interceptions which took place.

## A. THE STATE WIRETAP NOTICE REQUIREMENT

The requirement of notice is a constitutional prerequisite to engage in electronic surveillance. Berger v. State of New York, 87 S. Ct. 1873 18 L.Ed 2nd 1040 (1967). United States v. Katz, 389 U. S. 347 88 S. Ct. 507 (1967). The Berger and Katz decisions established that notice of surveillance is a constitutional requirement of any surveillance statute.

In that regard Chapter 272 §99 I (6) contains the Massachusetts wiretap statute notice requirement. All of the warrants purportedly contained a statement providing for the service of the notice required by §99 I (6). The Warrants as issued failed to provide a notice requirement recognized by the statute and permitted by law. In lieu of either of several statutory alternatives for service of notice mandated under Section L(2), the Judge issued a warrant which contained a caveat claiming to permit the actual notice requirement to be established after the warrant had issued and terminated, but more importantly, to consider factual assertions outside the wiretap application in order to effect deferred notice under the statute.

In support of the request for deferred service the application alleged there was "sound cause.. .because secrecy is essential to obtaining the sought after communications." [App. A, Item 75, Doc #1008]. In fact, the four categories of conclusions set forth in the application at paragraph 15 are simply devoid of a "description of circumstances including reasons for the

applicant's belief that secrecy is essential to obtain the evidence or information sought", as required by §99 F. (2) (i).  The application did not allege exigent circumstances as that term is defined in the statute,  nor "important special facts." More importantly, the 34 page affidavit which accompanied the application did not set forth any factual basis alleging exigent circumstances to support a request for deferred service.  Indeed, the affidavit limited its factual showing to multiple conclusory allegations, one of which was pure opinion unsupported by fact. The affidavit alleged, *inter alia*, that the investigation was expected to continue after the first interception and the affiant opined the target defendants would stop using the premises if served with notice and might harm informants named in the affidavit [App. A, Item 76, Doc #33].

One of these justifications, i.e., the disclosure of cooperating individuals is patently absurd for one compelling reason. The service required by the statute relates to an attested copy of the warrant, not the affidavit. Secondly, the affidavit at issue here did not refer to any informant by name.

 The law enforcement agents drafting this particular wiretap application did not establish entitlement to either of the two alternatives for deferred service under paragraph L (2) but sought to obtain deferral of service separate and apart from the original application. More importantly, the Judge issuing the warrant was mandated to include a provision for service authorized by the statute. The warrants as issued here contained only the following caveat "provided also that based upon a showing of sufficient facts, service of the warrant shall be postponed until such time as I will make an appropriate order for service."

As previously discussed, both the state and federal constitutions, and the statutory requirements of section 99 itself, compel a judge to issue a warrant that contains a statement in the warrant providing for service of the warrant pursuant to paragraph L. The judge has the option to defer service only when provided with an application establishing exigent circumstances, as that term is defined in the statute, in which case service may be deferred to a date within 30 days from the warrant's expiration. In the event the application specifically sets forth important special facts which establish the need for continued secrecy to the issuing judge's satisfaction, only then may the judge defer service beyond the thirty days to an appropriate time not to exceed three years.

There appears to be some ambiguity in the standard of proof required between paragraph I

(6) and L (2).  Subparagraph 6 refers to a finding of "good cause" for postponement, while subparagraph L (2) refers to a showing of "exigent circumstances" for thirty day deferrals and "important special facts demonstrating a continued need for secrecy" to defer service beyond thirty days.

No matter what ambiguity exists about the appropriate standard of proof to establish deferred service, there is no doubt the issuing judge is without statutory authority to establish a provision for service after the warrant's issuance. The provision for service must be included in the warrant at the time of its issuance in order to meet statutory and constitutional notice requirements. The judge may only consider a request to defer service if it is set forth in an application sworn in conformity with the statute.

In this case the warrant which issued was constitutionally and statutorily flawed. For the warrant to be legally valid it had to contain a notice provision recognized by the statute and supported factually by the application. In this regard, both the application and the warrant were lacking. Because the notice requirement is constitutional, the warrant which issued was invalid on its face.

## B. NECESSITY
## FAILURE OF NORMAL INVESTIGATIVE PROCEDURES

General Laws c. 272, §99, E(3), provides that a warrant authorizing a wiretap may issue only on a "showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." This statutory provision is practically identical to the federal wiretap statute. 18 U.S.C. §2518(1)(c) (1990).  See Commonwealth v. Vitello, 367 Mass. 224, 259, 327 N. E. 2d 819 (1975; Commonwealth v. Wallace, 22 Mass. App. Ct. 247, 248 n. 2, 493 N. E. 2d 216 (1986).

In meeting its statutory burden of establishing necessity, "[t]he Commonwealth need not show that traditional investigative techniques were wholly unsuccessful or that the police had exhausted all other investigative procedures before filing its application for a warrant authorizing a wiretap." Commonwealth v. Wilson, 405 Mass. 248, 250, 540 N. E. 2d 159 (1989). The necessity requirement is meant to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn,

-21-

415 U. S. 143, 153 n. 12, 94 S. Ct. 977, 983 n. 12, 39 L. Ed. 2d 225 (1974). The affidavit will be adequate if it indicates a reasonable likelihood that normal investigative techniques have failed in gathering evidence, or would fail if attempted. United States v. Ashley, 876 F. 2d 1069, 1073 (1st Cir. 1989); United States v. Abou-Saada, 785 F. 2d 1, 11 (1st Cir. 1986), cert. denied sub nom., Tannous v. United States, 477 U. S. 908, 106 S. Ct. 3283, 91 L. Ed. 2d 572 (1986). In determining whether the Commonwealth has met its burden, the affidavit should be read in a "practical and commonsense manner." United States v. Abou-Saada, *supra*, quoting United States v. Scibelli, 549 F. 2d, 222, 226 (1st Cir.), cert. denied, 431 U.S. 960, 97 S. Ct. 2687 (1977)

Several months before  the first wiretap application for Zapata's cellular telephone, the DEA in New York identified two major drug importation rings operating in that city and elsewhere.  One of these organizations was headed by Dagoberto Cordero-Sanchez and Jesus Medrano.  Rene Lora, Salvador Beltre, and Orlando Gonzalez were distributors for this organization.  DEA in New York learned this group imported 400 kilogram shipments of cocaine into the New York area for distribution.  Informants provided DEA Agents with information that Cordero-Sanchez, Medrano, and Lora distributed 20-30 kilogram quantities of cocaine from an apartment located at 1 Post Road., N.Y., N.Y., and maintained a warehouse to store cocaine prior to distribution at an identified address in upper Manhattan.  Informants also provided information which lead to Beltre's arrest and the seizure of over 12 kilos of cocaine.

