IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA      )
                              )           CRIMINAL ACTION
        v.                    )
                              )           NO.  05-10235-GAO
1. SERGIO ALCANTARA-SALDANA   )
2. CESAR ZAPATA               )
3. HERIBERTO CARRASCO         )
4. GEORGE SAMUELS             )
5. MANUEL FLORENTINO          )
```

## GOVERNMENT'S MOTION IN LIMINE TO ADMIT TESTIMONY ABOUT LIMITS OF FINGERPRINT ANALYSIS

The United States, by and through its counsel, Michael J. Sullivan, United States Attorney, and Neil J. Gallagher, Jr. and Rachel E. Hershfang, Assistant United States Attorneys, hereby moves in limine to admit testimony by fingerprint examiners regarding the absence of identifiable, latent fingerprints on many items seized during the take-down of the case (on August 26 and 27, 2007). The government submits that this testimony is proper expert testimony, is relevant and reliable under the Daubert/Kumho Tire principles, and will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).

## I.    Anticipated testimony.

The government intends to call either Massachusetts State

1

Trooper Christopher Dolan or Detective Lieutenant Kenneth Martin
(also of the Mass. State Police) (collectively, the "fingerprint
expert") to testify, based on their training and experience, as
to the manner in which fingerprints are created and the factors
that affect whether a fingerprint will be left when a person's
finger or palm comes in contact with an object.  The fingerprint
expert is expected to describe factors influencing the deposit of
a print, including (1) information about the individual (such as
the condition of his or her hands, the depth of his or her
ridges, whether the person's hands were dirty, wet, or contained
any foreign matter such as dirt, grease, and the amount of sweat
they produce); (2) the nature of the surface being touched (in
addition to the size of the surface, surfaces that are dirty,
wet, pitted, rusty, porous, or ridged will all adversely affect
the formation of recoverable prints); (3) the manner in which the
object is handled (if the fingers move along the surface, any
prints will be likely to be smudged, or if the object is rubbed
against another surface after being touched, any prints created
could also likely be destroyed); and (4) atmospheric conditions
(temperature, humidity, or the presence of any excess moisture
may also affect the creation of fingerprints).

The fingerprint expert is further expected to testify that
identifiable latent fingerprints are rarely recovered from
firearms.  This testimony will be based on training and

2

experience, as well as on data collected by the State Police showing that useable fingerprints are recovered from firearms and ammunition in approximately 3 to 5 percent of cases.  The fingerprint expert will also base that opinion on the manner in which guns are constructed, materials with which guns are coated, the way guns are usually handled or processed, and gases discharged upon firing which may adversely affect any existing prints.

With respect to the drugs seized in the case, the fingerprint expert is expected to testify about the factors that influence the recovery of fingerprints from packaging, including plastic.  For example, the expert will describe (1) the difficulty in recovering latent fingerprints from small sections of plastic bags, due to the tendency for these bags to be pinched or bunched together while in use as drug packaging, thus resulting in a fragmented fingerprint, and (2) the tendency of containers that have held cocaine to have a thin layer of powder on the outside, as well as inside, which can inhibit the depositing of fingerprints.

## II. Relevant legal principles.

Before such testimony is admitted, the Court must make a reliability and relevance determination under Rule 702; however, the "trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702,

Advisory Committee Notes, 2000 Amendments (quoting <u>United States</u> <u>v. 14.38 Acres of Land Situated in Leflore County, Mississippi</u>, 80 F.3d 1074, 1078 (5th Cir. 1966)); <u>Daubert</u>, 509 U.S. at 595-96 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

In this case, the testimony concerning the difficulty of recovering prints from firearms and packaging, and the various reasons for this difficulty, is important to "educate the factfinder." <u>See</u> Fed.R.Evid. 702, Advisory Committee Notes, 2000 Amendments ("The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.")

The evidence here is reliable and relevant.  Both fingerprint experts have been fingerprint examiners for over a decade and have received hundreds of hours of training in latent print analysis.  Each has personally examined hundreds of items, including guns and drug packaging, for prints.  Both could "assist" the trier of fact in understanding how latent prints are

4

(or are not) deposited on various surfaces, including guns and
drug packaging, and what factors can influence whether an
identifiable latent print is found.

