UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 05-10235-GAO

UNITED STATES OF AMERICA

v.

SERGIO ELPIDIO ALCANTARA-SALDANA, CESAR ZAPATA, HERIBERTO CARRASCO,
GEORGE SAMUELS, and MANUEL FLORENTINO
Defendants.

OPINION AND ORDER
November 14, 2007

O'TOOLE, D.J.

In about March 2005, law enforcement agents from the Drug Enforcement Administration

("DEA") in the agency's Springfield Resident Office and the Massachusetts State Police began a drug

investigation of a person known to them as Jose Delgado, who was later identified to be the

defendant Sergio Alcantara-Saldana ("Saldana"). Investigators concluded that Saldana and the

defendant Cesar Zapata, partners in a Springfield business known as "Pine Point Auto Sales," were

the leaders of a cocaine distribution conspiracy in the Springfield area. They believed that the

conspirators obtained the cocaine from large scale drug traffickers in New York and the Dominican

Republic. The defendants are all charged with conspiracy to distribute cocaine in violation of 21

U.S.C. § 846. In addition, Saldana is charged with distribution of Oxycodone, and the defendants

George Samuels and Manuel Florentino are charged with possession with the intent to distribute five

kilograms or more of cocaine, all in violation of 21 U.S.C. 841(a)(1).

In furtherance of the investigation, agents sought and were issued warrants to conduct

electronic surveillance and interception of calls made to and from certain cellular telephones used by

Zapata, Saldana and Samuels. Later, in part relying on evidence obtained from the wiretaps, agents

sought and obtained warrants to conduct physical searches of premises at five different locations in the Springfield area, all connected to one or more of the defendants. The defendants have moved on a variety of grounds to suppress evidence discovered by law enforcement agents as a result of the intercepts and searches. For the reasons that are set forth below, after hearing and consideration of the submissions and arguments of the parties, the several motions are in all respects DENIED.

## I.    The Wiretaps

Pursuant to Mass. Gen. Laws. ch. 272, § 99, agents applied for and were granted warrants by an associate justice of the Massachusetts Superior Court to conduct electronic surveillance of a particular cellular telephone used by Zapata. The first warrant, issued on May 31, 2005, authorized interception between June 2 and June 16, 2005. Five subsequent warrants, issued serially, authorized wiretaps on the same Zapata phone for successive fifteen-day periods through August 27, 2005. Similarly, state wiretap warrants were issued authorizing interception of calls to and from several different cell phones used by Saldana between July 1 and August 27, 2005. In addition, a state warrant authorized the interception of calls to and from a cell phone used by Samuels from August 17 through August 27, 2005.

Samuels, Zapata, and Saldana have each moved to suppress evidence obtained from the wiretaps for a variety of reasons, and the other defendants, apparently having been participants in intercepted calls, have joined those motions.

### A.    Authority to intercept cell-to-cell digital calls

A principal argument by all defendants is that the wiretap warrants were not lawfully issued under Massachusetts law because the relevant state statute only authorizes the interception of a "wire or oral communication," and a digitally encoded cell phone call falls within neither category. The

2

defendants then urge that evidence obtained unlawfully under Massachusetts law must not be admitted in a federal trial notwithstanding the fact that the manner in which it was obtained did not contravene any federal constitutional or statutory principle. Both parts of their argument are wrong.

Taking the second argument first, the First Circuit has held unambiguously that "federal law governs the admissibility of evidence in federal prosecutions," United States v. Charles, 213 F.3d 10, 19 (1st Cir. 2000), and that "[e]vidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings *without regard to state law.*" United States v. Sutherland, 929 F.2d 765, 769 (1st Cir. 1991) (quoting United States v. Little, 753 F.2d 1420, 1434 (9th Cir. 1984) (emphasis in Little quotation)). Specifically, in both Charles and Sutherland, wiretap evidence that had been obtained in violation of the Massachusetts statute was held admissible in a federal prosecution where the manner of obtaining it did not violate federal law.

The First Circuit has reserved the question whether "in an extreme case of flagrant abuse of the law by state officials, where federal officials seek to capitalize on that abuse, this court might choose to exercise its supervisory powers by excluding ill-gotten evidence." Charles, 213 F.3d at 20 (quoting Sutherland, 929 F.2d at 771). Here, however, the defendants have not argued any factual basis for finding a "flagrant abuse of the law by state officials" as the reason why the interceptions were in violation of the state statute. Rather, their argument is that the scope of authority for wiretaps under the state statute is limited in a way that excludes the interception of cell-to-cell digitally transmitted communications. In effect, they are arguing that both the applying agents and the issuing

court misunderstood the scope of wiretap authority afforded under the statute as applied to digital cellphone technology. Such a misunderstanding, if there was one, would not amount to a "flagrant abuse."[1]

Consequently, even if it were the case that the interception of digitally transmitted cell-to-cell communications is not authorized under Massachusetts law, it does not matter here, because there is no question, the defendants concede, that the interception of such calls *is* authorized under the applicable federal law. See generally 18 U.S.C. § 2510 *et seq.*; id. § 2510(12) (defining "electronic communication"). Under Charles and Sutherland, that is all that matters.

