```
 1                    UNITED STATES DISTRICT COURT FOR
                       THE DISTRICT OF MASSACHUSETTS
 2

 3  UNITED STATES OF AMERICA,              )
                                           )
 4                  Plaintiff,             )
                                           )
 5                                         )
    vs.                                    ) Civil Action
 6                                         ) No. 05-10235-GAO
                                           )
 7  SERGIO ELPIDIO ALCANTARA-SALDANA,      )
    CESAR ZAPATA, HERIBERTO CARRASCO,      )
 8  GEORGE SAMUELS, MANUEL FLORENTINO and  )
    CARLOS SANCHEZ,                        )
 9                                         )
                    Defendants.            )
10


11                    TRANSCRIPT OF STATUS CONFERENCE
                                and
12  HEARING ON DEFENDANT CARLOS SANCHEZ'S MOTION TO TRANSFER CASE TO
     WESTERN DIVISION OF DISTRICT AND MOTION TO SEVER -- RELIEF FROM
13                       PREJUDICIAL JOINDER
                                and
14        HEARING ON DEFENDANT CESAR ZAPATA'S MOTION TO DISMISS
                                and
15  HEARING ON USA'S MOTION FOR PROTECTIVE ORDER (AND FOR RETURN OF
           DOCUMENT INADVERTENTLY DISCLOSED IN DISCOVERY)

16


17            BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
                    UNITED STATES DISTRICT JUDGE
18
                    United States District Court
19              John J. Moakley U.S. Courthouse
                        1 Courthouse Way
20              Boston, Massachusetts  02210
                         May 31, 2007
21                        2:40 p.m.


22                       * * * * * *

23              SHELLY M. KILLIAN, RPR, CM, CRR
                     Official Court Reporter
24              John J. Moakley U.S. Courthouse
                  1 Courthouse Way, Room 3510
25                     Boston, MA  02210
                        (617) 737-7117
```

```
 1  APPEARANCES:

 2  For the Plaintiff:

 3      Neil J. Gallagher, Jr.
        United States Attorney's Office
 4      John Joseph Moakley Federal Courthouse
        1 Courthouse Way, Suite 9200
 5      Boston, Massachusetts  02210

 6  For Defendant George Samuels:

 7      Vincent Bongiorni, Esq.
        Law Offices of Vincent Bongiorni
 8      95 State Street
        Springfield, Massachusetts  01103
 9
    For Defendant Sergio Elpidio Alcantara-Saldana:
10
        Rosemary C. Scapicchio, Attorney at Law
11      Law Office of Rosemary C. Scapicchio
        Four Longfellow Place, 37th Floor
12      Boston, Massachusetts  02114

13  For Defendant Cesar Zapata:

14      David J. Apfel, Esq.
        Elianna J. Marziani, Attorney at Law
15      Goodwin Procter, LLP
        Exchange Place
16      53 State Street
        Boston, Massachusetts  02109
17
    For Defendant Carlos Sanchez:
18
        Charles W. Rankin, Esq.
19      Rankin & Sultan
        151 Merrimac Street, 2nd Floor
20      Boston, Massachusetts  02114-4717

21  For Defendant Manuel Florentino:

22      John Benzan, Esq.
        Law Offices of John Benzan
23      70 Warren Street, Suite 8
        Roxbury, Massachusetts  02119

24

25      Interpreter:  Laura Eastment
```

```
 1              P R O C E E D I N G S

 2              (The following proceedings were held in open court

 3    before the Honorable George A. O'Toole, Jr., United States

 4    District Judge, United States District Court, District of

 5    Massachusetts, at the John J. Moakley United States Courthouse,

 6    1 Courthouse Way, Boston, Massachusetts, on July 19, 2007.

 7              Defendant Cesar Zapata is present with counsel.

 8    Assistant U.S. Attorney Neil Gallagher is present.)

 9              THE CLERK:  All rise.  United States District Court

10    for the District of Massachusetts, court is now in session.

11    Please be seated.

12              For a motion hearing/status conference, case of

13    United States of America versus Sergio Elpidio

14    Alcantara-Saldana, Cesar Zapata, Heriberto Carrasco, George

15    Samuels, Manuel Florentino, and Carlos Sanchez, which is docket

16    05-10235.  Would counsel please identify yourselves for the

17    record.

18              MR. GALLAGHER:  Good afternoon, your Honor.  Neil

19    Gallagher for the United States.

20              MR. BONGIORNI:  Good afternoon, Judge.  Vincent

21    Bongiorni for Mr. Samuels.

22              MS. SCAPICCHIO:  Rosemary Scapicchio on behalf of

23    Mr. Saldana.  And I'm also standing in for Syrie Fried on

24    behalf of Mr. Carrasco.  I understand she's in another session,

25    your Honor.
```

```
 1              MR. RANKIN:  Good afternoon.  Charles Rankin for
 2    Mr. Sanchez.
 3              MR. APFEL:  Good afternoon, your Honor.  David
 4    Apfel.  And with me is Elianna Marziani on behalf of Cesar
 5    Zapata, who is at counsel table.
 6              MR. BENZAN:  Good afternoon, your Honor.  John
 7    Benzan on behalf of Manuel Florentino.
 8              THE CLERK:  Madam Interpreter, would you please
 9    rise and raise your right hand.
10              (Laura Eastment, Interpreter, sworn)
11              THE CLERK:  Please state your name and spell your
12    last name.
13              INTERPRETER:  My name is Laura Eastment,
14    E-a-s-t-m-e-n-t.  I'm a Spanish Certified Interpreter.
15              THE COURT:  Okay.  We have a couple, several I
16    guess, motions that are not suppression motions that I'd like
17    to address.  And then we will talk about scheduling the
18    suppression hearing.  And I'd also like to talk about
19    scheduling a trial.  And I think that the motions that I have
20    in mind for hearing this afternoon are motions made on behalf
21    of Mr. Sanchez, Mr. Zapata and the United States.
22              MS. SCAPICCHIO:  Your Honor, on behalf of
23    Mr. Saldana, we'll be joining Mr. Sanchez's motion to remand
24    the case to Springfield.
25              MR. BONGIORNI:  Judge, I orally move to join
```

1    Mr. Rankin's Local Rule 40 motion as well.  I'll file a written

2    request to do that at the end of today.

3              MR. APFEL:  Your Honor, ditto on behalf of

4    Mr. Zapata.

5              MR. BENZAN:  Not to be left out, your Honor, the

6    same.

7              THE COURT:  All right.  Well, that places a lot of

8    weight on your shoulders, Mr. Rankin.

9              MR. RANKIN:  I'll do my best.  Judge, I became

10   aware of this issue in 1997 when I was appointed to represent a

11   defendant in front of Judge Gorton in a multi-defendant RICO

12   case that involved three murders and 14 attempted murders.  All

13   three murders and 13 of the 14 shootings took place in

14   Worcester County, and one took place in Boston.  And -- I'm

15   sorry, it was vice versa.  All of them took place in Boston or

16   eastern Massachusetts, except one attempted shooting in

17   Worcester.

18              As a result of that case, the District Court

19   adopted an amendment that had been proposed by the CJA board to

20   provide mechanism to reassign cases when they were improperly

21   assigned for one reason or another.  And the mechanism by which

22   cases are assigned, as I understand it, is that JS-45 form that

23   the government completes upon return of an indictment.  And the

24   form, pursuant to the local rule, requires the government to

25   identify the location within the district of the most

PDF created with pdfFactory trial version www.pdffactory.com

1    significant criminal activity alleged in the indictment.  And

2    that's the language of Rule 40.1(E), the most significant

3    criminal conduct.  And that rule requires that the case be

4    assigned to the division, eastern, central or western with the

5    most significant criminal conduct.