Agents in New York reviewing toll records of cellular telephones utilized by members of this group revealed contact between them and a second group headed by Carlos Villavizar-Guzman. Guzman was already the subject of an Organized Crime Drug Enforcement Task Force (OCDETF) priority investigation labeled "Operation Storefront".

The investigation disclosed that cocaine was transported by boats into Puerto Rico and the U.S. Virgin Islands, and from those sites into the mainland United States. The proceeds earned from the sales of the drugs imported were laundered through a business identified as Capo Blancos Travel located in New York City.  Electronic surveillance of the land lines at this business identified individuals involved in transferring drug proceeds for the targets of the New York investigation to the Dominican Republic.

In March 2005, "Operation Big Fish" was initiated involving the utilization of a series of Title III orders directed against the principal members of the Cordero-Sanchez group. This surveillance was ongoing when the Springfield Resident Office of DEA became involved in

applying for the state wiretap orders at issue here.

Virtually none of the above information was made known to the judges issuing the state court orders. DEA Agents in Springfield sought permission to intercept Zapata with the expectation that he would be in contact with Lora, Medrano, and Montolio. In lieu of identifying these individuals as targets, and disclosing the existence of the New York Title III orders, the agents chose to provide the state court with three other targets, Nazario, Silva, and Soto. These individuals remained identified as targets through five extensions of the original warrant even though two were not intercepted at all. Although Nazario alone was intercepted, he was never charged. What makes this fact more remarkable is that most of the hierarchy of the Cordero-Sanchez group was intercepted in the first Zapata order, yet they were never listed as targets of any of the intercepts which followed. A wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target phone." United States v. Donovan, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977).

The District Attorney making the application for electronic surveillance asserted it was necessary to enable law enforcement to identify "sources of supply", "methods of operation", "relationships between the co-conspirators", and to "identify proceeds". In the same vein, the affidavit incorporated into the application professed an inability to accomplish these goals through normal investigative techniques. In support of the "necessity showing" the applicant claimed "undercover agents" could not get close enough to Zapata to identify the "upper echelon members and sources of supply" [App. A, Item 20, Doc # 376], the confidential informants who successfully targeted Beltre were unable to provide further information regarding Zapata "or any other traffickers associated with Zapata in the Massachusetts area"(emphasis supplied), search warrants were unavailable because "Agents have been unavailable to identify any possible warehouse". . . and, it is also unlikely that they will lead to the organization's source of supply in New York" [App. A, Item 20, Doc #377-378]. These same claims were also utilized to justify continuing to intercept communications beyond the initial orders and intercepts. See Title 18 U.S.C. §2518(5).

The same factual basis were employed to establish the necessity for the wiretap in the series of orders which followed the initial order for Zapata's cellular telephone. See [App. A, Item 50, Doc #752, #754], [App. A, Item 53, Doc #811, #813, #814] and [App. A, Item 76, Doc

#1042, #1043].

The failure to make full disclosure of the prior Title III orders against the Cordero-Sanchez organization and the intentional decision to omit them as targets from the state court applications fatally taints the warrants at issue. Where the intelligence from New York demonstrated the identity of the leadership, supply routes, methods, group roles, stash locations, money laundering facilities and the like, coupled with the intentional omission of the full breadth of electronic surveillance, the issuing judge was deprived of the ability to make an informed decision on the necessity of electronic surveillance.

## C. THE LACK OF STATUTORY AUTHORITY

M.G.L. Chapter 272 section 99, entitled Interception of Oral and Wire Communications, sets forth in Paragraph B the definition of terms used in the statute. The terms "oral and wire communications" and "intercepting device" are specifically defined. In part, an intercepting device "means any device or apparatus which is capable of transmitting receiving or amplifying or recording a wire or oral communication". . . other than any telephone or telegraph instrument equipment, facility, or component thereof. . ."

Samuels claims the device employed by the Commonwealth in this case fails to qualify as an "intercepting device" under the statutory definition stated above and, therefore, could not be the subject of a valid warrant issued pursuant to section 99. All of the case law dealing with entry into constitutionally protected areas of privacy have required a warrant. See Kyllo v. United States, 533 U. S. 27, 121 S. Ct. 2038 (2001); Silverman v. United States, 365 U. S. 505 (1961). Indeed, the Commonwealth recognized the need for a warrant before installing the intercepting device.

Its failure was not proceeding in a warrantless manner, rather, its failure was its choice of the warrant process. 272 section 99 F. 1. provides "any district attorney" may apply ex parte to a Judge of competent jurisdiction for a warrant to "intercept wire or oral communication". (emphasis supplied).

In this case the investigation was a product of a joint investigation by state and federal authorities. Although the state statute did not authorize a District Attorney to apply for a wiretap to intercept electronic communications, its federal counterpart did. It should have been apparent

to state authorities that digital cellular telephone communications were not covered by section 99. All of the requirements imposed by section 99 on the application and the warrant relate exclusively to the use of devices for the interception of oral or wire communications. All of the warrant requirements under paragraph I. also relate exclusively to interception of "oral and wire communication." Nowhere within the ambit of section 99 is there any language suggesting section 99 is applicable in any way to the interception of "electronic communications."

It is undisputed that the plain language of Chapter 99 limits its reach to the interception of oral or wire communication as those terms are defined by the statute. In this regard the statute is clear and unambiguous. "A statutory expression of one thing is an implied exclusion of other things, omitted from the statute." Police Commissioner of Boston v. Cecil, 431 Mass. 410, 413, 727 N. E. 2d 846 (2000). See also Commonwealth v. Russ, R., 433 Mass. 515, 744 N. E. 2d 39 (2001). When a statute is plain and unambiguous it is interpreted according to its ordinary meaning. See Commonwealth v. Brown, 431 Mass. 772, 775, 730 N. E. 2d 297 (2000). "Where the language of the statute is clear, it is the function of the judiciary to apply it, not amend it", Brown, supra. The plain language of the statute nowhere authorizes the installation of device which is designed to intercept electronic communications.