The testimony is also relevant, particularly if the defense
attempts to suggest that the absence of a defendant's prints
means he must not have touched an object (either a gun or the
drugs).  Courts are increasingly recognizing the need to address
the pervasive "CSI effect," or jurors' expectations that they
will see dispositive forensic evidence in every case, since that
it what happens on popular television crime shows.[1]  See generally
Shelton, et al. "A Study and Juror Expectations and Demands
Concerning Scientific Evidence: Does the CSI Effect Exist?"
http://law.vanderbilt.edu/journals/jetl/articles/vol9no2/Shelton.
pdf ) (authors concluded that, although heightened juror
expectation for scientific evidence could not be tied to any
particular television show, "the law must become better at

_____

[1] At least one District Judge in this District regularly
gives a pretrial instruction to counter this assumption.  The
government will ask that a similar instruction be given in this
case.  The instruction is, "Let me talk for a moment about
television and movies.  Many people watch television shows or
movies about police work or lawyers or the criminal justice
system, and sometimes people are affected by that when they serve
as jurors.  Television shows and movies can create false
expectations about real life; for example, how the trial is going
to proceed, what the evidence might look like.  You must decide
this case on the evidence in front of you and the law as I give
it to you.  Do not decide this case, even in part, based on
something you saw on television of in a movie.  It's improper and
unfair."

explaining why such evidence is not forthcoming"); Thomas, "CSI Effect: Fact or Fiction," 115 Yale L.J. Pocket Part 70 (2006) (discussion of case in Arizona in which foreperson convinced entire jury that police had done poor investigation based on what foreman had seen on TV); Linda Deutsch, Legal TV Dramas Influence Real Jurors, Associated Press, Jan. 14, 2006, available in Westlaw, APWires database (copy attached hereto).

Increasingly, circuit courts are recognizing and affirming district courts' admission of such testimony to educate the jury about the capabilities and limitations of real-life forensic analysis. For example, in United States v. Burdeau, defense counsel had cross-examined an FBI agent about the results of fingerprint tests conducted on a glass countertop and a firearm in connection with an armed robbery. 168 F.3d. 352, 356-57 (9th Cir. 1999). On redirect, and over defendant's objections, the government elicited testimony that "identifiable fingerprints are almost never found on guns and only rarely found on other objects submitted for testing." Id. Further, the expert testified as to why that is so, including that "the surface might not be conducive to fingerprints, skin can be too dry to leave a print, or fingers may be moved in a manner that smudges a print." Id. The Ninth Circuit rejected the defendant's argument that the testimony was irrelevant, finding that it "aided the jury in understanding why [defendant's] fingerprints might not be found

on items that the jury knew he had touched, which explanation
would not otherwise have been readily apparent." Id.[2]

     Similarly here, the government anticipates testimony that
various seized items (a handgun, drugs, cellular telephones) were
taken from the defendants' homes and persons.  After hearing this
testimony, a lay person might expect that a subsequent forensic
examination of these items would yield identifiable, latent
fingerprints.  Accordingly, the expert's testimony could be

---

[2]See also, United States v. Carpenter, 403 F.3d 9, 10 n.1
(1st Cir. 2005)("To counter [defendant's] contention about the
absence of fingerprints on the weapon, the government adduced
expert testimony that it is exceedingly difficult to lift viable
fingerprints from the surfaces of this particular weapon.");
United States v. Glover, 479 F.3d 511, 518 (7th Cir. 2007)
(expert testimony about difficulty in retrieving latent
fingerprints helped jury understand that, "despite what they
might see on popular television crime shows, certain objects are
not particularly conducive to finding prints"); United States v.