The defendants' argument about the proper construction of the Massachusetts statute is both unconvincing in its terms and unsupported by any legal authority. In brief, their argument is that the Massachusetts statute only authorizes the interception of "oral" and "wire" communications, and that digitally transmitted communications are, as a matter of taxonomy, neither. Simply as a matter of textual analysis of the statute, the proposition is dubious. The statute defines "wire communication" as "any communication made in whole or in part through the use of facilities for the transmission of

---

[1] The Charles court also briefly discussed, but did not apply, a proposition derived from cases in other jurisdictions, that would require federal courts to apply state wiretap rules where the state rules were "more protective of privacy than the corresponding provisions of the Federal Wiretap Statute." 213 F.3d at 20, citing United States v. McNulty, 729 F.2d 1243, 1264 (10th Cir. 1983)(en banc); United States v. Marion, 535 F.2d 697, 702 (2d Cir. 1976). There are two reasons for not applying such a principle here. First, the Charles discussion is an *obiter dictum,* not a controlling ruling. More importantly, the proposition would be inconsistent with the express holdings of both Charles and Sutherland. The only time the principle articulated in those two cases could matter would be when evidence would have been excluded under state rules, but is nonetheless admissible under federal rules. Besides, if the Massachusetts statute does not address digital cell technology, as the defendants argue, so as to permit interception of digital cell-to-cell calls, then its prohibition against unauthorized interception, see Mass. Gen. Laws. ch. 272, § 99 C.1., also would not apply to digital cellular calls. That state of the law would hardly be "more protective of privacy."

4

communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." It is plausible to think that a communication made "in part . . . by aid of wire . . . or other like connection" could include communications made in part by aid of digital circuitry, either because the circuitry is itself a "wire" or because it is at least another connection "like" a wire.

There is no Massachusetts authority directly on point, but there are two indications that the Massachusetts courts would not see the problem with the statute that the defendants propose. The first indication comes from the Superior Court. In a few unpublished opinions, that court has rejected a similar argument to the one made here by the defendants and ruled that the interception of digitally transmitted cell telephone calls is authorized by the statute. See Commonwealth v. Simone, No. 2001-49-001, 002 (Mass. Sup. Ct. June 8, 2004); Commonwealth v. Aldana, No. 2002-0216 (Mass. Sup. Ct. Sept. 25, 2003); Commonwealth v. Sanders, No. 2000-1533, 1534, 1539, 15-16 (Mass. Sup. Ct. Aug. 18, 2003). (And, of course, Superior Court judges approved the applications and issued the warrants in this case, though without any indication that the issue pressed now by the defendants was explicitly considered.)

The second indication comes from the Massachusetts Appeals Court, the Commonwealth's intermediate appellate court. In Dillon v. Mass. Bay Transp. Auth., 729 N.E.2d 329 (Mass. App. Ct. 2000), that court was called upon to interpret another provision of the Massachusetts wiretap statute. At issue was whether the so-called "telephone exception" in the statute – excluding from the statute's prohibitions "telephone" "equipment" furnished by a "communications common carrier" – applied to recording equipment that the MBTA had obtained from a vendor that was not "a telephone company." See id. at 333. The court noted that the Massachusetts statute had been modeled on the federal, and that consequently it would be guided by the principle that the Massachusetts statute

should ordinarily be construed "in accordance with the construction given the cognate Federal statute by the Federal courts." Id. at 333 (quoting O'Sullivan v. NYNEX Corp., 687 N.E.2d 1241, 1244 n.5 (Mass. 1997)). Originally, the "telephone exception" in the two statutes was identical. In the mid-1980s, Congress amended the federal statute to accommodate technological and business changes that had occurred in the telecommunications industry, and it "modernized the telephone exception." Id. No similar amendment was made to the Massachusetts statute, which remained "out of date" in light of the industry changes. See id. (noting the congressional finding that the federal statute prior to the 1986 amendments was "hopelessly out of date"). In order to "preserve the substance of the statute," and to avoid "absurd or unreasonable results," the Appeals Court gave a broad interpretation to the Massachusetts statute, effectively expanding the scope of the "telephone exception" to apply to the equipment the MBTA had obtained from vendors that were not "communications common carriers" as literally defined in the statute.

The Dillon case suggests that the Massachusetts appellate courts would, in a similar fashion, expansively interpret the state wiretap statute to authorize interception of digitally transmitted cell-to-cell communications, notwithstanding the fact that Massachusetts has not made any updating legislative amendment to the statute like the 1994 amendment to the federal statute that made explicit the inclusion of modern cell phone technology. In fact, the justices of the Superior Court who have written on the issue have taken that to be Dillon's suggestion and followed it.

In sum, I conclude that the interception of the defendants' digital cell phone calls was not unlawful under the Massachusetts statute, and further, that if it were, the evidence obtained would still be admissible because such interception did not violate federal law.