6           In this case there is no doubt that the most

7    significant criminal conduct occurred in the western section of

8    the district.  The government doesn't acknowledge that in its

9    pleading, but I don't think Mr. Gallagher's going to dispute

10   that.  It can't really be disputed.

11          The government's opposition to the motion really

12   kind of sets up a series of straw men.  First they say, well,

13   it's untrue that all the criminal activity occurred in the

14   Springfield area.  Well, I never said all the criminal activity

15   occurred in the Springfield area.  I said the bulk of it,

16   certainly the most significant criminal conduct.  Secondly,

17   they say, well, venue is proper in any division of the

18   district.  I didn't make a venue-based motion.  I didn't make a

19   Rule 18 motion.  I simply moved pursuant to the local rule that

20   the case be reassigned, as it should have been assigned in the

21   first instance, to the western division of the Court because

22   virtually all the criminal activity occurred.

23          The only justification the government posits for

24   drawing it to the eastern section is one that's not permissible

25   under the local rule and that is law enforcement resources.

1    The U.S. Attorney's Office has a bigger office in Boston than

2    it does in Springfield.  Well, I'm sorry, but that's not the

3    standard that the District Court adopted in 2001 when it

4    changed the local rules.  It didn't say whenever it's

5    convenient for the government it shall be drawn to the division

6    of the court that the government pleases.  It says where the

7    most significant criminal conduct took place.

8              Here you have, not just with respect to Mr. Sanchez

9    but really with respect to all of the defendants, the most

10   significant criminal conduct occurring in Springfield.  All of

11   the arrests were in Springfield, all of the drugs that were

12   seized in this case were in Springfield, including the 25

13   kilograms, a kilogram that my client is charged with in the

14   substantive count, a firearm that my client's charged with in

15   the substantive count, all of the searches were conducted in

16   Springfield, all the wiretaps were on telephones in

17   Springfield, all of the locations are in Springfield.

18             To be sure, there are things that occurred in other

19   places.  Mr. Gallagher points out that in the complaint

20   affidavit, which is docket entry 4, there's a reference to a

21   one-kilogram transaction in Lynn that's described by an

22   informant.  Certainly there was criminal conduct in the eastern

23   section.  They describe trips to New York.  Well, certainly the

24   case could have been brought in New York, I suppose, because

25   there was criminal conduct allegedly taking place in New York.

PDF created with pdfFactory trial version www.pdffactory.com

1    They describe trips from the southwest.  All that's true.  The

2    point is that the case should have been indicted in Springfield

3    and it wasn't, and it should be sent to Springfield now because

4    the government for an improper reason chose to bring it in the

5    eastern division rather than the western division.

6              So for those reasons I would urge the Court to send

7    the case to the western division under Rule 40.1.

8              THE COURT:  Mr. Gallagher.

9              MR. GALLAGHER:  Well, your Honor, I don't think

10   there's any really dispute about, you know, the facts.  I think

11   we're sort of quibbling about minor details, and I've never

12   represented since I began this case, throughout the case, a lot

13   of the conduct did happen in Springfield.  The search warrants

14   happened in Springfield.  The case, however, did begin in

15   Boston.  It began with a couple of cooperating witnesses that

16   were used, they're named in the complaint, and those

17   cooperating witnesses indicated they were being supplied large

18   quanities of cocaine by a guy in Springfield named Sergio.

19   That's when the case began.  I think it's crucial to the

20   Court's analysis they're really talking about local rules, not

21   constitutional provisions.  We're talking about where the case

22   should be brought.

23             It's been known for a good year and a half on the

24   superseding indictment that the case happened in Springfield.

25   There's already a motion to dismiss for speedy trial.

PDF created with pdfFactory trial version www.pdffactory.com

1    Transferring the case at this point would be counterproductive

2    to pursuing the case in the interests of justice, and what has

3    not been shown is really good cause.  I don't think there's

4    anything alleged that the government obtained any benefit from

5    bringing the case here.  There are, you know, a number of

6    judges here.  There's only one judge in Springfield.  There's

7    no attempt to and no allegation that the government obtained

8    some type of advantage by bringing the case here.  And a large

9    number of cases have been indicted in Springfield.  All the

10   conduct happened in Springfield were brought here because the

11   resources, not on the judicial resources but the resources of

12   AUSAs, are limited.  And to suggest this was done for an

13   improper reason I don't think -- is really a gross

14   overstatement because the investigation began here.

15           There is no advantage obtained by the government

16   bringing the case here.  There's no requirement -- and there's

17   really no case law on this.  The only case I could find that

18   really addresses this issue is a Second Circuit case that says

19   even if it's a violation of local rules, that there's no right

20   to trial in a particular part of the same district.  And that

21   case is the Acevedo case, Second Circuit case, 1984 case.

22           So at the same time I can't say the Court does not

23   have the discretion to transfer the case.  If the Court --

24   would not be an abuse of discretion.  Certainly there is some

25   facts to it.  All I'm saying is there's not good cause to

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    transfer the case and that at this point in the case it would

 2    be counterproductive, would further delay the case, and there

 3    was a good reason to bring the case here in Boston in the first

 4    place.

 5              (The Court conferred with the clerk.)

 6              MR. RANKIN:  I actually have docket entry 4, if

 7    that's what the Court's trying to find since it doesn't appear

 8    on the Court's docket.  The affidavit, complaint affidavit.

 9    Sorry.

10              THE COURT:  All right.  I'm going to reserve on the

11    motion.

12              Mr. Sanchez has a second motion?

13              MR. RANKIN:  Yes.  There was a second motion to

14    sever, essentially pointing out that there was no interception

15    on the wiretap that furnishes the bulk of the evidence against

16    the other defendants.  I understand the government does not

17    oppose that motion.

18              THE COURT:  I think that's right.  The government

19    does not object to that.

20              MR. GALLAGHER:  That's correct, your Honor.  We're

21    not conceding --

22              THE COURT:  As a matter of fact, you think there

23    may be an issue requiring it.