"In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 474-76, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). In other words, the court need not consult legislative history and other aids to statutory construction when the words of the statute neither create an ambiguity nor lead to an unreasonable interpretation. See United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir.1987).

"As in any case of statutory construction, analysis begins with the language of the statute." Zimmerman v. Cambridge Credit Counseling Corp., 409 F.3d 473, 475 (1st Cir.2005) (quoting Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)). If the statutory language provides a clear answer, the inquiry ends. See Hughes, 525 U.S. at 438, 119 S.Ct. 755; Sepulveda v. United States, 330 F.3d 55, 64 (1st Cir. 2003).

Samuels' position, simply put, is that section 99 does not permit the interception of digital cellular telephone conversations nor the installation of devices to intercept them. Similarly, section 99 does not authorize an Attorney General or District Attorney to make an

application for such an order. The only other warrant vehicle recognized under Massachusetts law is a warrant issued pursuant to Chapter 276 §1 et seq. In the event the Government seeks to justify the interception of Samuels' cellular telephone conversations under an "alternative state warrant" theory the defendant submits such a claim is barred by the statute and the common law. In the present case the Massachusetts State Police and DEA, through the Hampden County District Attorney applied for a warrant granting permission to intercept communications over the Defendant's digital cellular telephone pursuant to M.G. L. Ch. 272 §99 and did not make a warrant application under M. G. L. Ch. 276 §1.  The Supreme Judicial Court re-endorsed this view of independence in the two warrant statutes in <u>Commonwealth v. Penta</u>, 423 Mass. 546 (1996), when it held law enforcement officials seeking to transmit and record oral or wire communication pursuant to the one party consent provisions of M.G.L. 272, §99 may do so under the authority of a warrant pursuant to M.G.L. 276 and the common law. "We have <u>never incorporated</u> the procedures and requirements of M.G.L. 272 §99 into Article 14. We do not do so now," <u>Penta</u> at 423 Mass. 553. The same wiretap statute, M.G.L. Ch. 272 §99, statutorily authorizes courts to issue warrants authorizing the interception of oral and wire communications which may be executed for up to fifteen days with successive renewals.  See §99 I. (2) and (J).

The statute governing the return of search warrants issued pursuant to Ch. 276 requires the return be made as soon as the warrant has been served and in any event not later than <u>seven</u> days from the date of issuance.  (M.G.L. 276 sec. 3A).  Further M.G.L. ch. 276 sec 2A requires the executing officer to "make an <u>immediate </u>search." This corresponds with the requirement that there be a timely nexus between criminal activity and a particular person, place, or thing to be seized.

In the present case, the officers who prepared the affidavits in support of the application for the initial intercept warrant for Samuels' cellular telephone were being supervised by an Assistant District Attorney and it may be readily inferred that they were assisted in drafting the warrant application for the court's review. In that regard, notwithstanding the separate independent requirements of a search warrant under Chapter 276 and wiretap warrant issued under Ch. 272, the applicants requested, and more importantly, were given, authorization to install an intercept device to intercept "electronic" communications for fifteen days and monitor it without limitation.

Nowhere in the common law and certainly nowhere within Ch. 276 does there exist any

authority for an issuing judge to sign a warrant authorizing execution of a search warrant over a period of time in excess of seven (7) days. Section 99 is the exclusive authority for such a warrant and applies to statutorily authorized intercepting devices only.

In Commonwealth v. Cromer, 365 Mass. 519 (1974), the Supreme Judicial Court gave interpretation to the "immediacy" requirement of section 2A acknowledging the term was nowhere defined in the various sections controlling the issuance and execution of search warrants. The Court reviewed the legislative history and comparable federal law. The Court held "...because a warrant cannot be executed after it has been returned to Court, and because section 3A requires return of a search warrant within seven (7) days, we think that it is logical to infer from section 3A a legislative judgment that warrants must be executed, as well as returned, within seven (7) days. Therefore, we hold that no search warrant may validly be executed more than seven (7) days after its issuance." Cromer at 524 citing  Sgro v. United States, 287 U.S. 206, 53 S. Ct. 138, 77 L.Ed. 260 (1932).

This ruling has never been overturned and there is no jurisprudence holding a contrary view.   The Court in Cromer went on to conclude "we hold that G.L. c. 276, 2A, requires  execution of search warrants within a reasonable time after issuance.  Execution of a search warrant which is delayed more than seven (7) days is per se invalid without regard to prejudice. Cromer, 365 Mass. at 525.

Judges Sweeney and Page were therefore without statutory authority to issue a wiretap warrant authorizing the interception of electronic communications under Chapter 272. Additionally, the warrant at issue here permitted execution beyond the seven (7) day period, thereby invalidating it under Chapter 276 and the common law. It was invalid on its face and void *ab initio*.

       3.      Since the extensions of the wiretap orders for each cellular telephone were the product of the initial unlawful interceptions conversations recorded throughout, intercepts from the extension period must be suppressed as well.

Title III requires suppression not only of any communications which are unlawfully intercepted, but also of any "evidence derived therefrom." 18 U.S.C. §2518 (10)(a).  Under Title III, "extension orders do not stand on the same footing as original authorizations," but instead must be grounded in part on "the results thus far obtained from the interception."  United States v.Giordano, 416 U. S. 505, 530-532 (1974). Here, the electronic communications unlawfully intercepted under the primary warrants provided the foundation for all extensions of these

-27-

warrants. Accordingly, they were constructed on a faulty foundation.

      The affidavit in support of the first extension warrant relies on some fairly dramatic results obtained during the period of the primary order. There can be no question that this first extension was issued in large measure because of the promising results obtained during the first period. All subsequent extensions thus rode piggyback on this prior tainted evidence. Giordano, *supra*; United States v. Spagnuolo, 549 F. 2d 705, 711-712 (9th Cir. 1977); United States v. Ward, 808 F. Supp. 803, 809 (S.D. Ga. 1992). Since all evidence intercepted by authority of the extension orders was "derived from" the original unlawful interceptions, none of the recordings may be introduced in evidence at trial. 18 U.S.C. §2518 (10) (a).  Nor may any other ordinary evidence "derived from"these original interceptions be introduced; defendants are unable to address the particulars of this claim until we know more details of the Government's case.