Coffee, 434 F.3d 887, 897 (6th Cir. 2006)(in sufficiency of the
evidence challenge, "fact that no identifiable fingerprints were
found on either of the revolvers is not determinative,
particularly in light of the testimony of the government's expert
witness...that fingerprints are rarely identified on firearms,
the absence of fingerprints does not mean that an item has not
been touched, and mechanics' cracked and gouged hands (defendant
was a mechanic) are less likely than those of members of other
professions to leave fingerprints."); United States v. Castillo,
406 F.3d 806, 810 (7th Cir. 2005)(government expert testified
that "guns and ammunition are not very receptive surfaces for
leaving fingerprints"); United States v. Williams, 358 F.3d 956,
960 (D.C. Cir. 2004)(government introduced expert testimony that
"it was difficult to recover a useful fingerprint from a gun and
that the absence of any fingerprints on the gun recovered ...was
not unusual."); cf., United States v. Paladino, 401 F.3d 471, 477
(7th Cir. 2005)(holding that rarity of finding identifiable
fingerprints on firearms was irrelevant, but nonetheless
recognizing that it is indeed rare)(quoting Clive A. Barnum &
Darrell R. Klasey, Factors Affecting the Recovery of Latent
Prints on Firearms, The Prosecutor, Jan./Feb. 1998, at 32.)

necessary to educate the jury, and to prevent them from being

misled, either by argument at trial or by external influences

such as television crime dramas.

                              Respectfully submitted,
                              MICHAEL J. SULLIVAN
                              United States Attorney


                    By:  /s/ Rachel E. Hershfang
                         Neil J. Gallagher, Jr.
                         Rachel E. Hershfang
                         Assistant U.S. Attorneys
                         (617) 748-3392/-3249

**CERTIFICATE OF SERVICE**

I, Rachel E. Hershfang, hereby certify that this document filed through the
ECF system on Novembber 9, 2007, will be sent electronically to the registered
participants as identified on the Notice of Electronic Filing (NEF).

                         /s/ Rachel E. Hershfang
                         Rachel E. Hershfang

Westlaw.                                                    **News**Room

1/14/06 Associated Press (AP) Newswires 18:25:40

AP Online

Copyright 2006 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.

**January 14, 2006**

**Legal     TV     Dramas** Influence Real Jurors
By LINDA DEUTSCH
AP Special Correspondent

LOS ANGELES_Reality TV they are not, but two hit shows are so convincing as
imitations of life in the criminal justice system that some legal experts worry
they're distorting the expectations of real jurors.

The influence of the "CSI: Crime Scene Investigation" and "Law & Order" franchises
has permeated American law. Lawyers ask would-be jurors whether they watch the shows
and then change strategies depending on the answers. Law schools maintain video
libraries of the programs as teaching tools and even analyze the plot lines in
class.

Which side benefits the most _ prosecutors or defense attorneys _ is debatable.
While "Law & Order" glamorizes prosecutors, "CSI" can set standards for the
infallibility of forensic evidence that prosecutors can't often meet _ a
science-solves-all formula that millions of viewers may bring to jury service.

There is no debating, however, one clear, very widespread result of these programs:
The justice system is now facing what legal experts call, "the CSI effect," a
TV-bred demand by jurors for high tech, indisputable forensic evidence before they
will convict.

"These programs have a potential for great mischief but also for great learning,"
said Laurie Levenson, a Loyola University (Los Angeles) Law School professor who
discusses "Law & Order" in her classes and whose school maintains a library of
episodes.

"CSI" dominates network rankings for CBS with versions set in Las Vegas, Miami and
New York, while "Law & Order" and its spinoffs are an NBC stalwart. Both occupy many
hours each day on cable. A single first-run episode of "CSI" can draw 26 million
viewers while a "Law & Order" episode averages 11.4 million. Multiply that by
spinoffs and cable reruns, throw in other crime-based series, and there's a virtual
world of crime-show junkies who could end up deciding guilt or innocence in real
trials.

"The expectations of jurors are more elevated," said Elissa Mayo, assistant lab
director for the California Attorney General's Bureau of Forensic Services. "They
think that we have all the space-age equipment that they see on TV and before you
come back from the commercial break you have the results."

In response, scholarly law journals have included articles suggesting that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

prosecutors warn jurors at the outset that it can be very difficult to obtain
forensic evidence and that circumstantial evidence is sufficient to prove a case.

The problem is that many cases have little forensic evidence, notes Michael Asimow,
a UCLA law professor who teaches a course on law and popular culture.

"Shows like 'CSI' are teaching people that without forensic evidence you can't
convict anybody," said Asimow.

In Baltimore, for example, less than 10 percent of homicide cases in the state
attorney's office in 2004 involved fingerprint or DNA evidence. Evidence, instead,
often was circumstantial or reliant on eyewitnesses.