B.    Showing of "necessity" for the wiretaps

Both the Massachusetts wiretap statute and the federal wiretap statute require a showing of a need for the proposed eavesdropping, usually referred to as the "necessity" requirement. The Massachusetts wiretap statute authorizes the issuance of a warrant only "[u]pon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried." Mass. Gen. Laws ch. 272, § 99. The federal wiretap statute similarly provides that a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c), and a judge, before authorizing a wiretap, must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed of tried or to be too dangerous." Id. § 2518(3)(c). The necessity requirement is intended to ensure that electronic surveillance is not used when normal investigative techniques would suffice to expose the crime. United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).

Under the federal standard, which is of concern here, see Charles, 213 F.3d at 19, the applicant for a wiretap warrant must make a "full and complete statement" showing that the circumstances of the investigation of criminal activity are such that "a wiretap, though disfavored as an investigative technique, is justified." United States v. Yeje-Cabrera, 430 F.3d 1, 8 (1st Cir. 2005). An affidavit in support of a warrant is sufficient if it presents facts from which "the issuing court could have reasonably concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed." Id. The First Circuit has explained that:

> The requirement of a full and complete statement cannot possibly mean that every single detail, even if relevant to the wiretap, must be included . . ..Many aspects of an investigation, especially in a large, complex case like this one, will not be relevant to the question of whether a particular wiretap is necessary. And even if there is some relevance, the officer need not detail every single fact, so long as sufficient facts are described as to the crucial issue and material contrary facts are not omitted.

Id. at 9-10.

The defendants do not contend that the information presented in the affidavits did not, taken by itself, sufficiently support the issuance of the warrants. Rather, their argument is that the applicants for the warrants omitted material information that would have shown that there were available avenues for investigation alternative to wiretapping. See id. at 9 (the government "may not deliberately omit material information that, if known to the issuing judge, would prevent a finding of necessity").

Specifically, the defendants argue that in the initial application for the wiretap of Zapata's cellular phone, the government failed to identify by name persons being investigated for drug activities in New York as likely to be intercepted by the Zapata wiretaps. The pertinent facts are these: The affidavit in support of the initial application for the Zapata wiretap disclosed that the number for a phone ultimately traced to Zapata had been found in the memory of a cell phone seized from a person who had been arrested by the DEA in New York for drug trafficking. The affidavit also disclosed that the number for Zapata's phone also appeared in toll records for two other telephones "known [to agents] to be carried by members of a major Dominican cocaine trafficking group operating out of New York City and the Dominican Republic." (List of Exhibits in Supp. of Gov't's Opp. 16B at 10 [hereinafter "Gov't Ex."].) The affidavit then said: "It should be noted, these two telephone numbers and the targets names are

8

not being revealed at this time due to the fact that this is an ongoing investigation in New York and the Dominican Republic." (Id.)

The defendants point out that they subsequently learned that DEA agents in New York were intercepting calls on phones used by targets in the New York investigation. They argue that since Zapata's phone was apparently involved in calls with those phones, the intercepts would have captured Zapata and therefore there was no necessity for a separate wiretap on Zapata's phone to be issued by the Massachusetts judge. At the very least, they say, the intentional failure to inform the Massachusetts judge of the New York wiretaps deprived the judge of the opportunity to assess fully whether the necessity requirement was met.

The affidavit plainly disclosed that some information relevant to an investigation of Zapata for drug trafficking had been developed from the New York investigation and thus permitted the judge to insist on further details if she thought it important to the necessity question. More importantly, the other information in the affidavit adequately supported a conclusion that there was a Springfield-based conspiracy to distribute cocaine involving Zapata, Delgado (Saldana) and others. The affidavit stated that the four other individuals named as targets were part of the Springfield conspiracy with Zapata, one—Delgado (i.e., Saldana)—as a leader, one as a significant member, and the other two as mid-level distributors. (Gov't Ex. 16B ¶ 11.) The affidavit also accurately stated that there were no prior applications submitted for interception of communications occurring on the target telephone—that is, Zapata's phone. (Gov't Ex. 16B ¶ 28 & 29.) It would surely have been reasonable for the judge to conclude that evidence pertaining to Zapata gleaned from the New York wiretaps would not pretermit the need to investigate the local drug activities of Zapata and the other identified targets in Springfield.

9

The defendants also argue that the affidavit was deficient in that it did not identify the persons in New York as people likely to be intercepted if Zapata's phone were tapped, as required by 18 U.S.C. § 2518(1)(b)(iv), and further failed to disclose all previous intercept applications "involving any of the same persons…specified in the application. . . ." 18 U.S.C. § 2518(1)(e). In the first place, any omission in these respects was minor in significance. The affidavit submitted approximately two weeks later in support of the first extension of the Zapata wiretap disclosed the names of persons in New York with whom Zapata was communicating using his phone and who were thus likely to be intercepted by the surveillance. More significantly, "[i]f, after evaluating the statutorily enumerated factors in light of the information contained in the application, the judge concludes that the wiretap order should issue, the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization. The intercept order may issue only if the issuing judge determines that the statutory factors are present, and the failure to name additional targets in no way detracts from the sufficiency of those factors." United States v. Donovan, 429 U.S. 413, 435 (1977).