24              MR. GALLAGHER:  I think there might be a real

25    Bruton issue, and that is if there were statements made by
```

1    Mr. Sanchez after the rest of the defendants in which he

2    implicates himself with other defendants and makes reference to

3    Sergio.  That was -- I think there was a <u>Bruton</u> issue that --

4    and the fact that there is some -- he was arrested before the

5    wiretaps went up.  So I think it does make sense to expedite

6    this case to sever the case.

7            THE COURT:  Okay.  And I take it that Mr. Sanchez's

8    position that regardless of the disposition of the transfer

9    motion, that it's appropriate to separate the cases.  Is that

10   right?

11           MR. RANKIN:  Yes, your Honor.

12           THE COURT:  Well, I'll grant that motion to sever

13   Mr. Sanchez's case.  We'll get back to what that means in terms

14   of scheduling.  That's number 173.

15           Okay.  Now, Mr. Zapata.

16           MR. APFEL:  Yes, your Honor.  Mr. Zapata's motion,

17   as you know, is a motion to dismiss and it's a motion to

18   dismiss on speedy trial grounds and only on speedy trial

19   grounds.

20           Our motion is quite simple.  The heart and soul of

21   the motion is that 70 means 70 means 70, that the Speedy Trial

22   Act exists and can't be written out of the statute book.  The

23   government's argument is that it really doesn't much matter how

24   much time they take to get around to trying the case that has

25   been separated from all the other defendants, when a defendant

1    has unequivocally stated that he's ready for trial, that really

2    the Speedy Trial Act doesn't exist as far as the government's

3    concerned or at least the numbers that are in the Speedy Trial

4    Act are pretend numbers.

5          The facts are clear that on January 19th of 2006 in

6    this case before Magistrate Dein Mr. Zapata declared himself

7    ready for trial, and his case was then separated from that of

8    the other defendants and sent to the District Court for trial.

9    At that point the speedy trial clock started to run as against

10   Mr. Zapata.  And since that time, between that day on January

11   19 of 2006 and the date that we filed our motion to dismiss,

12   not 70 days but 76 times over passed.  Four hundred forty-five

13   days passed.  And, sure, there were orders of excludable delay

14   as to other defendants that issued during that time, but not a

15   single one of them on its face applied to Mr. Zapata.

16   Mr. Zapata was not responsible for any of that delay.

17         Mr. Zapata had made clear on January 19 that he was

18   ready for trial.  He never took that back.  There's no

19   requirement in the law that he says once he's said "I'm ready

20   for trial" that he needs to say to the government "I really

21   mean it."  He meant it when he said it, and the speedy trial

22   clock started running and ran out and run out again and again

23   and again and again.

24         Now, the -- it's -- Mr. Gallagher argues that all

25   of this excludable delay, the 445 days, since it was excluded

PDF created with pdfFactory trial version www.pdffactory.com

1  as to the co-defendants, it necessarily should be excluded as

2  to Mr. Zapata.  That's just not the -- it's not the law.  It's

3  not the rule.  Under the Speedy Trial Act there is a

4  requirement of reasonableness, and it is -- anything over a

5  year is presumptively unreasonable.  Anything over a year is

6  presumptively prejudicial to the defendant.  It is reasonable

7  if the defendant himself, if Mr. Zapata himself were

8  responsible for some of that delay, but here he was not

9  responsible for any of the delay.

10        It also is clear under the Speedy Trial Act that

11  had Magistrate Dein in any one of the multiple orders of

12  excludable delay that she did issue as to co-defendants, if she

13  had made specific findings showing that the interests of

14  justice outweighed the society's as well as Mr. Zapata's

15  interest in a speedy trial and, therefore, that delay as to

16  co-defendants should be appropriately applied to Mr. Zapata, I

17  wouldn't be here making this argument.  But she made no such

18  findings as she was required to do under 3161(h)(8)(A).  And

19  the government had at no point called her on any of that.

20        Now Mr. Gallagher's argument is that Mr. Zapata

21  waived his rights to a speedy trial because he didn't come

22  forward and say to this Court when I said on January 19th that

23  I was ready for trial, I meant it.  He didn't come forward and

24  move affirmatively for a severance.  And just before we walked

25  up to the front of the courtroom, Mr. Gallagher was kind enough

PDF created with pdfFactory trial version www.pdffactory.com

1    to hand me a piece of paper that is a portion of the hearing on

2    January 19, 2006 because, as he said to me, he didn't want to

3    sandbag me, he didn't want to blindside me with this portion of

4    the transcript.  But I'll read it to you myself.  The Court

5    said during the course of that hearing where Mr. Zapata had

6    declared himself ready for trial and indicated that she was

7    going to separate his case and move it to the District Court,

8    the Court says in this little snippet that Mr. Gallagher has

9    handed to me:  "COURT:  I'll send it up.  Have you filed a

10   motion to sever?  MR. APFEL:  I have not filed a motion to

11   sever, not as of yet.  COURT:  Are you going to file it?  The

12   rest of the case is not ready to try.  MR. APFEL:  If need be,

13   I will file a motion to sever."

14            Well, rightly or wrongly, I think rightly, the

15   determination was made that there was no need be to sever

16   because the case had, in effect, been severed by the action of

17   the magistrate judge in severing and separating the case and

18   sending it to the District Court ready for trial.  We'd never

19   revoked that.  We simply were waiting for the government to do

20   what the government is supposed to do, and that is obey both

21   the Constitution and the Speedy Trial Act and give the

22   defendant his day in court within the 70 days permitted under

23   the statute.

24            Now, there had been excludable delay prior to

25   January 19.  We're not arguing about any of that.  That's when

PDF created with pdfFactory trial version www.pdffactory.com

1    we were conducting discovery, when we had motions.  But since

2    January 19 of 2006, we have done nothing except say we're ready

3    to go, where's our trial?

4           Now, with respect to the waiver argument that the

5    government makes, the government's argument is that we can

6    waive our speedy trial rights.  The defendant can't waive

7    speedy trial rights.  Under the law of this Circuit, as stated

8    in United States v. Pringle, which we cite in at least the

9    reply brief, it's clear that a defendant cannot waive his

10   rights under the Speedy Trial Act.  And that's because the

11   Speedy Trial Act is there not just to protect an individual

12   defendant's rights, it's there to defend the society's right to

13   have criminal cases adjudicated quickly and efficiently.

14          The only exceptions to this no waiver rule are in

15   cases where the defendant's own conduct, the defendant's own

16   conduct is responsible for the delay.  And the government's

17   argument here is that our conduct by not having moved to sever

18   makes us the responsible party for the delay.  There's just no

19   basis for that.  We don't have that affirmative duty,

20   affirmative obligation, under the statute or under the case law

21   to move to sever.

22          The government also argues, your Honor, that this

23   is a -- you know, this is a complex case and because it's a

24   conspiracy charge, there's a likelihood of a joint trial and,

25   therefore, the delay is somehow reasonable.  Well, first of

PDF created with pdfFactory trial version www.pdffactory.com

1    all, that the case is -- whether or not the case is complex,

2    whether or not there is a likelihood of a joint trial simply

3    are not good enough to trump the constitutional right as well

4    as the statutory right to a speedy trial.  And that's what the

5    government's argument here is, that somehow complexity and

6    joinder rules in conspiracy cases are good enough to trump the

7    Constitution.  That's just not the law.

8          Also, there's just nothing complex about this

9    case.  At least not as to Cesar Zapata.  This is simply a

10   garden variety drug cocaine conspiracy, cocaine distribution

11   conspiracy case.  There's nothing complicated about it.  All

12   the government's evidence as to Zapata has to do with, you

13   know, with a series of tape recordings and a series of

14   surveillances, all of which are easily understood by any lay