      Suppression of derivative evidence is also compelled by the Fourth Amendment. Dunaway v. New York, 442 U. S. 200 217-218 (1979); Wong Sun v. United States, 371, U. S. 471, 488 (1963).

      In contrast to the requirements concerning probable cause, the government's obligation to make a "full and complete statement" concerning the practicality of specifying the place or places to be bugged is unqualified; the government is obligated to inform the court of all of its information relating to this issue.

      4.     Title III Requires Suppression where the Application failed to set forth a full and complete statement concerning all prior applications as required by Title 18 U.S.C. §2518 (1)(c)(e).

      In any  application for a  wiretap, the government must make a detailed proffer including: (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application; (b) a full and complete statement of the facts and circumstances justifying the applicant's belief that an order should be issued;  (c) a full and complete statement as to whether other investigative procedures have been tried and failed or why they appear to be too dangerous or unlikely to succeed if tried; (d) a statement of the period of time for which the interception is required to be maintained; and (e) a full and complete statement of the facts concerning all previous applications involving any of the same persons, facilities, or places specified in the application. See18 U.S.C. § 2518(1)(a)-(e).  United States v. Lopez, 300 F.3rd. 46 (1st Cir. 2002). All of the applications which were sought after the initial order on Zapata's telephone are equally silent with respect to the information required by §2518

(1)(e).

The Applicant in this case merely inserted the following into each application: "I am aware of no prior applications for interceptions occurring on telephone number. . ."[ App. A, Item 75 , Doc #1008]. This statement fails to satisfy both 2518 (1)(e) and its State Law counterpart, M.G.L. Ch. 272 §99 2 (H).

Samuels' claims the failure to alert the issuing court to the existence of ongoing electronic surveillance of individuals the applicant expected to intercept over the initial orders affects the necessity showing offered here.  The Applicants here intentionally failed to list Medrano, Lora, and Montolio as targets of these orders in order to establish plausible deniability as to the prior electronic surveillance of these individuals. This failure was intentional and designed to compartmentalize this information for law enforcement purposes having nothing to do with the requirements of Title III.

A full and complete statement regarding the availability of other techniques, including the use of informants, is required so that the issuing judge can make the findings as to necessity of electronic surveillance required by Title III. United States v. Cole, 807 F.2d 262, 267 (1st Cir.1986)(noting the importance of judicial scrutiny of wiretap applications to the necessity prong of Title III), cert. denied, 481 U.S. 1069, 107 S.Ct. 2461, 95 L.Ed.2d 870 (1987); United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986)(stressing that "the district court must satisfy itself" that electronic surveillance is necessary)(Breyer, C.J.), cert. denied, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986); United States v. Scibelli, 549 F.2d 222, 226 (1st Cir. 1977) (observing that issuing judge must consider "all the facts and circumstances")(quoting S. Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2190), cert. denied, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977). The full and complete statement must pertain to the specific facts of the case. United States v. Simpson, 813 F.2d 1462, 1471 (9th Cir. 1989)(wiretap "affidavit must show with specificity why in this particular investigation ordinary means of investigation will fail ")(quoting United States v. Robinson, 698 F.2d 448, 453 (D.C. Cir. 1983)(emphasis in original)), cert. denied, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987). Defendant has previously set forth all of the  factual basis to support this claim in part 2 of this memorandum setting forth Samuels' objections to the wiretap evidence and specifically incorporates them by reference herein.

5.     Title III requires suppression here regardless of the good or bad faith of Massachusetts police officers execution of the warrants.

Whether or not the "good faith" exception to the Fourth Amendment's exclusionary rule should be considered here, this court has a statutory duty to suppress the evidence under Title III. The Supreme Court has explicitly directed:

> [T]he availability of the suppression remedies for these statutory, as opposed to constitutional violations...turns on the provisions of Title III Rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights.  United States v. Donovan, 429 U. S. 413, 433 n. 22 (1977); accord, United States v. Chavez, 416 U. S. 562, 574-575 (1974); United States v. Giordano, 416 U. S. 505, 524-529 (1974).

Further, the Court has stressed the importance of the "precise wording" of Title III in determining how Congress intended to resolve the tension between law enforcement needs and the need to protect private conversation.  United States v. Kahn, 415 U. S. W. 143, 152 (1974).

Accordingly, because Title III's exclusionary rules include no good faith exception and because "the Fourth Amendment exclusionary rule is a judicially fashioned rule serving different purposes than the congressionally created rule of section 2515," the First Circuit has yet to apply a good faith exception to allow...illegally obtained evidence [under Title III] to be used at trial." United States v. Curzi, 867 F. 2d 36, 44-45 n. 8 (1st Cir. 1989), quoting United States v. Vest, 813 F. 2d 477, 481 (1st Cir. 1987). See also, Campiti v. Walonis, 611 F. 2d 387, 394-395 (1st Cir. 1979) (refusing to "graft good faith immunity defense" available under 52 U. S.C. §1983, civil rights statute onto plain language of Title III's civil liability provision, 18 U.S.C. §2520). United States v. Cunningham, 113 F. 3rd 289 (1st Cir. 1997).

The First Circuit's principled refusal to import extraneous concepts–whether from constitutional jurisprudence or from unrelated statutory sources–into specific provisions of Title III is necessary to preserve the proper separation of powers between Congress and the judiciary.

Accordingly, Congress' bright-line exclusionary rules require suppression whenever a "central provision" of Title III is violated. Donovan, supra at 437; United States v. Ward, 808 F. Supp. 803, 807-808 (S.D. Ga. 1992) and cases cited. Since the police could not adhere to the unparticularized terms of the primary orders authorizing interception of both oral and wire communications, all interceptions recorded under those orders and their extensions must be suppressed.  United States v. George, 465 F. 2d 772, 774-775 (6th Cir. 1972); 18 U.S.C. §2518

(10)(a)(iii).

6.  The Fourth Amendment also requires suppression since whatever Massachusetts police officers may have subjectively believed in executing the primary and extension orders, they could not have been acting in objective good faith.