In one case, an 11-year-old girl pointed at a defendant and said, "That's the man
who shot my father." But jurors found him not guilty. One later explained: "I would
have liked to see some evidence, like finding the gun with fingerprints."

In last year's murder case against Robert Blake, prospective jurors were asked
whether they could fairly evaluate evidence prosecutors contended would show the
former tough-guy actor killed his wife.

"Oh, that's easy," said one prospect. "I'll just go by the DNA."

A prosecutor informed the potential juror there might not be DNA evidence _ and as
the case played out there was none. Forensic testimony focused on a smattering of
gunshot residue and blood spatter and the claim that police mishandled evidence _ an
issue stressed in Blake's successful defense by attorney M. Gerald Schwartzbach.

Schwartzbach acknowledged that jurors probably were more receptive to his hours of
laborious cross-examination on scientific details because of their exposure to TV
forensics shows _ though he dismisses those shows as "electronic relatives of
tabloid journalism.

Hollywood's take on forensics is what millions of viewers get each week as they
watch pistol-packing sleuths peer at bloody crime scene evidence and get the bad guy
thanks to technology. The fact that a forensic expert with a gun could possibly
contaminate evidence doesn't bother Ann Donahue, executive producer and co-creator
of "CSI Miami."

"What we're doing is entertaining," she said. "It's like a medical show. When you go
to the hospital, you're not going to find that doctor you see on TV."

Dick Wolf, who launched the "Law & Order" franchise 16 years ago, traces his show's
roots to a pitch he made to the late NBC chief Brandon Tartikoff for a program based
on "the front page of the New York Post."

"And that's still it," he says, "'Headless body found in topless bar' is still a
great story."

The "Law & Order" series frequently offers thinly disguised dramatizations of
high-profile cases. But Wolf says the shows are more than mere entertainment.

"I think we have raised people's awareness of how the justice system operates, how
evidence is obtained, the conflicts between cops and prosecutors, why evidence is

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

excluded that the jury never gets to see," he said.

Defense attorney Thomas Mesereau Jr., who won acquittal for Michael Jackson on child molestation charges in a case with almost no forensic evidence, said he rarely watches "CSI" or "Law & Order," but doesn't object to jurors being educated by TV.

"I think we're better off if the public understands what techniques are available," Mesereau said. "I have great faith in American juries and I would like to think that they know a lot of these shows are pure fantasy."

But sometimes that fantasy does alter the reality of a case.

Last year in Texas, the conviction of Andrea Yates in the drowning deaths of her five children was reversed because of an error involving "Law & Order."

Forensic psychiatrist Dr. Park Dietz, a key prosecution witness and one-time consultant for the show, testified that an episode in which a woman drowned her children in a bathtub aired before the Yates killings.

Prosecutors suggested Yates concluded from that episode that she could get away with the murders.

However, it turned out, there was no such episode and Dietz has admitted he was mistaken.

In reversing Yates' conviction, an appeals court said his testimony could have affected the judgment of the jury.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Violent Crime (1VI27); Crime (1CR87); Judicial (1JU36); Legal (1LE33); Social Issues (1SO05); Criminal Law (1CR79))

INDUSTRY:  (TV (1TV19); Entertainment (1EN08); TV Programming (1TV26))

REGION:  (USA (1US73); Americas (1AM92); Florida (1FL79); New York (1NE72); North America (1NO39); California (1CA98))

Language:  EN

OTHER INDEXING:  (ANDREA YATES; BUREAU OF FORENSIC SERVICES; CBS; CSI; DNA; LAW SCHOOL; LOYOLA UNIVERSITY; NBC; TV; UCLA; YATES)  (Ann Donahue; Asimow; Blake; Dick Wolf; Dietz; Elissa Mayo; Hollywood; Influence Real Jurors; Laurie Levenson; Lawyers; M. Gerald Schwartzbach; Mesereau; Michael Asimow; Michael Jackson; Multiply; Park Dietz; Robert Blake; Schwartzbach; Thomas Mesereau Jr.; Wolf) (United States; USA; NorthAmerica)

KEYWORDS:  (e)

Word Count: 1264
1/14/06 APWIRES 18:25:40
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.