In other words, a failure to identify all persons expected to be intercepted does not support a claim of lack of necessity. Rather, it is a failure to observe the required protocols of the statute. But it is also a failure that does not require suppression of the evidence obtained by execution of the warrant. Donovan, 429 U.S. at 439. See also United States v. Lopez, 300 F.3d 46, 56 (1st Cir. 2002) (reiterating that "it is well-settled that not every failure to comply fully with any requirement provided in Title III necessitates suppression").

The defendants seek a "Franks hearing" to explore further the extent of the government's claimed material omissions, but they have not made the requisite showing, as the preceding discussion explains. See Franks v. Delaware, 438 U.S. 154 (1978). Apart from the lack of indication of willful or reckless withholding of information – the judge was advised of the existence of the New York investigation and told that detailed information about it was not being disclosed – a Franks hearing "is required only if the defendant is able to show that alleged misstatements or omissions are material to the probable cause determination." United States v. Stewart, 337 F.3d 103, 107 n.2 (1st Cir. 2003). In the wiretap context, an omission is material if the inclusion of what was omitted would likely have changed the judge's evaluation of the application, for example, by negating a finding of necessity. Yeje-Cabrera, 430 F.3d at 8. Since the inclusion of what the defendants point to as omissions here would not have negated the finding of necessity, no Franks hearing is necessary or advisable.

C.     Particularity

Samuels argues that the warrant issued on August 17, 2005, authorizing a tap on his phone failed to contain a particular description of the communications to be intercepted. The warrant set forth the judge's finding that there was probable cause to believe that Samuels and others (including Saldana and Zapata) "are part of a highly organized and disciplined group engaged in" a conspiracy to commit offenses "involving distribution of cocaine [and] trafficking in cocaine." (Gov't Ex. 42 C at 1.) It further stated that probable cause existed "to believe that particular oral and wire communications concerning these offenses will be obtained through the interceptions" applied for and that "these oral and wire interceptions will assist in establishing the identification and association of the members of the conspiracy including members whose identity is presently unknown." (Id. at 2.) It found that there was probable cause to believe that

11

interception of calls on the Samuels telephone would provide evidence of such matters. (Id.) Finally, the warrant authorized the interception of calls on the specified phone "to obtain evidence against all those who are committing the specified narcotics offenses" as previously described. (Id.)

The warrant did not say in so many words to the agents, "You may listen to calls between the conspirators on the identified phone to the extent the conversations relate to the workings of the conspiracy." But there is no question that the warrant made clear that that was the scope of eavesdropping authority that was being granted. It was sufficiently particular to satisfy the requirements of the law.

    D.    <u>Failure to minimize and subsequent reliance upon husband-wife communication</u>

Zapata argues that agents improperly intercepted a conversation he had with his wife on June 29, 2005 because it was privileged by virtue of the Massachusetts spousal disqualification statute, Mass. Gen. Laws ch. 233, § 20. During this conversation, Zapata twice told his wife "I'm going to New York. I'll see you in a little bit." (Gov't Ex. 24 at 2.) Mass. Gen. Laws ch 272, § 99 D.2.e. provides: "No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this section shall lose its privileged character." Title III also states that "[n]o otherwise privileged wire, oral, or electronic communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character,"18 U.S.C. § 2517(4), and that the government must "minimize the interception of communications not otherwise subject to interception . . . ." 18 U.S.C. § 2518(5).

Zapata argues that the interception of the statement only occurred because agents violated their obligation to "minimize" a privileged communication. He further appears to argue that having heard the statement, the agents were bound to disregard it and give it no useful effect – which in practical terms means they were bound not to follow Zapata as he drove to New York. (They did follow him, and observed him to meet with one of the participants in the conspiracy being investigated by the New York office of the DEA.) All their observations, he claims, must be stricken, as well as ensuingly discovered fruits of the observations. The argument, apparently an afterthought because it was raised for the first time in a reply brief, entirely lacks merit.

It is perhaps a quirk of the historical development of the law of evidence in Massachusetts, but the "spousal disqualification" enacted in the Massachusetts statute is not a privilege but rather, strictly speaking, a rule of witness competency: "neither husband nor wife shall testify as to private conversations with the other." Mass. Gen. Laws ch. 233, § 20. See Commonwealth v. Walker, 780 N.E.2d 26, 33 (Mass. 2002). While spouses may not testify as to private communications, third persons overhearing conversations intended to be private by the spouses are not similarly disqualified from so testifying. "[T]he statute bars a husband and a wife from testifying as to private conversations. It does not forbid testimony by a third party concerning a conversation between a husband and a wife." Commonwealth v. O'Brien, 388 N.E.2d 658, 661 (Mass. 1979); see also Martin v. Martin, 166 N.E. 820, 820 (Mass. 1929) ("Although these conversations were apparently held between husband and wife while they were physically alone, the nature of such conversations would be admissible in evidence from

the lips of one who overheard them.").[2] In any event, the rule is one governing the admissibility of evidence, not police practices. The fact that both the state and federal statutes assure that the status of a privileged communication in the law of evidence is not lost by its having been intercepted is beside the point, except to the extent that it implies a recognition that privileged communications may in fact be intercepted at times.