15   jury anywhere at any time.

16         As for, you know, there being a likelihood of a

17   joint trial, of course, you know, that goes without saying in

18   any conspiracy case, there's always likely to be a joint

19   trial.  But, again, the government seems to be talking out of

20   both sides of its mouth.  On the one hand it's saying you're at

21   fault, you, Zapata, should be held responsible for this delay

22   because you didn't move to sever; and on the other hand they're

23   saying, oh, if you move to sever, it would have been futile

24   because, after all, there's a likelihood of a joint trial

25   here.  I don't think that's good enough to overcome the

PDF created with pdfFactory trial version www.pdffactory.com

1    government's burden of establishing that whatever the delay

2    here as to Mr. Zapata was appropriate, excludable delay under

3    the statute, which it was not.

4           They then make a couple of other, I think,

5    make-weight arguments.  One is that Zapata has been out on

6    bail, he's been out on conditions of release, unlike his

7    co-defendants who have been in prison; and somehow because he's

8    been out on bail, he has not been prejudiced and therefore it's

9    okay to ignore the Speedy Trial Act.  But again, you know,

10   that's not what the Act says.  We don't have to establish

11   prejudice.  We have to establish that 70 days or more have

12   passed.  That's been established in spades.

13          As for prejudice, the case law again makes clear

14   that a delay of more than a year is presumptively prejudicial.

15   We have a delay here of well over a year, a year and some 80 or

16   90 odd days more than a year.  That's more than enough for the

17   presumption of prejudice to kick in.  Plus, you know, of course

18   there is prejudice to defendants if a defendant is in jail

19   while the speedy trial clock runs out, but there is also all

20   sorts of other forms of prejudice that the government simply

21   writes off or ignores.  And I think you can take without our

22   proving the specifics of lost witnesses or faded memories, you

23   can take judicial notice of the fact that with the passage of

24   time, memories fade, evidence is lost, there is increasing

25   anxiety on the part of someone who is on the street waiting,

PDF created with pdfFactory trial version www.pdffactory.com

1    just not knowing when, if ever, he will be -- he will have his

2    day in court.  And the Court in United States v. Mann, which is

3    the Southern District of New York case which I cite in footnote

4    3 on page 7 of the reply brief, makes this point quite clearly.

5    Being in jail is one sign of prejudice, but it is certainly not

6    the only form of prejudice.

7           Finally, the government's last argument is that

8    Mr. Zapata was -- had a central role, played -- allegedly

9    played a central role in the conspiracy and, therefore, the

10   motion to dismiss should be denied.  Well, the status of a

11   defendant, whether he be a peripheral player or a central

12   player, a ring leader, is irrelevant to a defendant's speedy

13   trial rights.  You know, moreover, in this case, in this case

14   on the facts the government is simply, you know, it's simply

15   not true.  Saying somebody is a central player doesn't make him

16   a central player.

17          Now obviously we're not going to try the case

18   here.  I'm not going to prove to you right now that he wasn't a

19   central player.  I hope that I never have to, you know, make

20   that proof because we will be dismissed from the case.  But the

21   government's evidence in this case, which came out in the

22   course of Mr. Zapata's detention hearing, is just a series of

23   tapes.  Drugs are not mentioned on any of the tapes.  They

24   never see him in the possession of drugs, unlike other

25   defendants, when his home is searched, the cars are searched,

PDF created with pdfFactory trial version www.pdffactory.com

 1    items of his are searched, no drugs are found.  There's no

 2    mention of cocaine, there's no mention of drugs.  The evidence

 3    against Mr. Zapata is -- are these tape recordings where the

 4    agents through their wisdom, through their experience,

 5    interpret words that on their face are benign and innocent as

 6    being somehow suggestive or proof of Mr. Zapata being engaged

 7    in a drug conspiracy.

 8          For instance, Mr. Zapata with Mr. Alcantara-Saldana

 9    was engaged in a legitimate car business, used car sales

10    business and car parts business, and there are conversations

11    between the two of them or between Mr. Zapata and others where

12    they talk about radiators and buying radiators.  Now, the

13    government interprets radiators in those conversations to mean

14    kilos of cocaine.

15          Now, radiators in a car business can mean

16    radiators.  I would suggest to your Honor that as Freud once

17    said, sometimes a cigar is just a cigar.  And the case against

18    Mr. Zapata is going to come down to the government trying to

19    prove over and over again by suggestion, by opinion testimony,

20    that a cigar is something else, whereas we're going to be

21    arguing that a cigar is just a cigar.

22          But again, regardless of what his role was in the

23    conspiracy, if anything, that's irrelevant to whether or not

24    the speedy trial clock ran out.  The long and short of it is

25    we're way beyond the 70 days.  I'm in danger of running beyond

PDF created with pdfFactory trial version www.pdffactory.com

1    whatever, you know, maybe even 70 minutes, which is way too

2    much for me to be talking here.  The 70-day delay, the 400 and

3    50 some odd delay here was not the fault of Mr. Zapata and,

4    therefore, under the Speedy Trial Act, as well as under the

5    Constitution, the case must be dismissed.  And our -- we're

6    asking that you dismiss the case with prejudice because the

7    delay has been so substantial here that there has actually been

8    prejudice to Mr. Zapata and his ability to defend a case that

9    would be brought, and he shouldn't be put in that position.

10            If it's not dismissed, if per chance you do not

11    dismiss it and you side with the government and write the

12    Speedy Trial Act out of the statute book, we would at a minimum

13    ask that the case be severed at this point and tried promptly

14    because if it's not tried promptly, there will be additional

15    delay as well as substantial spillover prejudice that will

16    result to Mr. Zapata from being tried together with defendants

17    as to whom the government has real evidence and not make

18    believe evidence.  That's all I have.

19            THE COURT:  Mr. Gallagher.

20            MR. GALLAGHER:  Judge, I want to ask the Court to

21    look at this motion, what really it is intending to do.

22    Mr. Zapata is trying to get a severance from the rest of the

23    defendants because he hopes if he is separated from his

24    defendants, he'll be able to point the finger at them and

25    appear to be a more minor person.

PDF created with pdfFactory trial version www.pdffactory.com

1          On January 19th, 2006, the day of his arraignment

2    on superseding indictments, he flat out told the judge he was

3    going to file a motion to sever, which under the case law

4    starting back with Mitchell in the First Circuit says that the

5    failure of a defendant to move to sever amounts to not a waiver

6    of a speedy trial by waiver of the application of Speedy Trial

7    Act 3161(h)(7) that says under Barnes, under Supreme Court in

8    Rush -- Henderson rather, First Circuit Rush that the period of

9    delay attributable to one defendant is attributable to all the

10   defendants.  The defendant had that remedy.  He said he was

11   going to pursue the remedy.  Instead he decided to lie in wait

12   in order to come in here at this time said, oh, my God it's

13   been 400 days, I need a severance and a speedy trial right

14   now.  It wouldn't take much for him to file a motion to sever

15   and he just didn't do that, even though he told the court that

16   he was going to.  Really the issue, and other circuits

17   including the Second Circuit have held the same thing, that

18   failure to file a motion to sever amounts to a waiver of the

19   claim, not a speedy trial but the application of (h)(7).

20          And the only other issue the Court has to decide is

21   whether or not the delay was reasonable.  The factors that come

22   into play are applicable here.  The fact the defendant's on

23   bond, as opposed to the other defendants.  The fact that the

24   defendant only asserted speedy trial rights in one hearing and

25   failed to move to sever, which is something that could have

PDF created with pdfFactory trial version www.pdffactory.com