Where, as here, officers conduct a search and seizure under a warrant which does not particularly describe the material seized, the Fourth Amendment does not require suppression if the officers "reasonably believed that the search they conducted was authorized by a valid warrant."  Massachusetts v. Sheppard, 468 U. S. 981, 988 (1984).

While the officers here can be expected to testify to their initial honest belief that the warrant authorized bugging–the authority which they sought in their affidavit, they will be unable to show, as they must, that "there was an objectively reasonable basis for [their] belief." They were permitted to intercept conversations not particularly described in the warrants.

By contrast, the critical errors in the warrant here are primarily attributable to law enforcement officials, who negligently drafted and presented the order to the judge without pointing out the defect. Indeed, these errors were committed by the same District Attorneys' office whose application drafting skills were criticized  by the First Circuit in Cunningham, " By referring randomly to oral communications and wire communications or wiretaps, the warrant is garbled on the very questions posed by subsections (b) and (c). Taken as a whole--but taken alone and without extrinsic evidence--the warrant does not tell the objective but ignorant reader just what interceptions are to be targeted." Cunningham supra at pg. 293.

Under these circumstances, the good faith exception cannot save the evidence from suppression, since the officers' conduct was not objectively reasonable.  As the First Circuit noted:

> [T]he exclusionary rule is alive and well to the
> extent that a warrant's defectiveness results from
> either (1) non-technical errors of a kind that a
> reasonable prudent officer would (or should) have
> recognized, or (2) law enforcement officers' acts
> or omissions of a kind that a reasonably prudent officer
> would have avoided. United States v. Ricciardelli,
> 998 F. 2d 8, 15 (1st Cir. 1993 )

In Ricciardelli, the defect on the face of the warrant–the lack of a nexus between the

object of the search and the place to be searched–was "glaring and easily correctable" by experienced agents and was, in addition, "attributable to the agents." Under these circumstances, the First Circuit refused to find "objective good faith." <u>Id.</u> at 15-16. In so holding, the Court referred to an earlier case where it had refused to apply the good faith exception.  Id. at 16, citing <u>United States v. Fuccillo</u>, 808 F. 2d 173 (1st Cir.), cert. denied, 482 U. S. 905 (1987).   There, where the warrant had not sufficiently described the things to be seized, the Court held as follows:

> [T]he good faith exception...will not be applied unless the officers executing the search warrants, at the very minimum, act within the scope of the warrants, and abide by their terms.  808 F. 2d at 177, emphasis added.

When the Government seeks to rescue a defective warrant, based in whole or in part on the knowledge of the judge or officer, the burden is upon it to prove such knowledge, just as it would be the defendant's burden if the warrant were facially valid.  Samuels asserts that he would be entitled to an evidentiary hearing in the event the Government posits such a claim.

## THE FRANK'S ISSUE

Critical to this warrant's vitality is the information contained in the Affidavit for the search of the Defendant's residence, as well as the interceptions of his electronic communications under the authority of the various state orders. Samuels alleges that  key paragraphs included within applications and affidavits for these  warrant contains either material falsehoods, a reckless disregard for the truth, or willful omissions designed to mislead the issuing authority.   <u>United States v. Rummey</u>, 867, F. 2d 714, 720-721 (1st Cir. 1989).   <u>Franks v. Delaware</u>, 438 U. S. 154 (1977) requires a defendant to make a "substantial preliminary" showing that false statements knowingly and intentionally or with reckless disregard for the truth were included in the affidavit. The defendant claims the affiant's failure to set forth fully the basis of knowledge  regarding the informant designated CW-2,  the intentional omission of past and present interceptions of the same parties, and the failure to make a full and complete disclosure of the necessity for the electronic surveillance in order to obtain the wiretap warrant requires an evidentiary hearing. (See Defendant's Affidavit pgs 1-3) It cannot be disputed that if

this material were to be excised from the affidavit, the affidavit would be insufficient on its face to establish probable cause to search or to establish the necessity for the wiretap.

## <u>VOLUNTARINESS OF THE STATEMENTS</u>

Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence.  <u>Lego v. Twomey</u>, 404 U.S. 477, 489, 92 S. Ct. 691, 626, 30 L. Ed.2d 618 (1972).  <u>Colorado v. Connelly</u>, 479 U. S. 157 (1986) An inculpatory statement is voluntary only when it is the product of a rational intellect and a free will.  <u>Blackburn v. Arizona</u>, 361 U. S. 199, 208, 80 S. Ct. 274 (1960).  The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborn. <u>Haynes v. Washington</u>, 373 U.S. 503, 513-14, 83 S.Ct. 1336 (1963); <u>United States v. Tingle</u>, 658 F. 2d 1332, 1335 (9th Cir. 1981).

A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."  <u>Hutto v. Ross</u>, 429 U.S. 28, 30, 97S. Ct. 202, 203 50 L. Ed. 2d 194 (1976) quoting <u>Bram v. United States</u>, 168 U.S. 532, 542-43 S. Ct. 183, 186-87, 42 L.Ed. 568 (1897).  This broadly stated rule has not been applied to invalidate, <u>per se</u>, all statements made by a suspect in response to a promise made by law enforcement personnel.  The promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances.

Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.  See, e.g., <u>Bram v. United States</u>, 168 U.S. 532, 542 (1897) (stating that the voluntariness test "is controlled by that portion of the Fifth Amendment...commanding that no person shall be compelled in any criminal case to be a witness against himself"); <u>Brown v. Mississippi</u>, 297 U.S. 278 (1936) (reversing a criminal conviction under the Due Process Clause because it was based on a confession obtained by physical coercion).

While <u>Bram</u> was decided before <u>Brown</u> and its progeny, for the middle third of the 20th century the rule against admitting coerced confessions rested primarily, if not exclusively, on

notions of due process. The due process test takes into consideration "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." Gallegos v. Colorado, 370 U.S. 49, 55 (1962); Rock v. Pate, 367 U.S. 433, 440 (1961) ("[All] the circumstances attendant upon the confession must be taken into account"); Malinski v. New York, 324 U.S. 401, 404 (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant"). The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, 346 U.S. 156, 185 (1953).