Zapata tries to tackle the police practices question by arguing that the statement was heard in violation of the obligation to minimize privileged communications during the wiretap. The trouble is, the wiretap order did not set forth such an obligation. The supervising attorney instructed agents to minimize privileged communications, including communications between spouses, but that was a voluntary limitation, not one imposed by the warrant. In any event, the warrant gave some leeway to agents to listen to a conversation long enough – up to two minutes – to determine whether it should be minimized. Thus, even if there were an obligation to minimize the statement, the agents were able to listen long enough to identify the participants and assess the nature of the call. The statements at issue were so short, there is no doubt they would have taken less than the two minute window to be expressed. Once it was heard, there was no reason for agents to disregard it.

---

[2] See also Commonwealth v. Wakelin, 120 N.E. 209, 212 (Mass. 1918) ("The circumstance that the conversation was between a husband and a wife while they were physically alone is no grounds for objection. There is no rule of law that third persons who hear a private conversation between husband and wife shall be restrained from testifying what it was. Commonwealth v. Griffin, 110 Mass. 181. It is of no consequence whether such conversation is overheard by a witness near by concealed from observation, or by one at a distance enabled to overhear by means of electrical or other devices which carry the sound of the voice. The provision of R.L. c. 175, § 20, cl. 1 [the predecessor to Mass. Gen. Laws ch. 233, § 20], simply prohibits either the husband or the wife from testifying to private conversations with one another. It forbids one method of proof, but does not exclude proof by other means. Sampson v. Sampson, 223, Mass. 451, 458 to 460, 112 N.E. 84.")

E.     Notice

The defendants argue that the wiretap warrants issued failed to provide the notice required by the Massachusetts wiretap statute. Mass. Gen. Laws ch. 272, § 99 L. requires the government to serve a copy of the wiretap warrant on the person whose communications are to be intercepted. However, the statute provides an exception to this service requirement whereby "upon a showing of important special facts which set forth the need for continued secrecy . . ." service of the warrant may be delayed for up to three years from the time of expiration of the warrant. See id. § 99 L. 2. In that case, the warrant must include a statement that "there has been a finding of good cause shown requiring the postponement of such service." Id. § 99 I. 6. Similarly, the federal wiretap statute also has a notice requirement which provides that "[o]n an ex parte showing of good cause to a judge of competent jurisdiction, the serving of the inventory required by this subsection may be postponed." 18 U.S.C. § 2518(8)(d). The defendants do not argue that the federal statute was violated, which would be required for the evidence to be suppressed in federal court. See supra note 1; Charles, 213 F.3d at 20. Furthermore, the Supreme Court in Donovan held that the failure to comply with the notice provision of § 2518(8)(d) does not render unlawful an intercept order that in all other respects satisfies the statutory requirements. 429 U.S. at 434.

In any event, the warrants issued in this case fully complied with the both statutes because the applications and the affidavits individually established that postponement of notice was required because secrecy was crucial to the investigation. The warrant stated that the court found "[t]hat exigent circumstances exist which require the postponement of service because notice to any parties named herein will prevent the effective execution of the warrant." (Gov't Ex. 16C ¶ G.) The issuing judges made such findings and postponed the notice. It is obvious

15

that, in an investigation into a drug conspiracy, the targets of electronic surveillance would discontinue use of the target phone numbers if they were notified that the government was listening in. Postponement in the interest of thorough investigation, where the warrant has amply been supported by the necessary findings of probable cause, was plainly justified.

> F.      Probable Cause as to "Delgado"

Saldana also argues that the affidavit in support of the warrant to intercept communications on his phones was not supported by probable cause because there was not probable cause to believe that the individual identified as "Jose Delgado" was involved in criminal activity, nor that he was that person. He argues that the affidavit does not establish probable cause because information from informants was not corroborated nor shown to be reliable or veracious.

A cooperating source referred to as CS3 provided the information which led agents to believe that the person CS3 knew as "Sergio" was in fact the same person as Delgado, whom agents had associated with Zapata. (Gov't Ex. 27 ¶ 22.) CS3 identified a photograph of the person agents believed to be Delgado as "Sergio." (Id.) Agents learned that "Sergio" was Delgado through a pager number CS3 had for Sergio, which from a prior investigation the DEA knew was used by Delgado. (Id.)

Under Illinois v. Gates, the two primary factors in assessing whether, in the totality of the circumstances, an informant's tip establishes probable cause are (1) corroboration of the details of the information from an informant, and (2) the informant's veracity, reliability, and basis of knowledge. 462 U.S. 213, 242 (1983). As to the first, Saldana ignores the fact that there was other information contained in the affidavit which identified "Sergio" as Delgado. A cooperating source referred to as CS4 stated that he/she had previously purchased several

kilograms of cocaine from "Sergio" on a daily basis, and stated that "Sergio" owned a car dealership called "Pine Point Auto." (Gov't Ex. 27B ¶ 24.) The affidavit stated that Delgado had already been observed by agents conducting surveillance at Pine Point Auto Sales on a daily basis, and also asserted that Delgado and Zapata owned the business together. The matching of the pager number that CS3 had for "Sergio" with a number that agents knew had been used in the past by Delgado was also a  significant corroborating fact. There was sufficient corroboration of the information provided by CS3 establishing that "Sergio" was Delgado.