```
1    expedited his trial.  The fact that there is going to be a

2    joint trial in this case.  All of the defendants are here,

3    they're in the same posture, and the case is going to be ready

4    for trial soon after the resolution of the motions.

5             And just to be clear, I did not make the arguments

6    in my brief, I made clear, footnote 5, that the Pringle case,

7    the defendant can't waive for speedy trial but they can waive

8    the application of (h)(7) if they fail to motion to sever.  In

9    this case when a defendant not only says he's going to file a

10   motion to sever and doesn't do it.  The other case that applies

11   here is the Maxwell case where the defendant in that case

12   actually filed a motion to sever, demanded a speedy trial

13   repeatedly.  And the District Court judge, I believe it was

14   Judge Wolf, indicated to the parties that he was not going to

15   consider the case until all the motions were resolved.  And the

16   First Circuit held that was not error, that that was reasonable

17   under the Act because the defendant didn't ask for a variance

18   of the typical practice in this district to resolve cases,

19   especially multi-defendant cases, all at one time in the

20   magistrate session and District Court session.

21            The defendant had the ability to challenge that

22   variance by a motion to sever and he didn't do it, even though

23   he said he was.  For that reason I suggest the Court should

24   deny the motion and really see the motion for what it really

25   is, it's a motion to sever, which should also be denied.
```

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  All right.  I'll reserve on that motion

2     as well.

3          Now, I think there are two motions by the

4     government.  One is for the return of an inadvertently

5     disclosed document and the other is for protective order with

6     regard to materials submitted with respect to the opposition of

7     the motions to suppress.

8          Let's take the first first.

9          MR. GALLAGHER:  I think I can address both at the

10    same time, your Honor, because they're really intertwined.

11    After return of second superseding indictment in this case in

12    January of 2006, Mr. Bongiorni asked for discovery in this case

13    and that included information about the administering of

14    subpoenas gathered by the DEA in Springfield during the wiretap

15    investigation.  And what I did was I asked them to really copy

16    the entire file.  I made it available to Mr. Bongiorni.  They

17    brought it to me, and it was a stack of papers probably about

18    three inches thick.  And what I did with that is I scanned it

19    into a database system known as Concordance and disclosed that

20    as part of automatic discovery.  I had not reviewed every

21    document in that stack of papers because I assumed it would not

22    include a document that was disclosed.  And that was a mistake

23    on my part from which I'm responsible.  That document was

24    disclosed.

25          What the document pertains to is a -- clearly an

PDF created with pdfFactory trial version www.pdffactory.com

1    internal government document and which it could not be clearer

2    that it is.  On the face of it it says "law enforcement

3    sensitive."  It says, "The attached information must be

4    protected and not released to unauthorized individuals."  Every

5    page, the second page, and every page thereafter says "law

6    enforcement sensitive."  And then it gives a description of an

7    investigation in New York that's related to this case but is a

8    separate investigation conducted by the New York field division

9    in New York about some individuals, some of which these

10   defendants had contact with.  Based on this document, the

11   purpose of which was not to present to a court, not to present

12   in any type of proceeding but as a pure internal matter

13   regarding how cases with the DEA and Department of Justice are

14   funded, that cases meet certain criteria in order to allocate

15   money from certain funds within the Department of Justice.

16   That was the purpose of this document.  And it was not supposed

17   to be disclosed in discovery.

18           I only noticed when I read Mr. Bongiorni's motion

19   and it had information about things I had never heard before.

20   And I did a search on Concordance and found this document and

21   it was then I realized where this information came from.

22           In order to respond to the information that was

23   presented in this report, which wasn't cited as an attachment

24   or as -- even though it's clear it came from this, I had to go

25   and obtain the wiretap affidavits and all the DA-6s from the

1   investigation that pertained to this internal report.  That

2   investigation is still ongoing.  The main targets in the

3   investigation with which Mr. Zapata was talking on the

4   telephone have not been arrested.  There's an ongoing

5   investigation involving cooperating individuals; and if this

6   information was put into the stream, and I've seen documents

7   appear in very strange places you do not expect to appear,

8   people will get hurt and the investigation will be

9   compromised.  And that I think is pretty clear and that's a

10  very serious danger.

11          So what I'm asking for is for this document to be

12  returned.  And really I submit to the Court it should have

13  been.  It was very clear once you look at it that it's a

14  document they shouldn't have gotten.  It wasn't a document they

15  asked for, and it's not a document they're entitled to.  And

16  despite that, they made use of the document.  The information

17  is out there and I responded to it with all the information

18  from my case, which I submitted to the Court as part of my

19  opposition to the motion to suppress.  And what I'm asking for

20  is to make this available for them, they can see it any time

21  they want at the U.S. Attorney's Office and review it.  They've

22  already seen it and used it.

23          What I would like also to do is to make available

24  for inspection at the U.S. Attorney's Office, either here or in

25  Springfield if their clients want to see it, I'd be willing to

PDF created with pdfFactory trial version www.pdffactory.com

1    have the client brought here and view it at the Marshal's

2    downstairs but not copies made for them.  So they can't keep

3    the copies with them.  I think that's reasonable in this case

4    because this document should have been returned to the

5    government once it was found and it wasn't.  And I think it's a

6    reasonable accommodation to ask counsel to not make use of that

7    document.

8              And I have submitted a proposed order which is very

9    standard language used in this district.  There are three

10   items.  The internal government report from the DA-6s, starting

11   from the beginning of the investigation to the end of this

12   investigation, from approximately August of 2005, and the

13   wiretap affidavits that took place in this case which have been

14   submitted to the Court.  And all I'm asking for is that if they

15   want to look at them, they look at them here and not take

16   copies home.

17             THE COURT:  You say "this case."  You mean that

18   case, right?

19             MR. GALLAGHER:  Well --

20             THE COURT:  In other words, as I read the order,

21   what you want -- what you've submitted under seal now in

22   opposition to the motion to suppress are the papers, the DEA-6s

23   and wiretap affidavits related to the other investigations but

24   not to this.

25             MR. GALLAGHER:  Yes, but it actually stops after

PDF created with pdfFactory trial version www.pdffactory.com

1    completion of this case because the investigation is ongoing,

2    there are other reports after that takedown this case that I

3    have reviewed and don't want disclosed because they don't have

4    any bearing on the wiretap because the wiretaps were already

5    signed.  Information that took place after the fact.

6              THE COURT:  All right.  Mr. Bongiorni.

7              MR. BONGIORNI:  Judge, I think counsel's motion is

8    directed, at least as I understand it, to two separate things.

9    One is the material he says was unintentionally disclosed,

10   which is a single report as I understand it.  And the other

11   thing that he's asking for is that there be a separate

12   protective order with respect to the exhibits that he submitted

13   in opposition to my motion to suppress.

14             THE COURT:  That's the way I understand it.

15             MR. BONGIORNI:  I haven't seen a copy of the

16   protective order, but my response is two-fold.  With respect to

17   the first item, I think it was discoverable.  It does not

18   involve -- it's not privileged, it doesn't involve the

19   government's attorney's thought processes in this case.  It's a

20   request by the agents for funding, and they set forth a factual

21   scenario to back that up.

22             THE COURT:  Why is it discoverable in this case?

23             MR. BONGIORNI:  Well, I think at this point there's

24   four things that you can look at.  One, it's relevant and

25   material to the necessity showing that the government was going

1    to have to make with respect to defending the necessity showing

2    that they made before the state court judge because this

3    request for funding -- this request for funding paints a very

4    rosy picture of the investigation that applies to these

5    gentlemen and the people in New York.  The government takes the

6    exact opposite position when they go before the state court

7    judge in making an application for the -- or the showing for

8    the necessity for the wiretap, the picture they paint is the

9    mirror opposite.  So we believe that these materials that were

10   always in the government's possession are relevant and material

11   to our claim regarding the lack of necessity and the failure to

12   make a full and complete disclosure to the state court judge

13   about the true state of the evidence.  And the case that

14   counsel cites --

15           THE COURT:  Just on that topic, as I understand it,

16   Mr. Gallagher says you can use the material, including in your

17   suppression arguments.  I think it's not so much that he's

18   saying -- I mean, you've seen it, you know -- you've referred

19   to it he thinks anyway in preparing the motions.  As I

20   understand what his position is, he just wants the document

21   secured so it doesn't wander.

22           MR. BONGIORNI:  I have no objection to that.  In

23   fact --

24           THE COURT:  If he can be assured that you can use

25   it and have access to it whenever you want, does it make any

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    difference whether you turn over whatever copies you have and
 2    return them to the government?
 3             MR. BONGIORNI:  It doesn't make a difference only
 4    in this respect -- and I can represent that Mr. Samuels, my
 5    client, has never seen the document.  But what I'm concerned
 6    about is that we're going to be getting T-3 materials and DEA
 7    6s and particularly the T-3 materials, which are usually fairly
 8    extensive.  And then we have to take and go to a U.S.
 9    Attorney's Office and make an appointment to see these
10    materials in order to prepare for a suppression hearing.  And I
11    don't think we should have to -- we shouldn't have to do that.
12    We should -- if the government is going to submit this, then
13    there's a protective order that can be fashioned that addresses
14    his concerns.  At least from my understanding, the fact that
15    some people have yet to be arrested in those other cases is
16    because they are beyond the territorial boundaries of the
17    United States.  So the likelihood that there's some imminent
18    danger to someone else as a result of this I think is minimal.
19    And I'm sure the Court could fashion a protective order that
20    all counsel would obey to keep these materials separate and not
21    distribute them to anybody outside the clients and then only
22    with the Court's permission.  Quite frankly, I really don't see
23    the need to even show it to my client.  It's useful to me as a
24    tool to prepare a reply brief to the government's opposition
25    motion.
```

```
 1                THE COURT:  Well, okay.  I think you said

 2      earlier -- the government submitted a form of protective order

 3      I guess yesterday.  At least it's docketed yesterday.

 4                MR. BONGIORNI:  I didn't get a chance to see it.

 5                MR. GALLAGHER:  I actually e-mailed that to the

 6      parties on Monday.

 7                THE COURT:  It's document number 200 on the

 8      docket.  Anyway, it does require that the review of the

 9      documents be made at the U.S. Attorney's Office so there aren't

10      copies, but it also provides that it can be shared with the

11      defendant, other counsel of record, independent experts, so on

12      and so forth.  I know you haven't seen it so you haven't -- but

13      you talked about if there were an appropriate order.  Is that

14      the kind of thing that you had in mind?

15                MR. BONGIORNI:  It is with the exception of having

16      to go to someone else's office and make an appointment to look

17      at something.  When you're trying to prepare a response to an

18      opposition motion, one of the things you need to be able to do,

19      oftentimes I take it home at night, may read it five and six

20      and seven times, to try to not copy the document or to recall

21      strictly from notes everything that's in a substantial

22      document, which is usually the order of the application and the

23      affidavit.  It seems to me to be uncalled for in this case

24      based on the breadth of discovery we've already had.  I'm sure

25      a protective order could be fashioned that doesn't require or
```