In Miranda the Court expressly disapproved deceptive stratagems such as giving false legal advice, stating: "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." Miranda, 384 U.S. at 476, 86 S. Ct. at 1629.

A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given. *See* Lynumn v. Illinois, 372 U.S. 528, 534, 83 S. Ct. 917, 920 9 L.Ed. 2d 922 (1963). The warnings required by Miranda v Arizona, 384 U.S. 436 (1966) are needed only when there has been such a restriction on a persons freedom as to render him/her "in custody" Pasdon v. City of Peabody, 417 F.3d 225 (1st Cir. 2005).

Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials. *See* Schnecklothe v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047 (1973)**.**

The validity of a Miranda waiver and the voluntariness of a confession must be addressed separately and distinctly. Edwards v. Arizona, 451 U. S. 477 (1981). The delineation of custody depends upon the objective circumstances of the interrogation not on the subjective views harbored by the interrogating officers or the person being interrogated. The subjective belief held by law enforcement officers is irrelevant in determining whether a person is in custody for purposes of Miranda warnings, except to the extent those beliefs influence the objective conditions surrounding an interrogation. Stansbury v. California,511 U.S. 318 (1994); Pennsylvania v. Muniz, 496 U.S. 582 (1990).

Questioning during a Terry stop can be a custodial interrogation necessitating Miranda warnings. Miranda warnings are necessary even during a Terry stop if the suspect has been taken

into custody or if the questioning otherwise takes place in a police dominated or compelling atmosphere.  United States v. Bautista, 684 F. 2d 1286 (9th Cir. 1982).  Even where the stop is valid, the validity of the stop does not insulate it from the possible application of Miranda principles.  Berkemer v. McCarty, 468 U.S. 420 (1984).

Miranda warnings are required only when a person in custody is subjected to express questioning or its functional equivalent.  Rhode Island v. Innis, 446 U. S. 291 (1980). Samuels alleges no warnings were provided to him with respect to his rights under the Fifth Amendment. Additionally, he executed no written waiver nor did he provide a written statement.  It appears that Samuels' admissions  were obtained in violation of his rights under Miranda and the product of an unlawful arrest/detention. Upon all of the attendant circumstances, Samuels' confession was not voluntary.

## SEARCH INCIDENT TO ARREST

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Subject to limited exceptions, warrantless searches of private property are per se unreasonable. California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); United States v. Donlin, 982 F.2d 31, 33 (1st Cir.1992). The mobility of automobiles and the attendant need to prevent loss of evidence undergirds one such exception. A warrantless search of an automobile will be upheld if "officers have probable cause to believe that the vehicle contains contraband." United States v. Ross, 456 U.S. 798, 808, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The Government bears the burden of proving the lawfulness of the search. Mincey v. Arizona, 437 U.S. 385, 390-91, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); United States v. Cruz Jimenez, 894 F.2d 1, 7 (1st Cir. 1990). Specifically, the government must demonstrate that law enforcement officers had "a belief, reasonably arising out of circumstances known to the seizing officer," that the vehicle "contain[ed] that which by law is subject to seizure and destruction," Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925).FN3 Our focus is on "what the agents knew at the time they searched the car," United States v. Goldman, 41 F.3d 785, 787

(1st Cir. 1994). In this case the seizures incident to the defendant's arrest may not be maintained.

## **CONCLUSION**

For all of the reasons set forth above the defendant is entitled to the relief requested and an evidentiary hearing upon the issues raised herein.

THE DEFENDANT,

BY:/s/ Vincent A. Bongiorni, Esq.
95 State Street, Suite 309
Springfield, MA. 01103
(413) 737-1489
BBO#049040

CERTIFICATE OF SERVICE

I, Vincent A. Bongiorni, Esq., do hereby certify that I have served a copy of the foregoing via CM/ECF to AUSA Neil Gallagher, United States District Court, John J. Moakley U.S. Courthouse, 1 Courthouse Way, Boston, MA 02210, this 1 day of March 2007.

/s/ Vincent A. Bongiorni

<u>APPENDIX AA</u>

<u>TABLE OF CONTENTS</u>

| | BEGDOC | ENDDOC | DATE | DOCTYPE | NOTES |
|---|---|---|---|---|---|
| ITEM 1 | USAO0000077 | USAO0000077 | 00/00/2005 | List of Search Warrants | |
| ITEM 2 | USAO0000078 | USAO0000082 | 08/26/2005 | Search Warrant | MJ No. 56-643, 31 Braywood Circle, Springfield, MA.<br>SA Jonathan Shankweiler |
| ITEM 3 | USAO0000083 | USAO0000121 | 08/26/2005 | Application and Affidavit for Search Warrant | MJ No. 05-643, 31 Braywood Circle, Springfield MA.<br>SA Jonathan Shankweiler |
| ITEM 4 | USAO0000122 | USAO0000126 | 08/26/2005 | Application and Affidavit For Search Warrant | MJ No. 05-644, 93 Floerence St. Apt. 1B, Springfield, MA<br>SA Jonathan Shankweiler<br>SA Jonathan Shankweiler<br>31 Braywood Cirlce, Springfield, MA |
| ITEM 5 | USAO0000127 | USAO0000130 | 08/26/2005 | Application and Affidavit for Search Warrant | MJ No. 05-644, 93 Florence St., Apt. 1B Springfield, MA<br>SA Jonathan Shankweiler |
| ITEM 6 | USAO0000131 | USAO0000136 | 08/26/2005 | Application and Affidavit for Search Warrant | MJ No. 05-645, 61 Appoloosa Lane, Springfield, MA<br>SA Jonathan Shankweiler<br>SA Jonathan Shankweiler |
| ITEM 7 | USAO0000137 | USAO0000139 | 08/26/2005 | Application and Affidavit for Search Warrant | MJ No. 05-645, 61 Appoloosa Ln, W. Springfield, MA<br>SA Jonathan Shankweiler |
| ITEM 8 | USAO0000140 | USAO0000146 | 08/26/2005 | Search Warrant | MJ No. 05-647, Pine Point Auto Sales, 1608 State Street, Springfield, MA |
| ITEM 9 | USAO0000147 | USAO0000152 | 08/26/2005 | Application and affidavit for Search Warrant | MJ No. 05-647, Pine Point Auto Sales, 1608 State Street, Springfield, MA<br>SA Jonathan Shankweiler |
| ITEM 10 | USAO0000153 | USAO0000154 | 08/28/2005 | Search Warrant | MJ No. 05-698, 41 Brooks Street, Springfield, MA |
| ITEM 11 | USAO0000155 | USAO0000155 | 08/28/2005 | Application and Affidavit for Search Warrant | 41 Brooks Street, Springfield, MA<br>SA Jonathan Shankweiler |
| ITEM 12 | USAO0000161 | USAO0000162 | 08/25/2005 | Search Warrant | MJ No. 05-649, 2000 Chrysler 300 automobile |
| ITEM 13 | USAO0000163 | USAO0000163 | 08/28/2005 | Application and Affidavit for Search Warrant | 2000 Chrysler 300 automobile<br>SA Jonathan Shankweiler |
| ITEM 14 | USAO0000164 | USAO0000165 | 08/28/2005 | Search Warrant | 2001 Nissan Maxima auto |
| ITEM 15 | USAO0000166 | USAO0000166 | 08/28/2005 | Application and Affidavit for Search Warrant | 2001 Nissan Maxima auto<br>SA Jonathan Shankweiler |
| ITEM 16 | USAO0000336 | USAO0000336 | 05/31/2005 | Cover Sheet | Cesar Zapata (413) 883-7649 |
| ITEM 17 | USAO0000337 | USAO0000347 | 05/31/2005 | Wiretap Application | Application for Wiretap - Telephone Number (413) 883-7649 |
| ITEM 18 | USAO0000348 | USAO0000349 | 05/31/2005 | Wiretap Order | Telephone (413) 883-7649 |