As to reliability, the affidavit credited CS3's reliability by stating that CS3 had provided agents with information in the past which led to the arrest of twenty-eight federal defendants and the seizure of fifty-eight kilograms of cocaine. (Gov't Ex. 27B ¶ 22.) This was sufficient.

The defendant also argues that there was not probable cause to believe that Delgado was involved in criminal activity. This argument is undermined once it has been determined that there was probable cause to believe that "Sergio" was Delgado, because the information provided by CS3 and CS4 suffice to establish probable cause to believe that "Sergio" was committing a crime. In addition, the interception of conversations between Zapata and "Delgado" pursuant to the wiretap of Zapata's phone, along with physical surveillance, confirmed Delgado's involvement in the criminal activity.

## II.    The Search Warrants

On August 26, 2005, the government filed a criminal complaint under seal charging Saldana, Zapata, Carrasco, and Samuels with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. That same day, agents sought and obtained search warrants for four locations in Springfield, Massachusetts: (1) Saldana's residence at 31 Braywood Circle; (2) Zapata's residence at 93 Florence Street, Apt. 1B; (3) Pine Point Auto Sales at 1608 State Street; and

(4) Samuels' residence at 61 Appoloosa Lane, West Springfield. The magistrate judge declined to issue a warrant to search Saldana's former residence at 41 Brooks Street. The warrants were issued on the basis of a single affidavit made by DEA Special Agent Shankweiler, and each warrant carried an identical description of the kinds of property authorized to be seized.

Agents executing the search warrant for 61 Appaloosa Lane found in the master bedroom a .357 magnum revolver, $6,123 in cash, and the title and key to a grey 2003 Mercedes CL 55 which agents had previously observed Samuels operating. In the garage attached to the residence, agents located the Mercedes and used the key found in the bedroom to open the trunk, where they found a storage bin locked with a padlock but slightly open on one side. Using a flashlight, agents were able to look inside the bin to see rectangular bricks that looked like kilograms of cocaine. The agents then broke the lock and found 26 kilograms of cocaine.

Saldana was arrested after he was observed departing 31 Braywood Circle. Agents then executed the search warrant of 31 Braywood Circle and seized $68,980 in cash from the bedroom, five rounds of nine millimeter ammunition, six cell phones, and a small amount of cocaine from the ceiling in the basement.

Agents executing the search warrant for 93 Florence Street, Zapata's residence, seized a safe, a scale, miscellaneous photographs, and a briefcase containing documents relating to Pine Point Auto Sales. The next day, agents obtained a search warrant which authorized the search of the safe, in which agents found $2,200 in cash and a Rolex watch.

On August 28, 2005, agents obtained an additional search warrant for 41 Brooks Street and a 2000 Chrysler 300 parked near it. In support of the warrant, Special Agent Shankweiler submitted an affidavit which recited the previous day's seizures of cocaine and drug proceeds as well as positive canine drug alerts to the front and rear doors of 41 Brooks Street and to the exterior of the vehicle. Inside 41 Brooks Street, agents found two .357 revolvers, and inside the vehicle found an electronic hidden compartment with hydraulics behind the backseat.

Saldana, Zapata and Samuels have each moved to suppress the evidence seized pursuant to these search warrants, on the grounds that probable cause was lacking and that the warrants did not describe the items to be seized with sufficient particularity and therefore the items actually seized fell outside the scope of the warrant.

A.    Probable Cause

A warrant application "must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999). There must be "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). In considering a motion to suppress, the court must "examine the affidavit in a practical, common-sense fashion and accord deference to reasonable inferences the [magistrate] may have drawn from the attested facts." United States v. Greenburg, 410 F.3d 63, 66-67 (1st Cir. 2005) (quoting United States v. Barnard, 299 F.3d 90, 92-93 (1st Cir. 2002)). A reviewing court must make sure that the issuing magistrate had a "substantial basis" for concluding that probable cause existed, but "the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." See United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)).

The defendants' argument is primarily predicated on their argument that all of the evidence derived from the wiretaps should be suppressed because the Massachusetts wiretap statute does not permit the interception of digital communications. Since I have rejected this argument, it is not necessary to consider whether the warrants would be sufficient if the evidence from the wiretaps were omitted.

After reviewing the affidavit in support of the search warrants, I conclude that probable cause was established for each of the searches. First, the Shankweiler affidavit demonstrated that there was probable cause to believe that a crime was being committed over an extended period of time. It included information from three cooperating witnesses and sources, physical surveillance of the suspects and locations, and the interception of communications between the suspects, all demonstrating that there was probable cause to believe that drug trafficking was taking place and that Saldana and Zapata were large scale cocaine dealers who obtained their cocaine from sources of supply in New York and Mexico and supplied large quantities of cocaine to individuals in Springfield, including Samuels. A cooperating witnesses referred to as CW-1 told investigators that he/she had obtained ten to fifteen kilograms of cocaine from Saldana five or six days a week, identified Saldana out of a photo array, and identified the auto business that Saldana and Zapata ran. Another cooperating witness, CW-2, told agents that Saldana had told him that he was receiving forty to fifty kilograms of cocaine per week from either Texas or California. CW-2 also stated that Samuels sold kilogram quantities of cocaine in Springfield for at least three years. Both CW-1 and CW-2 identified Zapata and Carrasco as associates of Saldana. A third cooperating witness, CW-3, identified Saldana as a multiple kilogram supplier of cocaine.