1    burden us with going to someone else's office --

2              THE COURT:  Would it satisfy you if you had access

3    to your own copy but were restricted from letting anybody else

4    look at it?

5              MR. BONGIORNI:  Absolutely.  I don't have a problem

6    with that at all.

7              MR. BENZAN:  I would have no problem with that type

8    of order as well.

9              MS. SCAPICCHIO:  When you say not let anyone else

10   look at it, are you including our clients?

11             THE COURT:  I was for discussion purposes.  You can

12   discuss it with them but they can't read it.  I don't know

13   whether that makes a difference.

14             MS. SCAPICCHIO:  I would have an objection to

15   that.  My client has been very involved in terms of assisting

16   in preparation as far as the motions are concerned.  He's read

17   every document that's been produced in this case.  And I think

18   his input in terms of what these documents might say will be

19   helpful to me in the preparation for the motion to suppress.

20   So I would want to be able to share that information with him.

21   I don't have an objection to not giving him necessarily a copy

22   of anything or to bring him to the courthouse to be able to

23   view the document.  My concern is that if I don't have a copy,

24   I can't work from it and I can't work with him in order to

25   prepare for a motion to suppress.

1          THE COURT:  I understand.  Anybody else?

2          MR. APFEL:  Your Honor, it just would seem as if

3    the government's interest as explained by Mr. Gallagher would

4    be served if we had a protective order that allowed each of us

5    as counsel to have a copy but not make any copies and to use it

6    for each of our copies to be available for counsel's eyes and

7    client's eyes only and not to be used for any other purpose and

8    not to be shown to anybody else.  That's really what the

9    government is looking for without the added inconvenience of

10   having to force us, compel us, to go to the government's office

11   to look at a document.

12         THE COURT:  Mr. Rankin, you don't have a particular

13   interest in this, right?

14         MR. RANKIN:  (Shakes head.)

15         THE COURT:  Mr. Gallagher, what's your reaction to

16   that suggestion?  I guess it's a kind of corporate suggestion

17   but --

18         MR. GALLAGHER:  It's not unreasonable but my

19   concern is this:  I want to make clear that these materials

20   really for large part don't pertain to these defendants at

21   all.  This report doesn't name anyone in Springfield.  The

22   wiretap affidavits, which I really have summarized in great

23   detail in my opposition, mentions Zapata I believe in two of

24   the wiretap affidavits.  The calls that are mentioned are also

25   mentioned in the state wiretap affidavits.  The only

PDF created with pdfFactory trial version www.pdffactory.com

information that's in addition to this information has really

nothing to do with these defendants.  It's a separate

investigation, which is ongoing.  And I probably would not have

taken this position had it not been for the fact that a

document that was clearly not discoverable, it says it wasn't

discoverable, was not returned when it was observed and used.

I would suggest really in an irrelevant matter because it was a

separate investigation and I think I had provided all the

information that really is not discoverable in the first place

and made it available and trying to balance that between

letting them see the documents and preserving the investigation

that's ongoing.

MR. RANKIN:  I'm sorry, your Honor.  I mean, I have

to respond to what Mr. Gallagher just said.  We get discovery

all the time that has big "Grand Jury Do Not Disclose" stamp on

it, all kinds of law enforcement insignia on it.  I get a

document like this that has this cover sheet on it, it

doesn't -- it's not immediately apparent to me that I shouldn't

have it.  And I don't think that's a fair suggestion.  So I

just want to not let that pass.

THE COURT:  Fine.  I think the defendants'

suggestions are acceptable.  That is -- and to both -- what I

can call the new material, the back-up to opposition material,

and also the seven-page report that's been previously referred

to, and that is that counsel may have a copy, one copy only

1     that they will not reduplicate or circulate except they may

2     consult with their client about it and share the contents with

3     their client.  And to the extent that most of this material

4     they haven't seen yet because that's the bulk of what's been

5     submitted in the opposition, there is one that has been

6     disclosed as part of the disclosure.  And as to that, if are

7     there are additional copies, then counsel are to destroy all

8     copies except one, which they can retain in a secure way.  And

9     so I think you can prepare an order that would reflect that.  I

10    may have given you the substance of it, but I think it would be

11    useful to have it in writing so there's no question.  Okay?

12              MS. SCAPICCHIO:  Yes.  Thank you.

13              THE COURT:  Let me ask you, have you made extra

14    copies of the seven-page document?

15              MR. BONGIORNI:  I believe the only copy I have

16    indicated that it was sent in disk form, in hard copy, but I

17    think the only copy that I have is on the disk.