| | BEGDOC | ENDDOC | DATE | DOCTYPE | NOTES |
|---|---|---|---|---|---|
| **ITEM 19** | USAO0000350 | USAO0000353 | 05/31/2005 | Warrant | Warrant Authorizing the interception of Wiretap on telephone no (413) 883-7649 |
| **ITEM 20** | USAO0000354 | USAO0000389 | 05/31/2005 | Affidavit | Affidavit of SA John Barron and Trp Michael Martin in support of wiretap for telephone number (413) 883-7649 |
| **ITEM 21** | USAO0000390 | USAO0000390 | 06/16/2005 | Cover Sheet | Cesar Zapata - Telephone No (413) 883-7649 |
| **ITEM 22** | USAO0000391 | USAO0000401 | 06/16/2005 | Application | Wiretap Application - Telephone Number (413) 883-7649 |
| **ITEM 23** | USAO0000402 | USAO0000405 | 06/16/2005 | Warrant | Warrant Authorizing Wiretap on (413) 883-7649 |
| **ITEM 24** | USAO0000406 | USAO0000425 | 06/16/2005 | Affidavit in support of wiretap | Affidavit of SA John Barron and Trp Michael Martin in support of wiretap for telephone no. (413) 883-7649 |
| **ITEM 25** | USAO0000426 | USAO0000429 | 05/31/2005 | Warrant | Warrant authorizing wiretap on telephone number (413) 883-7649 |
| **ITEM 26** | USAO0000430 | USAO000433 | 05/31/2005 | Service Provider Order | Wiretap Order for telephone no (413) 883-7649 |
| **ITEM 27** | USAO0000434 | USAO0000434 | 06/30/2005 | Cover Sheet | Cesar Zapata (413) 883-7649, 2nd Extension |
| **ITEM 28** | USAO0000435 | USAO0000445 | 06/30/2005 | Wiretap Application | Application for wiretap on telephone number (413) 883-7649 |
| **ITEM 29** | USAO0000446 | USAO0000449 | 06/30/2005 | Warrant | Renewal/Extension Warrant authorizing wiretap on telephone no. (413) 883-7649 |
| **ITEM 30** | USAO0000450 | USAO0000478 | 06/30/2005 | Affidavit | Affidavit of SA John Barron and Trp. Michael Martin for wiretap application on telephone no (413) 883-7649 |
| **ITEM 31** | USAO0000479 | USAO0000479 | 07/14/2005 | Cover Sheet | Cesar Zapata (413) 883-7649, 3rd Extension |
| **ITEM 32** | USAO0000480 | USAO0000490 | 07/14/2005 | Application | Application for wiretap on telephone number (413) 883-7649 |
| **ITEM 33** | USAO0000491 | USAO0000494 | 07/14/2005 | Warrant | Warrant for renewal/extension wiretap on telephone no (413) 883-7649 |
| **ITEM 34** | USAO0000495 | USAO0000518 | 07/14/2005 | Affidavit | Affidavit of SA John Barron and Trp Michael Martin in support of wiretap application for telephone no (413) 883-7649 |
| **ITEM 35** | USAO0000519 | USAO0000519 | 07/29/2005 | Cover Sheet | Cesar Zapata (413) 883-7649, 4th Extension |
| **ITEM 36** | USAO0000520 | USAO0000530 | 07/29/2005 | Wiretap Application | Application for wiretap on telephone number (413) 883-7649 |
| **ITEM 37** | USAO0000531 | USAO000561 | 07/29/2005 | Affidavit | Affidavit of  SA John Barron and Trp Michael Martin in support of wiretap application for telephone no (413) 883-7649 |
| **ITEM 38** | USAO0000562 | USAO0000562 | 08/15/2005 | Cover Sheet | Cesar Zapata (413) 883-7649, 5th Extension |
| **ITEM 39** | USAO0000563 | USAO0000573 | 08/15/2005 | Application | Application for wiretap on telephone number (413) 883-7649 |
| **ITEM 40** | USAO0000574 | USAO0000603 | 08/15/2005 | Affidavit | Affidavit of SA John Barron and Trp Michael Martin in support of wiretap application for telephone no (413) 883-7649 |