Where the basis for a probable cause finding was information provided by a unnamed informant, the affidavit must provide some information that allows the magistrate to assess the informant's credibility. Greenburg, 410 F.3d at 67. This can be demonstrated by information that supports the informant's veracity and/or the basis of his knowledge, by corroborating information, or by a law enforcement affiant making an assessment of the facts related by the informant based on experience. Id.; United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). The information from the informants was corroborated through extensive wiretaps, telephone records and physical surveillance. Telephone records connected Zatapa to seizures of cocaine and firearms in New York and Springfield. Intercepted communications and physical surveillance detailed Zapata's and Saldana's extensive involvement with, and trips to meet, individuals in New York whom agents knew to be involved with drug trafficking. Indeed, the wiretaps and physical surveillance not only corroborated the information provided by the unnamed informants but provided agents with significant amounts of additional information which supported probable cause to believe that a crime was being committed.

Second, the affidavit established the required nexus between the criminal activity and each of the locations to be searched. The specifics of the affidavit need not be recited here, but it more than sufficiently informed the issuing judge that each of the locations described were involved in the drug trafficking conspiracy. It detailed information obtained from cooperating witnesses, physical surveillance, and wiretap interceptions that specifically tied each location to one or more of the alleged conspirators and their actions in furtherance of the drug trafficking conspiracy. Special Agent Shankweiler stated that in his training, knowledge and experience, drug traffickers commonly store their drug inventory, proceeds and related paraphernalia at their residences. He noted that it is also a common practice for drug traffickers

to keep records relating to their drug trafficking activities in their residences, which are often kept close at hand so as to allow them to readily ascertain current balances for their clients. He stated that often small scale automobile sales businesses are used to obtain motor vehicles that can be equipped with hidden compartments, and that drug traffickers employed at such a business often keep stashes of money, drugs, and/or weapons at these businesses. Special Agent Shankweiler based these assertions on his involvement in prior drug investigations and substantial experience conducting residential searches, along with the knowledge and experience of other agents and police officers in his office. This knowledge of, and experience with, the common practices of drug traffickers, combined with the facts detailed in the affidavit informing the issuing judge of the specific connection between this drug trafficking conspiracy and each of the locations to be searched, established the required nexus.

Samuels argues that the information in the affidavit was stale. However, the affidavit sufficiently established that criminal activity was ongoing, detailed intercepted communications in which Samuels discussed in coded language what agents believed to be an impending delivery of cocaine, and observed what agents believed was criminal activity involving Samuels at his residence as recently as August 23, 2005, only four days before the execution of the search warrant.

Samuels also argues that there was no probable cause to believe that firearms would be found at his residence at 61 Appaloosa Lane, nor that if firearms were found their possession would be evidence of a crime. Special Agent Shankweiler stated in the affidavit that "[t]ypically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the trafficker's profits and/or supply of drugs." (Gov't Ex. 1 ¶ 7.) Where, as here, there is probable cause to believe

that evidence of a drug conspiracy may be found at a location, and the knowledge and experience of law enforcement indicates that such evidence often includes a firearm (just as it often also include scales, large quantities of cash, and other drug paraphernalia), there is probable cause to believe that a firearm may be found at that location and that it would constitute evidence of the drug crime.

Accordingly, the Shankweiler affidavit was more than sufficient to establish the required nexus between the drug conspiracy and each of the locations searched.

Even if any of the magistrate judge's probable cause determinations were in error, the evidence derived from the searches of these locations would still be admissible under the <u>Leon</u> "good faith" exception. <u>United States v. Leon</u>, 468 U.S. 897 (1984). In <u>Leon</u>, the Supreme Court held that suppression of evidence seized in reliance on a warrant later found to be defective is only required where (1) the issuing magistrate judge was misled by information in the affidavit that the affiant knew was false or would have known was false except for reckless disregard of the truth; (2) the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) a warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. <u>Id.</u> at 923. None of these four circumstances has been demonstrated here, and consequently the officers executing the search warrants were entitled to rely upon their apparent legality, and there would be no deterrence benefit to be gained by excluding the evidence.

### B.    Specificity

The Fourth Amendment requires that a warrant describe with particularity the items to be seized, in order to prevent a general exploratory rummaging in a person's belongings.

Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). This requirement exists to ensure that "nothing is left to the discretion of the officer executing the warrant," United States v. Fuccillo, 808 F.2d 173, 175 (1st Cir. 1987) (quoting Stanford v. Texas, 379 U.S. 476, 485 (1965)) and to prevent "the seizure of one thing under a warrant describing another," United States v. Klein, 565 F.2d 183, 186 (1st Cir. 1977). Accordingly, the warrant must supply sufficient information to guide the executing agent's judgment in deciding what items may be seized. United States v. Albert, 195 F. Supp. 2d 267, 275 (D. Mass. 2002). In reviewing whether the warrant meets the particularity requirement, a court should read the warrant and application in a common sense manner. United States v. Bonner, 808 F.2d 864, 868 (1st Cir. 1986).