18              MR. APFEL:  I think we have only one copy, but

19    we'll check and --

20              THE COURT:  If you have more than one --

21              MS. SCAPICCHIO:  I believe I only have one.

22              THE COURT:  Maybe for purposes of buttoning

23    everything up, if you could let us know.  Make a filing saying

24    what you have discovered and what you've done as a result.  All

25    right?

```
 1              Okay, I think that deals with the motions that I
 2   wanted to deal with.  As I say, I've reserved on two of them.
 3              Now, we have the motions to suppress.  I think just
 4   about everybody has joined in them.  We need to decide on a
 5   time for hearing.  This is going to be principally a legal
 6   argument based on the documents?  No?
 7              MR. GALLAGHER:  I'm sure we have disagreement.  I
 8   can see them rising.  But there is a disagreement and I would
 9   suggest if we could just bifurcate it and just have -- because
10   I know the argument is going to take a while.  Have that and if
11   the hearing is necessary, talk about a hearing date, a schedule
12   date, just so we have it on our calendars and perhaps have
13   discussion if a hearing is required about the scope of the
14   hearing.  I think those are the relevant issues.
15              MS. SCAPICCHIO:  Your Honor, we've requested a
16   Franks hearing.  I think everyone's requested a Franks hearing.
17              THE COURT:  I think we talked about this last time.
18              MS. SCAPICCHIO:  We did.  I think the hearing on
19   the argument of the four corners of the affidavit is going to
20   take some time I think because there are so many attorneys
21   involved.  And I think that it might be appropriate to schedule
22   that hearing and then determine whether or not we can schedule
23   an evidentiary hearing.  I'd like to, if it's at all possible,
24   get a date for the hearing on the four corners, get a date for
25   the potential evidentiary hearing, and ultimately a trial date
```

```
 1    just so that -- because there's so many attorneys involved we

 2    can set a trial date.

 3              THE COURT:  I agree.  And that would be the way I

 4    would typically approach a Franks issue, is to have the

 5    threshold question addressed first without evidence; and then

 6    if that appears that it's appropriate to go farther than that

 7    with evidence, then we'll schedule that after that.

 8              MS. SCAPICCHIO:  Absolutely.

 9              THE COURT:  So the part first anyway, maybe the

10    only part --

11              MS. SCAPICCHIO:  We might win.

12              THE COURT:  -- would be argument.  So with that in

13    mind, you still think that's going to take some time.

14              MS. SCAPICCHIO:  I do, your Honor.  I think it's

15    going to to take a little bit of time only because there are

16    very specific issues and I think a number of attorneys who want

17    to argue specific portions.

18              THE COURT:  Okay.

19              MR. RANKIN:  I kind of have a separate issue.  I'm

20    not on the wiretap, and I understand the government's not

21    proposing to offer any evidence at my trial on the wiretap?

22              MR. GALLAGHER:  Well, I wouldn't say that.

23              MR. RANKIN:  All right.  I'll join in on the

24    wiretap stuff.  I mean, I'll --

25              MR. GALLAGHER:  I don't think Mr. Sanchez has
```

PDF created with pdfFactory trial version www.pdffactory.com

1    standing for the wiretap because he was incarcerated at the

2    time.  He wasn't a target of the -- not an aggrieved person

3    under the statute.  But I think Mr. Rankin would probably

4    disagree.

5              MR. RANKIN:  Putting aside the question of the

6    wiretap, you're going to have a hearing on that anyway so I'll

7    either have a role in it or not.  I have a separate motion to

8    suppress on Mr. Sanchez's behalf pertaining to what I contend

9    is the unlawful interception of telephone calls between the

10   informant and Mr. Sanchez -- they say Mr. Sanchez -- and a

11   motion to suppress the fruits of a string of searches.  The

12   government's opposed that.  Certainly the -- some of that

13   requires evidence.  So that's a separate hearing, I think, from

14   this wiretap issue.  I don't know that any other defendant has

15   a stake in that fight, although they're welcome to join.

16             THE COURT:  Okay.  Let's talk about the

17   multiple-defendant motion first.  This is going to take -- when

18   you say take an extended period of time, give me a -- what do

19   you mean by extended period of time?  Are you talking about a

20   couple of hours, are you talking about --

21             MS. SCAPICCHIO:  I think a couple of hours.

22             THE COURT:  Are you talking about four hours?

23             MS. SCAPICCHIO:  I think probably three, maybe

24   three, four hours.  I speak quickly so maybe less than that.

25             THE COURT:  In general terms, when are counsel all

PDF created with pdfFactory trial version www.pdffactory.com

1    available to do that?

2              MS. SCAPICCHIO:  Could you just give us a minute to

3    confer?

4              MR. BONGIORNI:  Well, Judge, could I suggest

5    something because the governor's going to be providing us with

6    some additional opposition discovery items regarding the oral

7    argument that we're going to have that everybody's called the

8    four corners argument.

9              THE COURT:  Correct.

10             MR. BONGIORNI:  So I haven't yet seen the breadth

11   of those materials.  I know there are 14 items, and I presume

12   some of them are fairly substantial wiretap applications, which

13   is why --

14             THE COURT:  Are you talking about what was filed

15   under seal?

16             MR. BONGIORNI:  Right.

17             THE COURT:  That we were just talking about that

18   you're going to get to see now.

19             MR. BONGIORNI:  That I'm now going to get to see.

20             THE COURT:  There's more than 14.

21             MR. GALLAGHER:  Of the attachments which were three

22   volumes, I provided all the attachments to them that were not

23   the New York --

24             THE COURT:  Here's one of three.  That's the

25   total.  Three like this constitutes the volume.  So you've got

1    to review that and evaluate it and so on and so forth.

2                    MR. BONGIORNI:  Sure.  And I may --

3                    THE COURT:  Well, if we shot for early July?

4                    MS. SCAPICCHIO:  Could we do mid July?  I'm on

5    vacation.

6                    THE COURT:  This is going to be the trouble with

7    summer.  Everybody's going to be someplace.

8                    MR. BONGIORNI:  July 17th available?

9                    MS. SCAPICCHIO:  I can't do the 17th.

10                   THE COURT:  I can't do the afternoon.  I can do the

11   morning.  Unless we're on trial.

12                   MS. SCAPICCHIO:  Can we do it on the 19th?

13                   THE COURT:  We can do it in the morning.  Why don't

14   we do 9:30 on the 19th.  And it will be for a hearing on the

15   motions to suppress.  That's the common motions.  We'll have to

16   schedule something for Mr. Rankin's client.  It doesn't

17   necessarily have to be that long because you don't have to view

18   any new stuff.

19                   How about sometime late in the last week of June

20   for the hearing on Mr. Sanchez's motion.  Will that take more

21   than four hours?

22                   MR. RANKIN:  No, your Honor.  I'm good Wednesday

23   the 27th or Friday the 29th.

24                   THE COURT:  That's not a good week as it turns

25   out.  What are your plans for the week of July 4th?

PDF created with pdfFactory trial version www.pdffactory.com

1                MR. RANKIN:  Not being here.  At least that was my

2   plan.

3                THE COURT:  It's, as you might expect, wide open.

4                MR. RANKIN:  I could imagine it would be.  The

5   following week is pretty open.

6                THE COURT:  We could schedule it subject to a

7   trial.  We'll know in advance whether the trial's going to go

8   forward or not.  How about July 10th in the morning?

9                MR. RANKIN:  That's fine.

10              MR. GALLAGHER:  I'm on vacation from July 5th to

11   July 16th.

12              THE COURT:  To the 16th.  From the 5th, is that

13   what you said?

14              MR. GALLAGHER:  The 5th through the 16th, your

15   Honor.

16              MR. RANKIN:  I'm pretty open the week of the 23rd

17   of July.  Someday we're going to be able to point these little

18   electronic devices at each other and the computer will spit out

19   a day that works.