| | BEGDOC | ENDDOC | DATE | DOCTYPE | NOTES |
|---|---|---|---|---|---|
| **ITEM 41** | USAO0000604 | USAO0000604 | 07/01/2005 | Cover Sheet | Jose Delgado (413) 313-3144 |
| **ITEM 42** | USAO0000605 | USAO0000616 | 07/01/2005 | Wiretap Application | Application for wiretap on telephone number (413) 313-3144 |
| **ITEM 43** | USAO0000617 | USAO0000621 | 07/01/2005 | Warrant | Warrant authorizing the wiretap on telephone number (413) 313-3144 |
| **ITEM 44** | USAO0000622 | USAO0000631 | 07/01/2005 | Service Provider Order- Verizon Wireless | Service Provider Order authorizing wiretap on telephone number (413) 313-3144 |
| **ITEM 45** | USAO0000632 | USAO0000637 | 07/01/2005 | Monitoring Instructions | |
| **ITEM 46** | USAO0000638 | USAO0000690 | 07/01/2005 | Affidavit | Affidavit of SA Jonathan Shankweiler and Trp Michael Martin in support of application for electronic surveillance |
| **ITEM 47** | USAO0000691 | USAO0000691 | 07/01/2005 | Cover Sheet | Jose Delgado (413) 204-8402 |
| **ITEM 48** | USAO0000692 | USAO0000702 | 07/01/2005 | Application | Application for wiretap on telephone number (413) 204-8402 |
| **ITEM 49** | USAO0000703 | USAO0000709 | 07/01/2005 | Warrant | Warrant authorizing wiretap on telephone number (413) 204-8402 |
| **ITEM 50** | USAO0000710 | USAO0000763 | 07/01/2005 | Service Provider Order & Affidavit | Service Provider Order - T-Mobile for telephone number (413) 204-8402; Affidavit of SA Jonathan Shankweiler Trp Michael Martin |
| **ITEM 51** | USAO0000764 | USAO0000764 | 07/19/2005 | Cover Sheet | Jose Delgado (917) 684-5975 |
| **ITEM 52** | USAO0000765 | USAO0000777 | 07/19/2005 | Application | Application for wiretap on telephone number (917) 684-5975 |
| **ITEM 53** | USAO0000778 | USAO0000824 | 07/19/2005 | Affidavit | Affidavit of SA Jonathan  Shankweiler |
| **ITEM 54** | USAO0000825 | USAO0000831 | 07/19/2005 | Warrant | Warrant authorizing the wiretap on telephone number (917) 684-5975 |
| **ITEM 55** | USAO0000832 | USAO0000832 | 07/19/2005 | Cover Sheet | Delgado  (347) 621-7413 |
| **ITEM 56** | USAO0000833 | USAO0000845 | 07/19/2005 | Application | Application for wiretap on telephone number (347) 621-7413 |
| **ITEM 57** | USAO0000846 | USAO0000850 | 07/19/2005 | Warrant | Warrant authorizing wiretap on telephone number (347) 621-7413 |
| **ITEM 58** | USAO0000851 | USAO0000852 | 07/19/2005 | Service Provider Order | Order to Nextel authorizing the wiretap on telephone number (347) 621-7413 |
| **ITEM 59** | USAO0000853 | USAO0000854 | 07/19/2005 | Service Provider Order | Order to Nextel authorizing the wiretap on telephone number (347) 621-7413 |
| **ITEM 60** | USAO0000855 | USAO0000855 | 08/03/2005 | Cover Sheet | Jose Delgado (917) 684-5975, 1st Extension |
| **ITEM 61** | USAO0000856 | USAO0000866 | 08/03/2005 | Wiretap Application | Application for wiretap on telephone number (917) 684-5975 |
| **ITEM 62** | USAO0000867 | USAO0000868 | 08/03/2005 | Service Order Provider | Order to Sprint authorizing the wiretap on telephone number (917) 684-5975 |
| **ITEM 63** | USAO0000869 | USAO0000899 | 08/03/2005 | Affidavit | Affidavit of SA Jonathan Shankweiler and Trp Michael Martin in support of application for wiretap on telephone numbers  (917) 684-5975 and (347) 621-7413 |

| | BEGDOC | ENDDOC | DATE | DOCTYPE | NOTES |
|---|---|---|---|---|---|
| **ITEM 64** | USAO0000900 | USAO00009906 | 08/03/2005 | Warrant | Warrant authorizing wiretap on telephone number (917) 684-5975 |
| **ITEM 65** | USAO0000907 | USAO0000907 | 08/03/2005 | Cove Sheet | Delgado (347) 621-7413, 1st Extension |
| **ITEM 66** | USAO0000908 | USAO0000918 | 08/03/2005 | Application | Wiretap application for telephone number (347) 621-7413 |
| **ITEM 67** | USAO0000919 | USAO0000920 | 08/03/2005 | Service Provider Order | Order to Nextel authorizing the wiretap on telephone number (347) 621-7413 |
| **ITEM 68** | USAO0000921 | USAO0000927 | 08/03/2005 | Warrant | Warrant authorizing the wiretap on telephone number (347) 621-7413 |
| **ITEM 69** | USAO0000928 | USAO0000928 | 08/17/2005 | Cover Sheet | Jose Delgado (646) 427-9433 |
| **ITEM 70** | USAO0000929 | USAO0000939 | 08/17/2005 | Application | Application for wiretap on telephone number (646) 427-9433 |
| **ITEM 71** | USAO0000940 | USAO0000990 | 08/17/2005 | Affidavit | Affidavit of SA Jonathan Shankweiler and Trp Michael Martin in support of wiretap application |
| **ITEM 72** | USAO0000991 | USAO0000995 | 08/17/2005 | Warrant | Warrant authorizing the wiretap on telephone number (646) 427-9433 |
| **ITEM 73** | USAO0000996 | USAO0000999 | 08/17/2005 | Service Provider Order | Order to Sprint authorizing the wiretap on telephone number (646) 427-9433 |
| **ITEM 74** | USAO0001000 | USAO0001000 | 08/17/2005 | Cover Sheet | Samuels (413) 519-9044 |
| **ITEM 75** | USAO0001001 | USAO00001013 | 08/17/2005 | Application | Application for wiretap on telephone number (413) 519-9044 |
| **ITEM 76** | USAO00001014 | UASO00001052 | 08/17/2005 | Affidavit | Affidavit of SA John Baron and Trp Michael Martin in support of wiretap application for telephone no. (413) 519-9044 |
| **ITEM 77** | USAO00001053 | UASO00001061 | 08/17/2005 | Warrant | Warrant authorizing the wiretap on telephone number (413) 519-9044 |