Samuels argues that the search warrant for 61 Appaloosa Lane failed to specify with sufficient particularity the items to be seized, and that the seizure of various financial documents fell outside the scope of the warrant. Zapata makes the same argument with respect to some items seized from his residence. They complain that instead of providing a particularized list of items, the warrant simply recited an impermissibly broad laundry list of generic items that the DEA hoped to find. The search warrants each contained an identical list of items that were authorized to be seized:

1.   Controlled substances, including cocaine;

2.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

3.   Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property.

4.      Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

5.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

6.      The following items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location: (a) Utility bills; (b) Telephone bills; (c) Leases; and (d) Rental agreements.

7.      Firearms, ammunition, and records relating to the possession of firearms.

8.      Cell phones, pagers, billing records related telephone communications.

(Def.'s Omnibus Mot. to Suppress, Ex. 4 at 4; Def. Cesar Zapata's Mot. to Suppress and Supp. Mem. Ex. E at 5.)

A general description of the items to be seized is acceptable when it is reasonable under the circumstances. United States v. Morris, 977 F.2d 677, 681 (1st Cir. 1992) The First Circuit has applied a two-factor test in determining whether the warrant satisfies the particularity requirement. Id. The first factor is "the degree to which the evidence presented to the magistrate establishes reason to believe that a large collection of similar contraband is present on the premises to be searched." Id. The second factor is "the extent to which, in view of the possibilities, the warrant distinguishes or provides the executing agents with criteria for distinguishing the contraband from the rest of an individual's possessions." Id. Here, there was sufficient evidence to believe that a large collection of similar contraband—cocaine—would be found at these premises, and the list of items was not a "laundry list," as the defendants assert. Rather, it described the items that agents were authorized to seize with as much specificity as would be practicable. It described various categories of items that might be found, setting particular examples of the items that would fall within that category. The items listed in the

warrant, by listing specifically the different types of items that are typically found in conjunction with large quantities of cocaine, provided sufficient guidance for agents to distinguish seizable items from non-seizable items.

The items seized from Zapata's residence — a scale, cash, and documents relating to Pine Point Auto Sales — were all authorized by the warrant. The scales and cash were explicitly listed, and the documents related to a business which the affidavit described as being involved in drug trafficking. A second warrant authorized the search of the safe, in which a Rolex watch and cash were found. Likewise, the items seized from Samuel's residence — a .357 magnum revolver, $6,123 in cash, the vehicle (along with its title and keys), various financial records and the box containing approximately 26 kilograms of cocaine — were authorized by the warrant. The financial records which Samuels argues were outside the scope of the warrant clearly fall within the authorization to seize "books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances." (See Def.'s Omnibus Mot. to Suppress, Ex. 4 at 4.)

## III.    The Arrest of Samuels

On August 27, 2005, agents stopped and arrested Samuels pursuant to a warrant. At the time he was driving a 2004 Nissan Armada. During the arrest, an agent searched Samuels and found $3,209 in cash in his front pocket. Agents also searched his vehicle and found $20,000 in cash in the center console. Samuels argues that this was an unreasonable search in violation of the Fourth Amendment.

A warrantless search of an individual is valid when conducted incident to a lawful arrest. See New York v. Belton, 453 U.S. 454, 461 (1981). In such a situation, a police officer may conduct a search of the arrestee for weapons or contraband and may "search the passenger

compartment as well as the contents of any containers found within the passenger compartment of a vehicle in which the defendant is found at the time of arrest." United States v. Allen, 469 F.3d 11, 15 (1st Cir. 2006) (citing Belton, 453 U.S. at 460). The scope of the search must be limited, however, to those areas "generally reachable *without exiting the vehicle,* without regard to the likelihood in the particular case that such a reaching was possible." Allen, 469 F.3d at 15 (quoting United States v. Doward, 41 F.3d 789, 794 (1st Cir. 1994) (emphasis in original). Having lawfully arrested Samuels, the agents were entitled to search his person and the entire passenger compartment of Samuels' vehicle, including the center console where the cash was found.

Samuels also argues that statements he made to the police while in custody were made involuntarily and in violation of Miranda v. Arizona, 384 U.S. 436 (1966). The government has stated in its brief that it does not intend to introduce any of these post-arrest statements by Samuels, and that therefore this issue is moot. (U.S.'s Omnibus Opp. to Defs.' Mot. to Suppress Evidence 71.)

**IV.    Conclusion**

For all the foregoing reasons, the defendants' motions to suppress (dkt. nos. 160, 181 and 182) are DENIED. The defendant's motion to certify a question of state law to the Massachusetts Supreme Judicial Court (dkt. no. 240) is also DENIED. The defendants' motion for a status conference is MOOT in light of the imminent pretrial conference that is scheduled.

It is SO ORDERED.

        /s/ George A. O'Toole, Jr.        
                United States District Judge