20              THE COURT:  How about Wednesday the 25th?

21              MR. RANKIN:  That's fine.

22              MR. GALLAGHER:  That's fine.

23              MR. APFEL:  Your Honor, with respect to the joint

24   motion, can I make an oral motion for leave of court to file

25   reply briefs to the government's oppositions.

```
 1              THE COURT:  Yeah, I think that's reasonable.
 2    Didn't we just say the 19th?
 3              MR. APFEL:  The 19th is the date for the hearing.
 4    Can we do it the 12th of July?
 5              THE COURT:  That's kind of tight.  Yeah, all right,
 6    that's okay.  The 12th.  For any responses to the -- replies to
 7    the government's opposition.
 8              Now, planning for all contingencies, suppose
 9    there's a trial and suppose it's here.
10              MR. APFEL:  Are we also supposing that Mr. Zapata
11    is involved?
12              THE COURT:  We'll suppose everything right now.
13    We're looking at the fall, what -- I think I looked at our
14    calendar briefly before and the latter part of October looked
15    feasible.  There was an estimate someplace that I saw, I don't
16    remember where, that this would be about a three-week trial?
17    Anybody want to --
18              MR. GALLAGHER:  I think it could be four weeks.
19              THE COURT:  I'm sorry?
20              MR. GALLAGHER:  I always want to play safe and say
21    longer than shorter, but I think four weeks is more accurate.
22              THE COURT:  So if we sort of shot at the month of
23    November, late October into the month of November, is that
24    going to work for people?
25              MS. SCAPICCHIO:  Your Honor, I don't know what this
```

```
1    Court's position is with the murder session over in Suffolk,
2    but I have a trial scheduled, a murder trial scheduled to begin
3    empanelment on Halloween, October 31st, that is expected to
4    last three weeks.  The only saving grace is that today we got a
5    DNA report that excludes my client as a possible suspect, so
6    that might change.
7              THE COURT:  Depends on how confident you are on the
8    science I guess.
9              MS. SCAPICCHIO:  Apparently.  I'm very confident
10   now.  But I'm scheduled to empanel on that case, and it's been
11   estimated by the Commonwealth that it's going to take three
12   weeks to try, which would leave me unavailable until probably
13   the 16th of November, which is right up against Thanksgiving.
14   Unless this Court wants to issue some sort of protective order
15   to try this case first.  I just don't know how that works.
16             THE COURT:  How old is the murder case?
17             MS. SCAPICCHIO:  The murder case is two years in
18   August.
19             THE COURT:  We have a sort of protocol with the
20   state courts, and one of the factors is age of the case.  There
21   are other factors.
22             MS. SCAPICCHIO:  My client's in custody held
23   without bail on that matter as well, and it's two years old.
24             THE COURT:  Well, that matches up fairly well with
25   this one.  It might be a nose across the wire, I don't know.
```

PDF created with pdfFactory trial version www.pdffactory.com

1    But, I mean, if you think --

2              MS. SCAPICCHIO:  My powers of persuasion might --

3    I'll do my best, Judge.  But I'm told by Judge --

4              THE COURT:  No, I meant your power with the

5    prosecutor, if you could convince the prosecutor that there's

6    no prospect of conviction.

7              MR. BONGIORNI:  It's the three eyewitnesses that

8    pose the problem, Judge.

9              MS. SCAPICCHIO:  Consistently I try to convince the

10   prosecutor that they have the wrong person.  They just don't

11   want to listen to me.

12             THE COURT:  The other option with this case is to

13   move it forward rather than backward, and that is to do it

14   sometime mid to late September.

15             MR. GALLAGHER:  Judge, if that's a possibility, I

16   would ask for that only because November might be kind of tough

17   for me for some other reasons I've shared with counsel.

18             THE COURT:  We could -- let me see September.  No?

19             MS. SCAPICCHIO:  I don't want to be a pain.

20             THE COURT:  Before we go too far on that.

21             MS. SCAPICCHIO:  I have a murder trial scheduled in

22   September as well, your Honor.

23             THE COURT:  When?  Do you know?

24             MS. SCAPICCHIO:  It's scheduled to empanel, I

25   believe, on September 12th.

```
 1              THE COURT:  And how long?
 2              MS. SCAPICCHIO:  That's expected only to last seven
 3    trial days.  If we empanel on the 12th, we should be done by
 4    the 21st.
 5              THE COURT:  How old is that case?
 6              MS. SCAPICCHIO:  That case is two and a half years
 7    old with a client in custody.  There's a huge backup in
 8    Suffolk, Judge, with murder cases.  They just don't have enough
 9    judges to try them.
10              THE COURT:  Well, I think we ought to try the --
11    well, we can try it between Thanksgiving and Christmas.
12              MS. SCAPICCHIO:  Sounds like loads of fun.
13              MR. BONGIORNI:  Best time of year to get jurors in
14    that holiday spirit, your Honor.
15              MS. SCAPICCHIO:  I'm available.
16              THE COURT:  Monday the 26th, which is right after
17    the -- because we got to allow enough time.  We have to allow
18    four weeks.
19              MR. BONGIORNI:  Monday the 26th, that works.
20              MS. SCAPICCHIO:  That's fine.
21              THE CLERK:  All right.  We're going to have jury
22    trial starting on Monday, November 26 at 9 a.m. with a final
23    pretrial conference on Thursday, November 15th at 2 p.m.
24              THE COURT:  How about a -- just to make things
25    worse, how about a trial date for Mr. Sanchez.
```

```
 1            MR. RANKIN:  Well, I was thinking either mid
 2    September or earlier in November.
 3            THE COURT:  We could do mid -- how long will this
 4    one be?
 5            MR. GALLAGHER:  I think this will take tops a week.
 6            THE COURT:  A week.  So about September 17th,
 7    24th.  How about the 17th?
 8            MR. GALLAGHER:  September or --
 9            THE COURT:  Yeah, September.
10            MR. GALLAGHER:  That's fine with the government,
11    your Honor.
12            THE CLERK:  Monday, September 17th at 9 a.m.  That
13    will be for Mr. Sanchez for a trial, and we'll have a final
14    pretrial ten days before, which would be Thursday, September
15    6th at 2 p.m.
16            THE COURT:  Okay.
17            MS. SCAPICCHIO:  And, Judge, do we want to pick a
18    date for an evidentiary hearing if it's necessary if our
19    motions --
20            THE COURT:  No, let's see what develops at the
21    hearing first and then we'll pick a date.
22            MS. SCAPICCHIO:  Thank you.
23            THE COURT:  Okay.  And so to recap, you'll prepare
24    a revised protective order that reflects --
25            MR. GALLAGHER:  Yes, I will.  The only thing I just
```

PDF created with pdfFactory trial version www.pdffactory.com

1    want to mention to the Court is I have a motion pending for the

2    District of New York to permit disclosure to defense counsel.

3    I expect it to be signed this week.  I should get it back

4    hopefully by tomorrow, in the event that order is signed.

5                    THE COURT:  Okay.  We'll see what happens.  Okay.

6                    THE CLERK:  All rise.  Court is in recess.

7                    (Adjourned, 3:54 p.m.)

8                         - - - - - - -

9                          CERTIFICATION

10                   I certify that the foregoing is a correct

11   transcript of the record of proceedings in the above-entitled

12   matter to the best of my skill ability.

13

14   /s/ Shelly M. Killian
     Shelly M. Killian RPR, CM, CRR

15   Registered Professional Reporter
     May 28, 2008

16

17

18

19

20

21

22

23

24

25